Shannon C. Lamb
Shannon C. Lamb, APC
State Bar #208753
19200 Von Karman Avenue #600
Irvine, California 92612
(949)275-2391
shannon@sclesq.com
*Attorney for Petitioner Randi M. Mazzara*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

RANDI M. MAZZARA,

Petitioner,

vs.

UNION PACIFIC RAILROAD AND BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN 660,

Respondents.

Case No.: 8:26-CV-00526-DFM

AMENDED PETITION FOR JUDICIAL REVIEW OF ARBITRATION AWARD UNDER THE RAILWAY LABOR ACT 45 U.S.C. §153

# TABLE OF CONTENTS


I. INTRODUCTION .......... 5

II. FACTUAL BACKGROUND .......... 5

- A. Safety Concerns .......... 6
- B. GCOR Infraction .......... 9
- C. Pre-Hearing Investigation .......... 10
- D. GCOR Disciplinary Hearing .......... 12
- E. Post Disciplinary Hearing .......... 17
- F. Appeal .......... 19
- G. Arbitration and Award .......... 20
- H. Post Award .......... 22

III. JURISDICTION .......... 24

IV. TIMELINESS .......... 25

V. ARGUMENT .......... 25

- A. The Structure and Purpose of the Railway Labor Act .......... 29
- B. Although Judicial Review Under the RLA Is Narrow, Congress Preserved Judicial Oversight .......... 30
- C. The Arbitration Proceedings Denied Petitioner a Fair Hearing .......... 31
- D. The Arbitrator Exceeded His Jurisdiction Under the Railway Labor Act .......... 33
- E. The Arbitration Award Fails to Provide the Final Resolution Required by Federal Law Error! Bookmark not defined.
- F. Judicial Review Is Appropriate Where the Integrity of Arbitration Is Compromised .......... 34
- G. Enforcement of the Award Would Undermine Federal Public Policy Protecting Railroad Safety Whistleblowers .......... 37

VI. CONCLUSION .......... 37

# TABLE OF AUTHORITIES

## Cases

*Brotherhood of Locomotive Engineers v. Louisville & Nashville Railroad Co.* 373 U.S. 33 ........ 34, 35

*Elgin, Joliet & Eastern Railway Co. v. Burley* 325 U.S. 711 ........ 29

*English v. Burlington Northern Railroad Co.*, 18 F.3d 741 ........ 39, 40

*Glus v. Brooklyn Eastern District Terminal,* 359 U.S. 231 ........ 25, 26, 27

*Gunther v. San Diego & Arizona Eastern Railway,* 382 U.S. 257 ........ 33, 34

*Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246 ........ 38, 39, 40

*International Ass'n of Machinists v. Central Airlines*, 372 U.S. 682, 692 . 28, 29, 34

*Kinross v. Utah Ry. Co.*, 362 F.3d 658 ........ 31, 32, 33

*Union Pacific Railroad Co. v. BLET General Committee of Adjustment* 558 U.S. 67 ........ 30

*Union Pacific Railroad Co. v. Sheehan* 439 U.S. 89 ........ 30

*United Transportation Union v. BNSF Railway Co.*, 730 F.3d 764 ........ 35, 36, 37

## Statutes

325 U.S. 711 ........ 29

372 U.S. 682 ........ 34

373 U.S. 33 ........ 34

382 U.S. 257 .......... 33

439 U.S. 89, 91 .......... 30

45 U.S.C. §153 .......... passim

558 U.S. 67 .......... 30

## I. INTRODUCTION

Petitioner, Randi M. Mazzara ("Mazzara") seeks judicial review of an arbitration award issued pursuant to the Railway Labor Act. Although review of such awards is narrow, Congress expressly preserved judicial review where the arbitration board failed to comply with the Act, exceeded its jurisdiction, or issued an award procured by fraud or corruption. 45 U.S.C. §153 First (q). In this case, all three factors are present.

## II. FACTUAL BACKGROUND

Mazzara is a retired locomotive engineer who devoted 32 years of service to Union Pacific Railroad Company ("UP"). She was one of very few women, and was the fifth senior-most, having been working for UP longer than many men in the Southern California area. Mazzara maintained an exemplary work record, serving faithfully over the course of her three-decade career.

Hired by UP on June 19, 1989, her employment was uneventful until 2020, when the union took it upon itself to request that a keypad door lock be placed on the women's restroom/locker room. Up to that point, both men and women had used the women's facilities. Mazzara was not involved in the door lock request action, however, shortly thereafter, Mazzara began experiencing an increasingly hostile and threatening work environment, ostensibly due to the fact male co-workers no longer

had access to the toilet in the women's restroom. Mazzara became the butt of jokes and the target of bullying by male coworkers thus making her workplace increasingly uncomfortable and hostile.

### A. Safety Concerns

In August 2020, the already antagonistic work environment worsened after Mazzara raised concerns regarding the unsafe work practices by crew members, unhealthy air quality in the Corridor and freight tonnage overages to UP management. Mazzara had serious concerns regarding the air quality in the Corridor and had made her concerns known to UP management on several occasions.

On September 16, 2020, Mazzara contacted Manager of Operations Jerry Feetham ("Feetham") regarding an instrument anomaly she experienced while operating a locomotive. She then discovered that the locomotive's speedometer was not operating properly and notified mechanical forces. Following a mechanical inspection, Mazzara learned that there were indications someone had tampered with the speedometer. The lack of an operable speedometer was very troubling to Mazzara, as at a minimum, it was below FRA standards, and at worst, represented a serious compromise to safe train operations. This, coupled with other safety issues Mazzara had reported, caused her to be fearful of retaliation.

No one responded to Mazzara's safety concerns – not Feetham, not the other onsite managers, and not the BLET. This was consistent with an ongoing pattern and practice at this UP work location and with Feetham's general attitude given that he had previously ignored Mazzara's reports of bullying and harassment by her fellow coworkers. Nevertheless, it was surprising given UP's numerous policies covering safety and reporting requirements on workplace violations.

Moreover, Mazzara's superiors, including Brotherhood of Locomotive Engineers and Trainmen (BLET), Division 660, Local Chairman Lon Simmons ("Simmons"), were aware that Mazzara needed surgery due to a health condition that caused her to have increased sensitivity to her work environment.

In March 2021, Mazzara again reached out to Feetham concerning the air quality in the ten-mile subterranean Corridor that she frequently travelled while at work. She further contacted her union representative, Simmons, and UP "roving" manager Ken Fair regarding the suspected poor air quality in the Corridor.

The Corridor air quality is a known health hazard documented by OSHA and other federal agencies; trains are not to be held unnecessarily in the Corridor for this reason. However, trains have been and are currently being delayed in the Corridor for extended periods, where diesel exhaust fumes are concentrated from refrigerated rail cars and idling locomotives.

In contacting UP management, Mazzara explained that the toxic conditions from the diesel exhaust fumes were further exacerbated by members of her own train crew who refused to keep the locomotive cab windows closed while operating in the Corridor, unnecessarily exposing her to unhealthy conditions such as diesel exhaust fumes, particulate matter and noise.

After receiving no response to her safety concerns from Feetham, and no corrective action by other UP managers, Mazzara sought assistance from her union representative, Simmons. Simmons suggested Mazzara use UP's confidential Internal Safety Hotline system ("Hotline").

Mazzara followed Simmons' advice, and on April 5, 2021, submitted a Hotline complaint regarding the occurrences in the Corridor. Mazzara received no response to the Hotline report, and it was closed within two days. However, ten days later, on April 15, 2021, UP initiated disciplinary charges against Mazzara, alleging violations of GCOR rules Section 1.6, Quarrelsome Conduct. (Exhibit C, GCOR Infraction).

When Mazzara raised safety concerns regarding air quality in the Alameda Corridor (Corridor), freight tonnage overages and safety equipment tampering, the harassment and bullying escalated. Rather than addressing Mazzara's workplace safety concerns, UP instead chose to inflate a minor rule infraction into a career-

ending termination. UP conducted an unfair and partial disciplinary proceeding that failed to conform to even the most rudimentary level of due process, besmirched her character, ignored her pleas for clarification, concealed her objections to the proceedings, and set a corrupt and fraudulent stage for the arbitration process that would follow.

### B. GCOR Infraction

The GCOR infraction charge involved the wholly unsupported allegation that Mazzara pushed a coworker ("Cuevas") following the refusal of her request to roll up the windows of the crew transportation vehicle.

Mazzara, a small-statured woman, has repeatedly and vehemently denied pushing the much larger Cuevas, a member of the "Mongols Motorcycle Club." Rather, she has always maintained it was Cuevas and conductor Noble ("Noble") that baited her into a confrontation. Both coworkers were well-aware that Mazzara feared for her personal safety because of the conditions in the Corridor as well as the imposing behavior of the men in her workplace. They, and others, used this knowledge to intimidate her and to provoke the argument.

Knowing Mazzara's objections to being exposed to the toxic air, Cuevas rolled down the windows of the vehicle. Mazzara, sitting in the backseat, was bothered by the blast of the cold air and wind noise which exacerbated her health

condition. Cuevas and Noble refused to roll the windows up or otherwise accommodate this request. Rather, Cuevas tried to get Mazzara to hit him by rolling his body into hers and then claiming she hit him. Despite this abuse, Mazzara did not engage in physical misconduct. (Exhibit A, Witness Statement, R. Mazzara.)

Nevertheless, Mazzara was summarily dismissed from service.

### C. Pre-Hearing Investigation

Following Mazzara's termination, BLET and UP wholly failed to engage in the mandatory, multi-step process for resolving this dispute under the CBA. Mazzara was not provided with any guidelines, rules, or procedures in advance of the disciplinary hearing. Nor was she afforded the opportunity to meaningfully review the statements made against her regarding the infraction and its ultimate consequences. No effort whatsoever was made by UP management to discuss the matter or offer reasonable resolution options.

Instead, Simmons inappropriately suggested a meeting at Mazzara's personal residence to review the statements of the incident in question, Mazzara declined. Simmons refused to meet or suggest another, appropriate location. Instead, UP management and BLET, via Simmons, tried to persuade Mazzara, still recovering from neck surgery, to sign a "Letter of Acceptance" relinquishing her employment

rights, her seniority and any future legal actions against the UP without providing Mazzara with any corresponding benefit. (Exhibit B, May 10, 2021, Agreement).

The May 10, 2021, Letter of Acceptance, already signed by UP's Director of Labor Relations, Beth Wilderman, stated that the discipline assessed for the alleged infraction, if Mazzara was found guilty, "*would be* permanent dismissal." (Exhibit B, *emphasis added*.)

Under the proposed terms of this Letter of Acceptance, Mazzara would have forfeited 32 years of locomotive engineer seniority, taken responsibility for an act she did not commit. She would have further waived any legal action against UP, including for its retaliation.

> 8. Ms. Mazzara acknowledges that she fully understands the terms of this agreement and has entered it freely and voluntarily of her own accord. Ms. Mazzara further acknowledges that she has had an opportunity to discuss the proposed discipline and her rights pursuant to any applicable collective bargaining agreement with his/her union representative. Ms. Mazzara hereby releases and relieves the Organization, the Carrier, and their officers and agents from any liability and/or responsibility in connection with the discipline or alternative thereto proposed herein which she has of her own free will and accord decided to accept.

Simmons repeatedly tried to get Mazzara to sign the document telling her that she would not be able to avoid the disciplinary hearing otherwise. Simmons further misrepresented that Mazzara would have to agree to signing the document if she wanted to retire in good standing and receive her pension. Mazzara refused to relent.

In response, Simmons called her a "cracker" and thereafter cut off all communication.

Having never been involved in a formal disciplinary hearing process, and with management and the union completely failing her, Mazzara had no idea what to expect or how to prepare. Mazzara was additionally unaware that the hearing was to be conducted by her immediate supervisor and local manager, Feetham.

**D. GCOR Disciplinary Hearing**

Without following any legitimate procedure or protocol or doing anything to ensure that Mazzara understood the process, on May 12, 2021, UP conducted a disciplinary hearing purportedly under authority of the Railway Labor Act ("RLA") and in accordance with BLET's Collective Bargaining Agreement ("CBA"). The hearing is supposed to be fair and impartial under the auspices of the RLA and the CBA. In fact, it was neither, and in stark contradiction to the RLA, CBA, and UP's own policies. Further, the on-property disciplinary hearing vastly exceeded its jurisdiction conferred by the CBA, which does not concern itself with the administration of–retirement benefits (this is the jurisdiction of RRB), but rather focuses only on wages, rules and working conditions.

From the outset, the opaque process was fraudulent, corrupt, and stacked against Mazzara. Feetham, who served as the disciplinary hearing officer, was

Mazzara's immediate supervisor - a person with a direct interest in the proceeding outcome. Feetham had previously ignored Mazzara's safety concerns and all efforts she made to improve workplace safety conditions associated with her crew and the Corridor. Additionally, Feetham ignored Mazzara's concerns regarding the hostile and bullying work environment. Accordingly, Feetham should have been conflicted out of serving in connection with Mazzara's hearing.

Moreover, Mazzara was denied experienced representation and advocacy from BLET to whom she had paid union dues for 31 years. Simmons, despite his improprieties, was trained to represent and defend employees at company disciplinary hearings. Unfortunately, although he was slated to represent Mazzara, Simmons failed to appear on the day of the hearing. Mazzara only learned that Simmons was a "no show" an hour before the proceeding was to start. UP should have postponed the hearing until such date and time when a competent, experienced union representative for Mazzara could attend.

Instead, UP continued allowing inexperienced BLET Local 660, Vice-Local Chairman Alex Reeves ("Reeves") to be substituted for Simmons at the last minute. Originally, Reeves was to attend only as an observer, not to actively represent Mazzara. *Reeves had no experience or qualifications at representing BLET members at disciplinary hearings.* In effect, Mazzara had no representation at the

company-controlled disciplinary hearing where the ultimate outcome could be permanent dismissal.

As such, Mazzara was required to question witnesses herself and make her own opening and closing statements. Mazzara's testimony and arguments were peppered with frequent interruptions and admonishments by Hearing Officer Feetham. Consequently, Mazzara's responses were incomplete and often unintelligible.

The resulting disciplinary hearing was confrontational, argumentative, unprofessional, and farcical. Mazzara's accuser, Cuevas, had his own representation, LC Edward Campos, who questioned Mazzara and made arguments in support of brakeman Cuevas, the instigator of the incident. In contrast, Reeves (who provided a fictitious home address in the transcript) asked few questions and made no statements on Mazzara's behalf. Instead, he insisted, four times, that Mazzara should sign the company's "Letter of Acceptance."

Frustrated by the entire process, Mazzara asked at one point, "So, what is the purpose [of this] then?" (Exhibit C, Transcript, page 165). There was a great deal of uncertainty on Mazzara's part regarding the hearing's scope and process. In fact, it appears that the only point upon which the parties could agree was that the incident stemmed from Mazzara's request to have the crew transportation vehicle windows

rolled-up. (Exhibit C, page 118). Although Feetham attempting to placate Mazzara by promising to revisit safety issues and related retaliation after the hearing, he did not follow through. (Exhibit C, Transcript, pages 61, 118, 165, 169).

| | |
|---|---|
| Mr. J. M. Feetham: | So- and I'm gonna remain it that way, that this is not the forum for a safety hotline either. All right. So, I want to keep us focused on that. If there's something in a retaliatory nature, there's a policy that addresses this. We'll convene after these proceedings and address that is what- is how I'm addressing your objection. |

(Exhibit C, page 118).

A cursory review of the transcript reveals that Mazzara was not provided the opportunity to enter key testimony and exculpatory evidence into the record. Such information would be vital for a neutral arbitrator to consider at a future Public Law Board ("PLB") arbitration proceeding. However, Feetham refused to allow Mazzara to make a record, and Reeves made no objections. Moreover, Mazzara requested that UP management download video footage from several security cameras in the vicinity that likely would have captured an alleged pushing incident with Cuevas. But UP management refused this request, thus denying Mazzara evidence that may have vindicated her at the disciplinary hearing.

Feetham also refused to allow Mazzara's statement that retaliation for her reporting of safety hazards played a role in the disciplinary action. Even Mazzara's handwritten statement was entered into the record in such a way as to render it illegible and thus useless for any future arbitration proceeding. (Exhibit D, Handwritten Statement of R. Mazzara).

Importantly, the "disciplinary hearing transcript and exhibits," the only information on which an arbitrator's decision may be based upon, was not a traditional, self-authenticating record. No witnesses were placed under oath. The record was additionally created, produced, edited, and maintained by Respondent UP. Amongst other issues:

- The transcriptionist was not present at the hearing, and the proceedings were not contemporaneously documented. Rather, the document was created using an audio recording of the hearing, using PLB's preferred vendor CAS Associates.
- The record itself is replete with interruptions and notations that render the proceedings inaudible.
- There are no timestamps.
- Mazzara was not provided with a copy of the final disciplinary hearing transcript to review for accuracy.

- Reeves provided a fictitious home address.
- The arbitrator's citations made in reference to the disciplinary hearing record (transcript) do not match Mazzara's copy of the "transcript." (Exhibit C).

Immediately following this company-controlled disciplinary hearing, UP proclaimed Mazzara "guilty" and summarily dismissed her from service on May 21, 2021.

### E. Post Disciplinary Hearing

Her employment terminated; she was forced into an involuntary "retirement" pending the arbitrator's future decision. Reeves further compounded matters by failing to assist Mazzara in obtaining unemployment benefits and job insurance. The job insurance that LECMPA could have provided if a well-written, local union official statement of the facts had been submitted was $78,585. These benefits would have provided Mazzara substantial subsistence income while waiting for the arbitration decision.

Unfortunately, however, the only documentation sent to the LECMPA by BLET regarding Mazzara's claim for job insurance was a worthless note provided by Reeves. In his witness statement, Reeves merely stated that he "was in attendance" at the disciplinary investigation on May 11, 2021, that Mazzara was accused of a

verbal threat to a coworker and that the charges were upheld. (Exhibit E, Witness Statement.)

To be completed by Witness - Details of occurrence are as follows:

I A.L. Reeves was in Attendance of and witnessed to Actual investigation held on May 11th 2021

Randi Mazzara was accused of a Verbal threat against a Fellow co-worker Ray Cuevas.

The charges were upheld.

Reeves made no mention of Mazzara's position, provided no details regarding the incident or even the fact that she strenuously denied the allegations. Further, Reeves made no mention of UP's pretextual use of the GCOR 1.6 rule to conceal company retaliation for Mazzara's reporting of workplace safety concerns, despite Feetham's explicit promise that he would follow up with Reeves to initiate further actions regarding Mazzara's safety allegations. (Exhibit C, Transcript, page 169). Once again, Reeves added to this witness statement a (different) fictitious address.

Compounding matters, BLET General Chairman Brian Carr, overseer of both Simmons and Reeves, failed to provide any meaningful assistance or advice in support of Mazzara, before, during, or after the UP disciplinary hearing. When

Simmons cut off communications, or when it became apparent that the disciplinary hearing should be continued, Carr merely suggested that Mazzara try contacting UP management.

### F. Appeal

On June 23, 2021, Carr appealed to UP Manager of Labor Relations, Mr. Jim Boyle ("Boyle") on Mazzara's behalf. (Exhibit F, letter to J. Boyle). In it, Carr outlined the many due process failures in the disciplinary hearing for a minor incident that lasted no more than 5 minutes, concluding that:

> it does not take an astute reader to realize there was a history with this crew that led to this incident which was being buried by the Carrier's hearing officer. This history should have been laid bare on the record to allow for a full and impartial hearing. Was Claimant subject to retaliation due to previous reports or complaints she made concerning her crew?

In response, and without adequate foundation, Boyle, responded that Mazzara was quarrelsome and that her termination should be upheld. He admitted that evidence of Mazzara's safety concerns was not introduced, and he further wrongfully asserted that Mazzara admitted to pushing Cuevas. Although there was no competent evidence in support of the quarrelsome charge other than biased and self-interested testimony, Boyle nevertheless went on to besmirch Mazzara's character, explaining that the "transcript and exhibits prove Claimant was physically and verbally abusive, threatening, confrontational, quarrelsome, and provocative.

Her behavior would not be accepted in any environment, anywhere, in any industry. This was an entirely one-sided event as the brakeman did not react in kind to Claimant's attempts to provoke him." Everyone at UP, Boyle asserted, should feel safe from verbal and physical assaults. (Exhibit G, August 24, 2021). He further concluded that there was no prejudice occasioned by the failure to secure available video footage and that Mazzara received "all due process consideration and received a fair and impartial hearing."

### G. Arbitration and Award

Approximately seven months later, in late December 2021 or early January 2022, Mazzara's grievance was finally submitted to the National Mediation Board (NMB) PLB for adjudication by an arbitrator.

BLET's National Vice President Mark L. Wallace (now BLET National President) and Carr, presented Mazzara's case to PLB's selected arbitrator, Edwin Benn ("Benn") asserting the discipline lacked just cause, was imposed in retaliation for her safety complaints, and violated the letter and spirit of the CBA's just cause requirement. (Exhibit H).

In May 2022, Benn issued a written Award deciding the merits of the case. (Exhibit I, Award). In that Award, Benn explicitly acknowledged Mazzara's long, service record and noted that under normal circumstances she "would be entitled to

reinstatement" to her former position given the excessive nature of the punishment. However, the Award stopped short of granting reinstatement. Although having no jurisdiction to do so under the CBA (which only deals with wages, rules and working conditions), Benn stated that Mazzara's retirement status rendered the question of reinstatement "moot" and directed that Mazzara's employment record be modified to show a mere "training opportunity" for the quarrelsome incident. (Exhibit I.)

In a follow up letter dated May 16, 2022, Carr indicated that dismissal was excessive for Mazzara, a long-term employee, and that, taking her length of service into account along with her prior record, in ordinary circumstances Mazzara would be entitled to reinstatement to her former position without loss of seniority with placement at a MAPS 2 Training level. However, BLET would not seek Mazzara's reinstatement due to her being "retired," rather it "shall only require that Claimant's record be corrected to show that she received a MAPS Training 2 for the demonstrated misconduct" even though this was a fiction, and this two-year training process was neither implemented nor discussed with Mazzara. This was a curious decision to make considering his opinion that Mazzara's return to UP as an employee was moot, in his view. (Exhibit J.)

As such, the Award was sustained in accord with the opinion.

### H. Post Award

At no time was Mazzara given notice concerning her option to seek judicial review under the RLA or any mention of any applicable statutory time limitations. Moreover, in an email dated May 19, 2022, from the BLET Divisional General Chairman's Office, the Administrative Secretary informed Mazzara, "Under the Railway Labor Act we have exhausted all remedies." (Exhibit K, emphasis added.)

In an effort to obtain clarity about her employment, in May of 2022, Mazzara began casually inquiring of UP about returning to work and learned she could, indeed, unretire and return to work. However, her various follow up efforts to be reinstated were ignored, despite her work record and faithful payment of union dues for decades. During this time, at no time did anyone at UP or BLET inform her of the judicial review process. Her various contacts were largely ignored.

In June of 2022, after receiving no response to her telephone calls, Mazzara sent a letter to Wallace for clarification. (Exhibit L, June 29, 2022 correspondence to Wallace.) Several unreturned messages were also left for Carr. On August 4, 2022, Mazzara finally received information that she may be able to be reinstated. (Exhibit M.) However, Wildeman (who had previously signed the Letter of Acceptance foisted upon Mazzara) responded that Mazzara could only return upon by agreement

between BLET and UP, or that she would need to be rehired, forfeiting her 32 years of seniority.

In late January 2024, Mazzara's prospects for returning to work as a locomotive engineer seemed to improve. A fellow coworker, M.S. Redmon ("Redmon") provided information concerning his PLB Award (#31560). (Exhibit N). Redmon, who was also forced into retirement pending his arbitration appeal, was granted reinstatement to his former position as brakeman with full seniority rights restored. Importantly, Redmon had been terminated for the same offense as Mazzara (GCOR Rule 1.6.) Retirement status was never an issue in Redmon's case, as it should have been for Mazzara. Additionally, Mazzara came to learn that her punishment was unusual – other UP employees charged with more serious and violent GCOR infractions were routinely permitted to return to work with minimal consequences.

In February 22, 2024, Mazzara sought confirmation in writing from the RRB that she could unretire and return to work at work at her former locomotive engineer job. (Exhibit O). Her request was again ignored. Mazzara accordingly contacted Congressman Lou Correa's office in early 2024. (Exhibit Q). In turn, Congressman Correa made an inquiry to the National Mediation Board ("NMB"), the administrative arm for arbitration proceedings in the railroad industry, to receive

clarification on Arbitrator's Benn's decision. Only then did Mazzara learn for the first time that RLA allows an aggrieved employee to file a petition in federal court to vacate or modify an arbitration award. This would need to be done within, as NMB put it, "generally two years." (Exhibit R.)

UP and BLET failed to properly represent Mazzara's interests, allowing the railroad to treat her as a new hire with no rights, no seniority, or job preference. Nor did UP treat Mazzara, its long-term employee, with any respect or dignity, rather terminating her position as a locomotive engineer with the railroad.

The process from charging Mazzara with the violation, to arbitration, appeal and Award was irretrievably flawed, and Mazzara respectfully requests this Court to vacate or amend the Award. Mazzara further seeks reinstatement to her former position with full seniority, benefits, and backpay from the date of Benn's PLB decision – relief that both equity and the arbitrator's own findings indicate is warranted.

## III. JURISDICTION

This Court has jurisdiction under the Railway Labor Act, 45 U.S.C. §153 First (q), which authorizes federal courts to review arbitration awards issued by adjustment boards and public law boards.

## IV. TIMELINESS

Acting promptly after the National Mediation Board ("NMB") finally indicated that the arbitration process did not, in fact, exhaust all available remedies, Mazzara immediately prepared a petition *pro se* seeking to vacate the arbitration award. She attempted to file the petition on May 16, 2024—exactly two years after receiving the May 16, 2022 notice from BLET regarding the arbitration decision. Due to a clerical error, however, the filing was recorded on May 17, 2024, one day later than intended.

That action, filed in this Court as **Case No. 8:24-cv-01081**, was promptly met with procedural challenges by Respondents. In August 2024, the Court dismissed the matter without prejudice. Mazzara diligently continued to pursue relief. On September 16, 2024, she refiled her Petition, initiating **Case No. 8:24-cv-01990**. Respondents again filed motions to dismiss, which were ultimately granted, although the Court permitted Mazzara leave to amend.

Equitable tolling is particularly appropriate where a litigant has been misled regarding the availability of legal remedies. The Supreme Court addressed this principle in *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231 (1959), a case arising under the Federal Employers' Liability Act ("FELA"), another federal statute governing railroad employment. In *Glus*, the plaintiff filed suit after the statutory limitations period had expired because representatives of the railroad had informed him that he had seven years to bring his claim, when in fact the statute required filing within three years. The lower courts dismissed the case as untimely.

The Supreme Court reversed. It held that a defendant may not rely on a statute of limitations where the defendant's own conduct misled the plaintiff regarding the time for filing suit. The Court explained that the doctrine of equitable estoppel prevents a party from invoking a limitations defense when that party's conduct caused the delay. As the Court stated, "To decide the case, we need look no further than the maxim that no man may take advantage of his own wrong." *Id.* at 232. The Court further emphasized that federal courts possess equitable authority to prevent injustice where strict application of a limitations rule would reward misleading conduct. *Id.* at 234–35.

Although *Glus* arose under FELA, the equitable principle it articulated applies broadly to federal statutes governing railroad employment. Courts have repeatedly recognized that equitable tolling is appropriate where an employee reasonably relies on representations made by railroad officials concerning the availability of legal remedies.

The circumstances presented here mirror the concerns addressed in *Glus*. After the arbitration proceedings concluded, Mazzara sought clarification regarding the finality of the award and the remedies available to challenge it. She was repeatedly informed that the arbitration decision represented the final step in the grievance process and that no further remedy existed. Those representations effectively concealed the availability of judicial review under the RLA.

Like the plaintiff in *Glus*, Mazzara relied on information provided by individuals responsible for administering the governing legal framework. Where such reliance results in delayed filing, equity prohibits the party responsible for the misleading information from invoking the statute of limitations as a defense. Respondents cannot now rely on a limitations argument after Mazzara was affirmatively led to believe that the arbitration decision was final and that no further remedy existed.

Accordingly, the equitable principles recognized in *Glus* apply directly here. Equity requires that the limitations period be tolled, and the present Petition for Judicial Review should therefore be deemed timely.

## V. ARGUMENT

The Supreme Court has repeatedly emphasized that arbitration under the Railway Labor Act must provide a "final and binding settlement" of labor disputes. *International Ass'n of Machinists v. Central Airlines*, 372 U.S. 682, 692 (1963). An award that recognizes wrongful termination yet refuses to implement the remedy that normally follows cannot satisfy that requirement.

Congress created adjustment boards to provide a definitive resolution of employment disputes between railroad carriers and their employees, thereby replacing industrial conflict with an adjudicatory process capable of determining the parties' rights. For arbitration to fulfill this statutory purpose, the award must actually resolve the dispute submitted. An award that leaves the central controversy unresolved cannot serve the function contemplated by the Act.

The award in this case fails that requirement. The arbitrator concluded that Mazzara's termination was excessive and that she would ordinarily be entitled to reinstatement. Yet reinstatement was denied based upon Mazzara's purported retirement status, an issue outside the CBA. The result is an award that recognizes

the impropriety of the termination but refuses to provide the remedy that normally follows from that finding.

Such a decision does not produce the "final and binding settlement" required by *Central Airlines*. Instead, it leaves the central dispute regarding Petitioner's employment status unresolved. Under the principles articulated by the Supreme Court, judicial review is appropriate where an arbitration award fails to provide the definitive resolution contemplated by the RLA

As the arbitration proceedings denied Petitioner a fundamentally fair hearing, because the arbitrator exceeded the jurisdiction granted under the RLA, and since the resulting award fails to provide the final and definite resolution required by federal law, the award must be vacated.

### A. The Structure and Purpose of the Railway Labor Act

The RLA establishes a system of arbitration designed to resolve labor disputes between railroad carriers and their employees. The Supreme Court described the purpose of this framework in *Elgin, Joliet & Eastern Railway Co. v. Burley* 325 U.S. 711 (1945), explaining that Congress created adjustment boards to provide an orderly mechanism for resolving disputes arising from the employment relationship while preserving the rights of railroad employees. 325 U.S. 711, 722–724 (1945).

The arbitration system created by the Act therefore balances two objectives: the efficient resolution of labor disputes and the protection of employee rights. Judicial review serves as an essential safeguard within that system.

### B. Although Judicial Review Under the RLA Is Narrow, Congress Preserved Judicial Oversight

The narrow scope of judicial review under the RLA is most commonly associated with *Union Pacific Railroad Co. v. Sheehan* 439 U.S. 89 (1978), where the Supreme Court observed that review of adjustment board decisions is "among the narrowest known to the law." 439 U.S. 89, 91 (1978).

However, the Court also emphasized that Congress deliberately preserved judicial review where arbitration boards exceed their jurisdiction or fail to comply with the Act. Id. at 93.

The Court reaffirmed this principle in *Union Pacific Railroad Co. v. BLET General Committee of Adjustment* 558 U.S. 67 (2009), emphasizing that federal courts retain authority to enforce the statutory limits placed upon arbitration boards. 558 U.S. 67, 72–73 (2009).

Mazzara's claims fall squarely within those statutory categories.

### C. The Arbitration Proceedings Denied Petitioner a Fair Hearing

Courts reviewing RLA arbitration awards have recognized that an award may be vacated where the arbitration process deprived a party of a meaningful opportunity to present her case. *Kinross v. Utah Ry. Co.*, 362 F.3d 658, 662–63 (10th Cir. 2004). In *Kinross*, the court considered a challenge to a disciplinary decision that had been affirmed through the RLA arbitration process. The court acknowledged the highly deferential standard governing review of adjustment board awards but emphasized that the integrity of the arbitration process depends upon the fairness of the disciplinary record on which the arbitration decision is based.

Because adjustment boards typically rely on the record created during the carrier's internal disciplinary proceedings rather than conducting full evidentiary hearings of their own, procedural defects occurring at the disciplinary stage can directly affect the fairness of the arbitration outcome.

The Tenth Circuit explained that judicial review may be appropriate where the arbitration process is based on proceedings that denied the employee a fair opportunity to present evidence or otherwise compromised the reliability of the record submitted to the arbitration board. Id. at 662–63. The court recognized that the statutory scheme of the RLA presumes that arbitration decisions will rest on a

fundamentally fair disciplinary process capable of producing a reliable evidentiary record.

The circumstances presented here raise precisely the concerns identified in *Kinross*. The arbitration board relied entirely on the disciplinary record generated by UP during its internal hearing. Yet that hearing contained several serious procedural irregularities. First, the disciplinary hearing was conducted by Mazzara's immediate supervisor, creating an inherent risk of bias in a proceeding that ultimately resulted in termination. Second, the only experienced union representative failed to appear at the hearing, leaving Mazzara to proceed without meaningful representation in a complex disciplinary proceeding. Third, requests for potentially exculpatory evidence, including surveillance footage, were denied. Finally, the transcript of the hearing was later produced from an incomplete audio recording containing numerous inaudible passages, raising substantial concerns about the accuracy of the record upon which the arbitration board relied.

Because the arbitration board did not conduct an independent evidentiary hearing and instead relied on this record, the procedural defects that occurred during the disciplinary proceedings directly affected the arbitration process itself. As the Tenth Circuit recognized in *Kinross*, when the reliability of the disciplinary record

is compromised, the fairness of the arbitration decision that depends upon that record is necessarily called into question.

Accordingly, the circumstances presented here fall within the category of cases contemplated by *Kinross* in which judicial review is appropriate to ensure that arbitration under the RLA rests on a fair and reliable evidentiary foundation

### D. The Arbitrator Exceeded His Jurisdiction Under the Railway Labor Act

Adjustment boards may only interpret and apply the collective bargaining agreement governing the employment relationship. The Supreme Court made this limitation clear in *Gunther v. San Diego & Arizona Eastern Railway,* 382 U.S. 257 (1965), explaining that arbitration boards exceed their jurisdiction when they base their decisions on considerations outside the agreement. 382 U.S. 257, 261 (1965).

The limitation recognized in *Gunther* reflects the statutory structure of the Railway Labor Act. Adjustment boards are empowered to resolve disputes arising from the CBA, but they may not adjudicate issues governed by independent statutory frameworks or other external considerations.

Arbitrator Benn's decision in this case violates that limitation. Although he determined that Mazzara's termination was excessive and that reinstatement would ordinarily be appropriate, reinstatement was denied based on Mazzara's purported

retirement status. However, retirement eligibility is governed by federal law administered by the RRB rather than by the CBA. As such, by relying on retirement eligibility to deny reinstatement, Benn based the decision on a factor outside the agreement and therefore exceeded the jurisdiction granted under the Railway Labor Act. Under *Gunther*, such a jurisdictional error warrants judicial review.

Here, Benn relied upon Mazzara's retirement eligibility to deny reinstatement. Retirement eligibility is governed by federal law administered by the RRB rather than by the collective bargaining agreement. By relying upon this extraneous consideration, the arbitrator exceeded the jurisdiction granted under the RLA. Moreover, Benn determined that the termination imposed by the railroad was excessive but declined to order reinstatement based on a consideration outside the CBA. As a result, the award leaves the central dispute regarding Mazzara's employment status unresolved.

### E. Judicial Review Is Appropriate Where the Integrity of Arbitration Is Compromised

The Ninth Circuit has recognized that courts may review arbitration awards where improper influence or procedural misconduct compromises the arbitration process. *United Transportation Union v. BNSF Railway Co.*, 730 F.3d 764, 770–72 (9th Cir. 2013). Because the arbitration decision relied entirely upon a disciplinary

record produced through a procedurally defective hearing, the fairness of the arbitration process itself is in question. Although the court acknowledged the narrow scope of review prescribed by the Act, it emphasized that federal courts retain authority to intervene where the integrity of the arbitration process itself is called into question.

In *BNSF*, the union challenged an arbitration award on the ground that the proceedings had been tainted by improper influence and threatening behavior affecting the arbitration board. The Ninth Circuit recognized that while courts generally defer to arbitration decisions under the RLA, judicial review remains available where corruption, fraud, or other misconduct undermines the fairness of the arbitral process. Id. at 770–72. The court explained that the limited grounds for review contained in 45 U.S.C. §153 First (q) are intended to safeguard the legitimacy of the arbitration system by ensuring that decisions are reached through a fair and lawful process.

The reasoning of *BNSF* underscores a broader principle: arbitration awards under the RLA are entitled to deference only when the proceedings producing those awards satisfy the basic requirements of fairness and integrity contemplated by the statute. Where the reliability of the arbitral process itself is in doubt, judicial review is appropriate to preserve the integrity of the statutory dispute-resolution framework.

In *Ollman v. Special Board of Adjustment No. 1063*, the court explained that arbitration awards under RLA are subject to limited judicial review and depend on the integrity of the underlying disciplinary process. The court emphasized that employees retain statutory protections within the arbitration framework, including procedural safeguards such as notice and fair representation, and that judicial review remains available where the arbitration process fails to comply with the requirements of the RLA or where the reliability of the proceedings is called into question.

These concerns are present here. The arbitration board relied entirely upon a disciplinary record produced through a hearing that lacked several fundamental procedural safeguards. The hearing was conducted by Mazzara's immediate supervisor, the only experienced union representative failed to appear, and the proceeding continued without postponement. Requests for potentially exculpatory evidence were denied, and the transcript of the hearing was later generated from an incomplete recording containing numerous inaudible and incomprehensible passages.

Because the arbitration decision was based entirely on this defective record, the procedural irregularities that occurred during the disciplinary hearing directly affected the arbitration process itself. As the Ninth Circuit recognized in *BNSF*,

judicial review is warranted where the integrity of the arbitration process has been compromised.

Accordingly, the circumstances presented here fall within the limited but important category of cases in which federal courts may review arbitration awards under the RLA to ensure that the statutory arbitration system functions fairly and lawfully.

### F. Enforcement of the Award Would Undermine Federal Public Policy Protecting Railroad Safety Whistleblowers

Federal law strongly protects railroad employees who report hazardous safety conditions. Congress has long recognized that railroad employees serve as a critical safeguard in identifying unsafe practices affecting both workers and the public. For that reason, federal law encourages employees to report safety concerns without fear of retaliation.

The Supreme Court addressed this principle in Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246 (1994). In *Hawaiian Airlines*, an aircraft mechanic alleged he had been terminated after reporting safety violations affecting aircraft maintenance. The employer argued that the employee's claims were preempted by the grievance and arbitration procedures established under RLA.

The Supreme Court rejected that argument. The Court explained that RLA governs disputes that arise from the interpretation of collective bargaining agreements, but it does not displace independent statutory rights created to protect employees and the public. *Id.* at 258–59. The Court emphasized that Congress did not intend the RLA to shield carriers from liability for retaliating against employees who report unsafe conditions.

The Ninth Circuit has applied the same reasoning in English v. Burlington Northern Railroad Co., 18 F.3d 741 (9th Cir. 1994). In *English*, the plaintiff alleged that the railroad had violated rights arising from independent sources of law after he raised concerns regarding railroad operations. The railroad argued that the claims were preempted by RLA because they arose within the employment relationship governed by a collective bargaining agreement.

The Ninth Circuit rejected that argument, explaining that the RLA does not extinguish independent legal protections afforded to railroad employees under federal law. *Id.* at 744–46. Where claims arise from constitutional or statutory rights independent of the CBA, those rights are not displaced by the arbitration procedures of RLA.

Congress has reinforced these principles through the FRSA which expressly protects railroad employees who report hazardous safety conditions. See 49 U.S.C.

§20109. That statute prohibits railroad carriers from disciplining or retaliating against employees who report unsafe conditions, refuse to work under hazardous circumstances, or otherwise participate in activities designed to promote railroad safety.

The circumstances presented here implicate precisely those federal protections. Mazzara repeatedly reported serious safety concerns affecting railroad operations in the Alameda Corridor, including dangerous air quality conditions caused by diesel exhaust, unsafe crew practices that exacerbated those conditions, and equipment irregularities affecting locomotive operation. Rather than investigating or correcting those safety hazards, UP initiated disciplinary proceedings that ultimately resulted in Mazzara's termination.

Although the arbitrator later concluded that the termination was excessive, the award nevertheless denied reinstatement and left Mazzara without a meaningful remedy. Allowing that result to stand would undermine the federal policies reflected in *Hawaiian Airlines*, *English*, and FRSA, policies designed to ensure that railroad employees can report dangerous operating conditions without fear of retaliation.

As enforcement of the arbitration award would conflict with federal safety protections, judicial review is appropriate to ensure that the statutory dispute-

resolution framework of RLA does not produce a result inconsistent with federal law and public policy.

## VI. CONCLUSION

For the foregoing reasons, Mazzara respectfully requests that the Court vacate the arbitration award issued pursuant to the RLA. In the alternative, Mazzara requests that the Court correct or modify the Award to grant the relief that fundamental fairness requires, specifically, reinstatement to her former position as a locomotive engineer with full seniority and benefits, together with any back pay or other emoluments necessary to make her whole.

Dated this 6th day of March 6, 2026.

Shannon Lamb

Shannon C. Lamb

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Randi M. Mazzara appearing in pro per, certifies that this brief contains 6,949 words, which complies with the word limit of L.R. 11-6.2. The memorandum of points and includes a table of contents in compliance with L.R. 11-8.

Dated this 6th day of March 6, 2026.

Shannon C. Lamb

# EXHIBIT A

4/14 LOG44 RMAZZARA 0229159

AFTER SECURING POWER IN TRK 8
COND NOBLE + BRAKEMAN CUEVAS WERE
IN THE FRONT SEATS OF THE JEEP, BECAUSE
OF ALL THE WINDOWS DOWN ON BOTH DRIVER
+ PASSENGER I HAD ASKED IF COND NOBLE
COULD DROP BRAKEMAN CUEVAS AT THE
DEPOT AND COME BACK AND GET ME "NO"
I HAD ASKED CUEVAS IF HE WOULD GET IN
THE BACK AND I UP FRONT THAT WAY
HE COULD HAVE THAT WINDOW DOWN "NO"
JUST GET IN THE BACK HE WANTS TO
GO HOME SAYS HE. DURING DRIVE TO OFFICE
I ASK BOTH IF THEY COULD ROLL WINDOW UP SOME - I ASKED
RAY IF HE WOULD PUT HIS WINDOW UP A LITTLE - 'NO"
I'M MAKING A REQUEST 'NO' AND SO
I SAID YA KNOW IF I WAS A DUDE YOU
WOULDN'T HAVE A FACE HE SAID THATS
A THREAT I SAID NO I'M NOT A DUDE AND
SAID HE WAS BEING IGNORANT - RAY & JAMES
WAS DOING THIS ON PURPOSE AS ALL THE
OTHER AGITATING ISSUES THAT TRANSPIRED
DURING THE EVENING - I DID NOT
PUSH CUEVAS SO HE SAYS HE BUMPED INTO
ME AND CLAIMED I PUSH HIM.
NOBLE & CUEVAS HAVE BEEN ACTING OUT
DUE TOO THE SAFETY HOT LINE ISSUE
WHICH HAS NOT BEEN ADDRESSED AS OF YET

RMazzara 0229159

# EXHIBIT B

UNION PACIFIC BUILDING AMERICA

May 10, 2021

Mr. B. P. Carr
General Chairman BLET
1902 Orange Tree Lane, Suite 120
Redlands, CA 92374

Dear Mr. Carr:

This refers to the case of Randi Mazzara, Employee ID # 0229159, who was advised by letter dated April 23, 2021 to report for investigation on charges that she allegedly violated Rule 1.6: **Conduct (Quarrelsome)** on 4/15/21. If Ms. Mazzara were found guilty of such charges, the discipline assessed pursuant to the Carrier's MAPS Discipline Policy would be permanent dismissal.

As a result of discussions between Ms. Mazzara, the Carrier and the Organization, it was agreed to resolve the case of Ms. Mazzara in the following manner:

1. Ms. Mazzara acknowledges responsibility for her actions.

2. Ms. Mazzara will be administratively reinstated with vacation and seniority rights unimpaired, but without pay for time lost.

3. It is clearly understood this reinstatement is administrative only to permit Ms. Mazzara to resign or retire as a career employee depending on her eligibility. Ms. Mazzara will not physically return to duty with the Union Pacific Railroad Company in any capacity. Ms. Mazzara will not be required to perform any duty, nor will she accept any call for service. Should Ms. Mazzara attempt return to service, this document will serve as a resignation and relinquishment of all seniority rights.

4. Ms. Mazzara will resign from company service on May 12, 2021.

5. No claim may be filed by or on behalf of Ms. Mazzara and any and all claims already filed by or on behalf of Ms. Mazzara, regarding this incident, are considered withdrawn and dismissed in their entirety.

6. This offer of reinstatement will not diminish or prejudice in any manner the seriousness of the rule violations.

7. It is understood and agreed that acceptance of this offer will not be considered precedent nor cited in the future, except as it relates to Ms. Mazzara.

8. Ms. Mazzara acknowledges that she fully understands the terms of this agreement and has entered it freely and voluntarily of her own accord. Ms. Mazzara further acknowledges that she has had an opportunity to discuss the proposed discipline and her rights pursuant to any applicable collective bargaining agreement with his/her union representative. Ms. Mazzara hereby releases and relieves the Organization, the Carrier, and their officers and agents from any liability and/or responsibility in connection with the discipline or alternative thereto proposed herein which she has of her own free will and accord decided to accept.

If the above adequately and accurately describes our understanding as to the terms of the settlement on this claim, please sign and date on the space provided below. If you choose not to accept this offer it is withdrawn in its entirety and the investigation will be held as scheduled on May 12, 2021.

Yours truly,

B. Wilder

Beth Wilderman
Director – Labor Relations
Union Pacific Railroad

AGREED:

______________________________ ____________
R. Mazzara, EID 0229159 Date

______________________________ ____________
B. P. Carr, General Chairman Date

# EXHIBIT C

Union Pacific
Southern Region
24125 ALDINE WESTFIELD RD
SPRING TX 77373-9015

**USPS CERTIFIED MAIL™**

9414 8368 9784 6973 5502 04

RANDI MAZZARA
2221 E SOUTH REDWOOD DR
ANAHEIM CA 92806

US POSTAGE AND FEES PAID
easypost
2021-05-21
77373
C363112
Retail
2.0 OZLTR
0901000002253

FOLD ALONG THIS LINE

BUILDING AMERICA®

05/21/2021

Randi Mazzara
Employee ID: 0229159
2221 E South Redwood Dr
Anaheim, CA 92806

**Subject: NOTIFICATION OF DISCIPLINE ASSESSED**

Dear Randi Mazzara:

This correspondence is regarding the hearing held on 05/12/2021 in Long Beach, CA as originally outlined in the Notice of Investigation dated 04/23/2021.

After carefully considering the evidence adduced at the hearing, I find that the evidence more than substantially supports the charges against you. The following charge has been sustained:

> On 04/15/2021, while employed as a ENGINEER, you acted with hostility toward another employee. This is a violation of the following rule(s) and/or policy:
> 1.6: Conduct - Quarrelsome

Additionally, **Rule 1.6: Conduct** stipulates that any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty or to the performance of duty will not be tolerated.

Based on your current record, you are hereby dismissed from all service with the Union Pacific Railroad. Immediately arrange to deliver all Company property in your possession to Jerry Feetham.

Respectfully,

Mike Santa Maria
General Manager Transportation

cc: Brian Paul Carr, gca177@bletupwl.org - E-Mail
Jerry M Feetham, jerryfeetham@up.com - E-Mail
Lon Simmons, 5728 Alviso Ave, Los Angeles, CA, 90043 - Us Certified Mail Return Receipt (Rre) Electronic
Lon Simmons, localchairman@blet660.com - E-Mail
Richard P Murphy, rpmurphy@up.com - E-Mail

# UNION PACIFIC RAILROAD COMPANY

## IN RE THE INVESTIGATION OF:

**Mr. R. Cuevas**
Brakeman

**Ms. R. M. Mazzara**
Engineer

## INVESTIGATION SITUS:

1000 Hours
May 12, 2021

**Union Pacific Railroad**
ICTF Administrative Building
2401 East Sepulveda
Long Beach, California
90810

## TRANSCRIPTION BY:

**CAS Associates, Inc.**
1993 A Avenue
Emerson, Iowa 51533

99

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

## TRANSCRIBER'S CERTIFICATION

I, JENNA K. STANLEY, do hereby certify that one (1) original video/audio recording(s) of an investigation held on May 12, 2021, commencing at approximately 1000 hours, was received by CAS Associates, Inc., on May 13, 2021. Thereafter, we transcribed said original electronic recording(s); that the foregoing and following of said investigation consisting of one hundred seventy-four (174) pages is a full, true and correct transcription of the proceeding as recorded, and has been electronically submitted.

Certified by: Jenna Stanley
Jenna K. Stanley

Date: May 18, 2021

*Any clarifications or notations from transcriptionist will be encased by square brackets - [sample]. Also the [sic] is used to show the transcript was typed to indicate that it is intended exactly as printed and [phonetic] indicates "sounds like" or that the spelling is undocumented, and [indistinct comments] indicates could not understand.*

| PRESENT AT INVESTIGATION | TESTIMONY BEGINS |
|---|---|

Mr. J. M. Feetham
Conducting Manager

Mr. E. J. Campos
Local Chairman

Mr. H. A. Ray
Local Chairman → VICE LOCAL

Mr. A. L. Reeves → VICE LOCAL
Local Chairman
WAS ONLY SUPPOSE TO OBSERVED UNTILL MY REPRESENTATIVE WAS A NO SHOW

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

**PRESENT AT INVESTIGATION** — **TESTIMONY BEGINS**

Mr. R. Cuevas .......... Page 139
Brakeman
Charged

Ms. R. M. Mazzara .......... Pages 110, 166
Engineer
Charged

Mr. R. P. Murphy .......... Page 25
Senior Manager Train Operations
Charging Manager/Company Witness

Mr. J. S. Cramer .......... Page 69
Manager Road Operations
Company Witness

Mr. J. D. Noble .......... Page 82
Conductor
Company Witness

Mr. K. K. Wilson
Local Chairman
Observer

CLOSING STATEMENT OF
Mr. R. Cuevas, Charged .......... Page 172

CLOSING STATEMENT OF
Ms. R. M. Mazzara, Charged .......... Page 169

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

| PRESENT AT INVESTIGATION | TESTIMONY BEGINS |
| --- | --- |

CLOSING STATEMENT OF
Mr. E. J. Campos on Behalf of
Mr. R. Cuevas, Charged .......... Page 173

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

**Formal Investigation Opens:**

Good morning, Jerry Feetham, Los Angeles Service Unit. I'll be the Conducting-

[Indistinct Comments]

Mr. J. M. Feetham: -Manager in this formal investigation being held to develop the facts and determine responsibility, if any, in connection with Ms. Mazzara and Mr. Cuevas allegedly acting with hostility towards another employee.

After I've completed the opening phase of this investigation by one, reading into the record the Notice of Investigation and two, introducing those present, and before questioning any witnesses, the charged and their representative will be given an opportunity to raise any objections they may have. Therefore, please withhold until we get to that point.

Some of the- a couple ground rules here. Cell phones, silence or off, either one, I don't care. If you need to make a phone call, we can take a recess and you can be excused and- and complete a phone call or accept a call. No vulgarity or profanity

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

unless you use it in a direct quote and related to testimony.

Please speak clearly, one at a time, in the microphone. The transcripts of these proceedings will not show head nods or hand gestures, so I may have to remind some of you, but- but it has to be verbalized, okay? And make sure we speak up. Like I say, this room is set up a little different than normal and we're spread out a little bit.

These proceedings are being taped recorded on an electronic recording device. Investigation transcripts will be provided as required. Any conversation recorded will be included in the transcript. Anyone wishing to have a private conversation, it is recommended that a recess be requested and we go off the record.

Should any of the parties feel that a statement is not being clearly recorded because of interruptions or simultaneous conversations, we will stop the proceedings and have those involved repeat the missed portions for the record. In doing so, it can be assured that everything said is accurately and properly transcribed.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

At this point in time, I'm gonna introduce all present. I'm gonna start on my left. If you would state your full name and role in this investigation. Mr. Murphy?

Mr. R. P. Murphy: My name is Richard Murphy and I'm the Charging Officer in this investigation.

Mr. J. M. Feetham: Okay.

Mr. J. S. Cramer: James Cramer. I am the witness- Company witness in this investigation.

Mr. K. K. Wilson: Karl Wilson. I'm the representative of the 240 and assistant to the 1770- or the 1422, sorry.

Mr. J. D. Noble: James Noble. I'm a witness to this.

Mr. R. Cuevas: Brakeman Ray Cuevas, Brakeman on the LOG44, charged.

Mr. H. A. Ray: Anthony Ray, Vice Local Chairman, Local 1422, representative for Ray Cuevas.

Mr. A. L. Reeves: Alex Reeves, Vice Local Chairman, BLE 660, representative for Randi Mazzara.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Ms. R. M. Mazzara: Randi Mazzara, Engineer on the LOG44.

Mr. J. M. Feetham: And you're charged. Is that correct?

Ms. R. M. Mazzara: And charged.

Mr. J. M. Feetham: All right. At this time, I'm gonna qualify the charged employees and I'll try and stay in routine this way. I'm- I'm gonna start with you, Ms. Mazzara. We'll qualify you and then your representative and then we'll to Ray. And throughout the testimony, we're gonna try and stay in- in that order of call.

Ms. Mazzara, if you'd state your full name and Employee I.D. Number.

Ms. R. M. Mazzara: Randi Mazzara, 0229159.

Mr. J. M. Feetham: Okay. Present address of record?

Ms. R. M. Mazzara: 2221 E period South Redwood Drive, Anaheim, 92806.

Mr. J. M. Feetham: And occupation and/or title?

Ms. R. M. Mazzara: Engineer.

Mr. J. M. Feetham: Railroad employed by and length of service, please?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Ms. R. M. Mazzara: Thirty-two years, hired out in 1989.

Mr. J. M. Feetham: Do you wish to have a representative present?

Ms. R. M. Mazzara: Yes.

Mr. J. M. Feetham: Whom do you wish to represent you?

Ms. R. M. Mazzara: Mr. Alex Reeves.

Mr. J. M. Feetham: Mr. Reeves, if you would, state your full name, present address of record, please.

Mr. A. L. Reeves: Alex Reeves; address is 1401 Redondo Boulevard, Inglewood Avenue, Redondo Beach, California. My title is- Employee Number is 0407325, Local-

Mr. J. M. Feetham: Occupation and/or title?

Mr. A. L. Reeves: Occupation is a Locomotive Engineer and my title is Vice Local Chairman, BLE 660.

Mr. J. M. Feetham: State the railroad employed by and length of service, please.

Mr. A. L. Reeves: Employed with the railroad in 2004, roughly 17 years of service.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: And Mr. Reeves, do you desire to represent Ms. Mazzara at this investigation?

[Indistinct Comments]

Mr. A. L. Reeves: Yes.

Mr. J. M. Feetham: Okay, thank you. Mr. Cuevas, please state your full name and Employee I.D. Number.

Mr. R. Cuevas: Raymond Cuevas, Employee I.D. 0040057.

Mr. J. M. Feetham: State your present address of record.

Mr. R. Cuevas: 1020 North Lagoon Avenue, Wilmington, California.

Mr. J. M. Feetham: Occupation or title?

Mr. R. Cuevas: Brakeman on the LOG44.

Mr. J. M. Feetham: And railroad employed by and length of service, please.

Mr. R. Cuevas: Twenty-four years of service.

Mr. J. M. Feetham: And railroad employed by Union Pacific?

Mr. R. Cuevas: Yes.

Mr. J. M. Feetham: Okay. Do you wish to have a representative present?

---

Mr. R. Cuevas: Yes, I do.

Mr. J. M. Feetham: Whom do you wish to represent you?

Mr. R. Cuevas: Anthony Ray.

Mr. J. M. Feetham: Mr. Ray, state your full name, present address of record, please.

Mr. H. A. Ray: Hughey Anthony Ray; address, 8162 Regency, La Palma, California, 90623.

Mr. J. M. Feetham: Occupation and/or title?

Mr. H. A. Ray: Conductor.

Mr. J. M. Feetham: And the railroad employed by and length of service, please?

Mr. H. A. Ray: Union Pacific Railroad; length of service, 16 years; Vice Local Chairman.

Mr. J. M. Feetham: Mr. Ray, do you desire to represent Mr. Cuevas in this investigation?

Mr. H. A. Ray: Yes.

Mr. J. M. Feetham: Okay. I gonna mark as **Exhibit #1** Notice of Investigation, which reads as follows:

Union Pacific letterhead, dated 4-23-2021; Randi Mazzara,

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Employee I.D. #0229159, 2221 East South Redwood Drive, Anaheim, California, 92860 [sic]; Subject: Notice of Investigation:

Dear Randi Mazzara:

Please report to ICTF Administrative Building, 2401 East Sepulveda, Long Beach, California, at 1000 hours on 5-3-2021, for the hearing to develop the facts and determine your responsibility, if any, in connection with the below charge.

> On 4-15-2021, at the location of 2400 East Anaheim Avenue, Wilmington, California, 90477, at approximately 0500 hours, while employed as a Engineer, you allegedly acted with hostility towards another employee. This is a possible violation of the following rule and/or policy:
>
> 1.6: Conduct – Quarrelsome

Under the MAPS Policy, this violation is a dismissal event. Based upon your current status, if you are found to be in violation of this alleged charge, dismissal may result.

Please be advised that this hearing will also satisfy the procedural requirements as specified by the Federal Railroad Administration in 49 CFR, 242, Qualification and Certification of Conductors and/or 49 CFR Part 240, Qualification and Certification of Locomotive Engineers/Remote Control Operator, as applicable.

The investigation will be conducted in accordance with applicable provisions of the collective bargaining agreement between the Company and the organization representing your craft or class. You are entitled to representation and to present witnesses, at your own expense, in accordance with the agreement. Any request for popo- postponement must be submitted in writing, including reason thereof, no less than 48 hours prior to the date scheduled. A copy of your written request for

---

postponement must be given to me. I can be reached at phone number 562-490-7051.

The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an Hours of Service covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected not to attend the hearing.

Respectfully, Richard Murphy, Senior Manager of Train Ops

Please Arrange to Appear as Witnesses: James Cramer, James Noble

cc to James Dale Noble, James Stephen Cramer, Jerry Feetham, Lon Simmons, and Richard P. Murphy.

Ms. Mazzara, did you receive proper notice to report for this investigation?

Ms. R. M. Mazzara: I did.

Mr. J. M. Feetham: And **Exhibit #1** that I read in the record, is that the notice that you- you received?

Ms. R. M. Mazzara: Yes, that's correct.

Mr. J. M. Feetham: There's also a postponement that postponed it from- and I'm not sure which union requested it, maybe it was a combination

---

| | |
|---|---|
| | of both, but from the original date to today's date. Any objections if I- we'll make it part of the proceedings as an exhibit. It'll be **Exhibit #2** attached to- to- or addressed to Randi Mazzara. |
| Ms. R. M. Mazzara: | I never received that in the mail. |
| Mr. J. M. Feetham: | You never received it? |
| Ms. R. M. Mazzara: | Uh uh. |
| Mr. J. M. Feetham: | Okay. But it was requested? Mr. Reeves, did you request a postponement to today's date? |
| Mr. A. L. Reeves: | I'm not aware. |
| Mr. R. P. Murphy: | I have a- |
| Mr. J. M. Feetham: | Do you have an email, Mr. Murphy? |
| Mr. R. P. Murphy: | -email from Lon Simmons about a postponement. |
| Mr. J. M. Feetham: | Okay, Lon Simmons- |
| Mr. R. P. Murphy: | [Overtalk] |
| Mr. J. M. Feetham: | -is the same local as Mr. Reeves. Is that correct, Mr. Reeves? |
| Mr. A. L. Reeves: | Yes, sir. |

---

Mr. J. M. Feetham: Okay, okay. Any objection not reading it into record? We just gonna make it an exhibit. It'll be part of these proceedings.

Mr. A. L. Reeves: No.

Mr. J. M. Feetham: Okay, make that **Exhibit #2.** [See **Exhibit #2**] I'll ask you for that exhibit once-

Mr. R. P. Murphy: Okay.

Mr. J. M. Feetham: -we get started. Okay. I'm gonna mark as **Exhibit #3** Notice of Investigation, which reads as follows:

Union Pacific Railroad letterhead, dated 4-23-2021; Raymond Cuevas, Employee I.D. #0040057, 1020 North Lagoon Avenue, Wilmington, California, 90744; Subject: Notice of Investigation.

Dear Raymond Cuevas:

Please report to ICTF Administrative Building, 2401 East Sepulveda, Long Beach, California, at 1000 hours on 5-3-2021, for the hearing to develop the facts and determine your responsibility, if any, in connection with the below charge.

On 4-15-2021, at the location of 2400 East Anaheim Avenue, Wilmington, California, 90477, at approximately 0500 hours, while employed as a Brakeman, you allegedly acted with hostility towards another employee. This is a possible violation of the following rule and/or policy:

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

1.6: Conduct – Quarrelsome

Under the MAPS Policy, this violation is a dismissal event. Based upon your current status, if you are found to be in violation of this alleged charge, dismissal may result.

Please be advised that the hearing will also satisfy the procedural requirements as specified by the Federal Railroad Administration in 49 CFR Part 242, Qualification and Certification of Conductors and/or 49 CFR Part 240, Qualification and Certification of Locomotive Engineers/Remote Control Operator, as applicable.

The investigation will be conducted in accordance with applicable provisions of the collective bargaining agreement between the Company and the organization representing your craft or class. You are entitled to representa- representation and to present witnesses, at your own expense, in accordance with the agreement. Any request for postponement must be submitted in writing, including reason thereof, no less than 48 hours prior to the date scheduled. A copy of your written request for postponement must be given to me. I can be reached at phone number 562-490-7051.

The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an Hours of Service covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected not to attend the hearing.

Respectfully, Richard Murphy,
Senior Manager of Train Ops

Please Arrange to Appear as Witnesses: James Cramer, James Noble

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

cc: Edward Jesus Campos, James Noble, James Cramer, Jerry Feetham, and Richard P. Murphy.

Mr. Cuevas, did you receive proper notice to report for this investigation?

Mr. R. Cuevas: Yes, I did.

Mr. J. M. Feetham: And **Exhibit #3** that I just read into record, is that the notice you received?

Mr. R. Cuevas: Yes.

Mr. J. M. Feetham: Also, there's an accompanying postponement related to **Exhibit 2** that was addressed to Mr. Cuevas. I'm gonna enter that and make that **Exhibit #4**. Any objections, Mr. Ray, if I don't read this, but it's gonna be part of the investigation?

Mr. H. A. Ray: No objection.

Mr. J. M. Feetham: Okay. So, that'll be **Exhibit #4**-

Ms. R. M. Mazzara: What is that?

Mr. J. M. Feetham: -and that's the same postponement, just addressed to Mr. Cuevas, postponing to today's date and time. [See **Exhibit #4**].

---

What I'd like- Mr. Murphy, you said you had an email from Mr. Simmons. I'm gonna go ahead and enter it now, Mr. Reeves, because you- you're here for Mr. Simmons. Is that correct?

Mr. A. L. Reeves: Yes.

Mr. J. M. Feetham: All right. You- have you seen this document? You said you weren't aware that there was a postponement. Why don't you take a look at it? And I- I'm gonna go ahead and enter it and that'll be **Exhibit #5**.

Okay, I got Mr. Cramer and Mr. Noble here as Company witnesses. Should any additional witnesses be necessary, the Company and the accused have the right to call or request them. In doing so, every reasonable effort will be made to get them to the hearing.

And- and be mindful, any witness's request, I- I think the Carrier has the wit- witnesses that it uh- it [indistinct comment] for the caption of Notice of Investigation. Any- any other witnesses requested by the representatives will have to go through the qualifying process. So-

---

Ms. R. M. Mazzara: I didn't know- excuse me, I didn't realize I could have other witnesses on my defense.

Mr. J. M. Feetham: So, like I said, when- if there's witnesses and if they- if the- the representatives have a right to bring in their own witnesses.

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: All right? So, then it'll be my job to qualify them, and I can tell you the qualification process is were they a party to or a witness to the incident for the caption of the Notice of Investigation.

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: If they weren't, then, you know- yes?

Mr. H. A. Ray: Can I take a brief recess?

Mr. J. M. Feetham: Yeah, let me- can I get- let me just-

Mr. H. A. Ray: Yes.

Mr. J. M. Feetham: -get this last part and we get to that point. All right.

The opening phase of this investigation has been completed. If there are any

---

| | |
|---|---|
| | objections, you may make them at this time. Mr. Reeves, do you have any objections or requests? |
| Mr. A. L. Reeves: | I'd like to request that James Noble will be dismissed from a witness due to prior history with the LOG44. |
| Mr. J. M. Feetham: | Okay. So, when you say dismissed from a witness, you don't mean dismissed from the room. You mean not to be a part of these proceedings. Is that correct? |
| Mr. A. L. Reeves: | Yes. |
| Mr. J. M. Feetham: | Okay. I'm gonna- Mr. Murphy is the Charging Manager and Mr. Murphy, you are the one that requested Mr. Noble here. Is that correct? |
| Mr. R. P. Murphy: | That is correct. |
| Mr. J. M. Feetham: | Can you give me a reasoning on why Mr. Noble was- was requested? |
| Mr. R. P. Murphy: | Because he was present and on duty at the time of the alleged allegations that took place there at Mead Yard. |
| Mr. J. M. Feetham: | Okay. So, he was present and witness to it. Is that correct? |

---

Mr. R. P. Murphy: That is correct.

Mr. J. M. Feetham: Okay. Mr. Reeves, at- at this point in time, it's- it's a witness that- that witnessed it and was present during the time. So, I am not gonna dismiss him. He's- he's uh- he's gonna have pertinent testimony, per the Charging Manager, in regards to these proceedings.

Mr. A. L. Reeves: Okay.

Mr. J. M. Feetham: All right, anything else?

Mr. A. L. Reeves: No.

Mr. J. M. Feetham: Okay. Mr. Ray, you have any objections or requests?

Mr. H. A. Ray: No, not at this time.

Mr. J. M. Feetham: And you- you- you want a recess now?

Mr. H. A. Ray: Yes.

Mr. J. M. Feetham: Okay, let's take a short recess.

[RECESS]

Mr. J. M. Feetham: Okay, we're back on record. A couple stipulations. I did excuse Mr. Wilson. We do have Mr. Eddie Campos here.

APPROX 12:20 CAMPOS ARRV

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

[Indistinct Comments]

Mr. J. M. Feetham: And Mr. Campos, you're- you're gonna be representing Mr. Cuevas. Is that correct?

Mr. E. J. Campos: Yes.

Mr. J. M. Feetham: And you're reasoning for being, I guess, tardy to these proceedings, I guess, for the record so anyone that reads it will have an understanding of it?

Mr. E. J. Campos: Yeah, I apologize- I apologize for being late. I uh- I was up last night working the case and instead of laying off, I went to bed and I forgot to lay off. When I woke up this morning, I was on duty and so I couldn't- I couldn't- it- it was too late to lay off union, so I had to show up to work.

B.S
RSIA

Mr. J. M. Feetham: Okay. All right. So, and- and based on the magnitude of this- these proceedings for both Ms. Mazzara and Mr. Cuevas, I'm- I'm allowing that, right?

Mr. E. J. Campos: Okay.

Mr. J. M. Feetham: One thing I need to do, because when we did the opening, I kind of- I- I want to go back to Mr. Cuevas. I qualified Mr. Cuevas. Since you're gonna be the

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

primary, I'll ask Mr. Cuevas a few questions and then I want to go back to qualifying you-

Mr. E. J. Campos: Roger.

Mr. J. M. Feetham: -just to kind of set the record straight. Well, Mr. Cuevas, I'm not gonna kind of go through the whole thing we talked to originally in qualifying, but I will ask you whom do you wish to represent you in these proceedings? Would- would Mr. Campos be the one you would want to represent?

Mr. R. Cuevas: Yes, that is correct.

Mr. J. M. Feetham: Okay. Mr. Campos, if you would, state your name and Employee I.D Number.

Mr. E. J. Campos: Edward Campos, 0083358.

Mr. J. M. Feetham: And a present address of record?

Mr. E. J. Campos: 115 Geneva Walk, Long Beach, California, 90803.

Mr. J. M. Feetham: And a position and/or title?

Mr. E. J. Campos: Conductor and Local Chairman, 1422.

Mr. J. M. Feetham: Okay. Railroad employed by and length of service, please.

---

Mr. E. J. Campos: Union Pacific Railroad, 43 years.

Mr. J. M. Feetham: Okay, and do you desire to represent Mr. Cuevas at these proceedings?

Mr. E. J. Campos: Yes, I do.

Mr. J. M. Feetham: All right, thank you. A little out of the ordinary, but based on the magnitude of these, I want to-

[Indistinct Comments]

Mr. J. M. Feetham: -to make sure we got that. So, Mr. Cuevas and- and Ms. Mazzara, are you ready to proceed at this point?

Ms. R. M. Mazzara: Yes.

Mr. R. Cuevas: Yes.

Mr. J. M. Feetham: Okay. You do understand you and your representatives will have the right to cross- examine and cross-examine any witness who may testify, and to inspect and examine all documents that may be offered as evidence in this in- investigation. Do you we have that understanding?

Ms. R. M. Mazzara: Yes.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. R. Cuevas: Yes.

Mr. J. M. Feetham: Okay. The charged and representatives will remain in the hearing room. All the witnesses at this point in time are being- being excused and sequestered. So, I've asked Mr. Cramer to be excused and Mr. Noble to be excused. And once we get to their point in the testimony, we'll ask them to come back in. All right. So, I'm gonna start with Mr. Murphy, who's still with us, and we will start with his testimony.

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q Mr. Murphy, will you state your name and occupation, please?

A Richard Murphy, Senior MTO here at Long Beach, California.

Q And railroad employed by and years of service, please?

A Union Pacific Railroad, 14 years.

Q Okay. Do you supervise the employees who are charged in responsibility in connection with the incident under investigation?

A Yes, I do.

Q Did you make an inquiry into the incident?

A Yes, I did.

---

Q And what was the result of your inquiry?

A My findings were that-

Q Well, let me ask you this, how were you made aware of this incident?

A I was made aware of this incident via phone call by Ray Cuevas.

Q So, Mr. Cuevas called you on the- I guess the date in question would be, let me see here, on April 15th, 2021. Is that correct?

A That is correct.

Q And this shows approximately 5:00 a.m. Do you have an approximation when he called you? It doesn't have to be exact.

A Yeah, it was approximately 5:00 a.m. That's where I got that timestamp on the Notice of Investigation.

Q Okay. What- what was the conversation regarding?

A Regarding the alleged uh- alleged confrontation that took place between the Engineer, Randi Mazzara, and himself. As far as virtually what- what he said to me was that he was shoved and threatened that morning.

Q That's what he told you in that conversation?

A Yes.

Q With that information, what did you do from there?

A I then turned- headed towards Mead Yard at that time. When I got there, the Engineer was already gone. The Brakeman, Ray Cuevas, was there and uh- and James Noble, the Conductor, were- were still on property.

Q Okay. And so, Ms. Mazzara was gone. Is that correct?

A That is correct.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Uh-

A She actually later contacted me and I spoke to her. And then she actually took her statement. That's why- took her statement at Anaheim Yard Office with Jamie Cramer-

Q Okay.

A -to keep the two parties separate.

Q So, you did talk to Mr. Cuevas, correct-

A Uh huh.

Q -who was the original report to you?

A Yes.

Q And then Ms. Mazzara called you as well.

A Yes.

Q And what did Ms. Mazzara relay to you?

A Just kind of wanted to know what- what I wanted to do. Can I- do I need to write a statement was what she was asking me. And at that point, it was just kind of organizing the fact that we need to kind of keep both parties separate. And then, in turn, ta- mentioned to her I will call Jamie Cramer. He will be on duty at Anaheim and that he could probably take her statement. Which, in turn, called Jamie and then to- I- I thi- I guess he was walking in as he was getting off the phone with me is what I understood.

Q So, you coordinated Ms. Mazzara to meet-

A Yes.

Q -Mr. Cramer-

A That's-

Q -in order to-

A -correct.

Q -give her statement.

A That's correct.

Q Okay. And you were at Mead Yard at this point in time?

A That's correct.

Q Okay. What took place at Mead Yard going forward from this point?

A What took place was- going forward from the time after we had this conversation-

Q Yes.

A -was just getting statements from both Ray Cuevas and James Noble-

Q Okay.

A -as well as, I- I believe, the uh- the EEO hotline was- was called on that.

Q Okay. Okay, and do you have those statements? Is that the statements there?

A As far as statements from the employees, yes, I do have-

Q Of what you-

A -[overtalk]

Q -received from their statements?

A Yes.

Q Okay. So, we got- yes?

Ms. R. M. Mazzara: Mr. Murphy, you were not at the office-

Mr. J. M. Feetham: Hey, I-

Ms. R. M. Mazzara: -so- but-

Mr. J. M. Feetham: -so-

Ms. R. M. Mazzara: I- I just wanted to know what time did he arrive at the office-

Mr. J. M. Feetham: -but- but-

Ms. R. M. Mazzara: -after the phone call.

Mr. J. M. Feetham: Okay, let me- I'm not denying your opportunity to-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -ask Mr. Murphy-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -questions. So, let me- here- ju- and- and I know you're new to this, all right-

Ms. R. M. Mazzara: Yeah, very.

Mr. J. M. Feetham: -so- so bear with me.

---

Ms. R. M. Mazzara: Yeah.

Mr. J. M. Feetham: So, let me explain this to you. Let me get through my questioning with Mr. Murphy and then what I do, and I'm gonna hand it in turn to your representative first. This is the order of call. So, the- the purpose of the order of call, Ms. Mazzara, is to make sure we have a clear and concise transcript. That's part of my responsibility, too-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -all right?

Ms. R. M. Mazzara: All right.

Mr. J. M. Feetham: I want it clear and concise. So, let me get through mine-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -all right? And you can take your notes and do what you need to do, confer with your representative. And then when I'm done, I'm gonna go- you-you and your representative are the next order of call, so I'll hand it to Mr. Reeves. Once Mr. Reeves is done, I always give the charged employees an opportunity to ask questions.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: Most of the time they don't.

Ms. R. M. Mazzara: Excuse me.

Mr. J. M. Feetham: It's entirely up-

Ms. R. M. Mazzara: Uh-

Mr. J. M. Feetham: -to you-

Ms. R. M. Mazzara: I-

Mr. J. M. Feetham: -and your representative.

Ms. R. M. Mazzara: Yeah.

Mr. J. M. Feetham: But you'll have that opportunity then. Is that okay?

Ms. R. M. Mazzara: Yes, that's perfectly-

Mr. J. M. Feetham: Okay.

Ms. R. M. Mazzara: -fine.

Mr. J. M. Feetham: So, let me finish then-

Ms. R. M. Mazzara: I understand-

Mr. J. M. Feetham: -looking at it [phonetic].

Ms. R. M. Mazzara: -thank you.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: Okay. I don't want to cut you off. I don't want you to think I'm-

Ms. R. M. Mazzara: [Laughing]

Mr. J. M. Feetham: -shutting you down. That's not-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -the point. I just want to keep it in turn.

Ms. R. M. Mazzara: Thank you.

Mr. J. M. Feetham: All right.

QUESTIONS BY: MR. J. M. FEETHAM [Continued]
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q All right, let's see. So- all right, this one here, Mr. Murphy, so these are the three statements you gave me, correct?

A Yes.

Q All right. So, I'm gonna mark this one as **Exhibit #6**, and this is the one- let's see, so did you receive this from Ms. Mazzara or Mr. Cramer?

A Mr. Cramer-

Q Okay.

A -actually.

Q So, I'm gonna go ahead and mark it. I can confer when Mr. Cramer's back in that this is the statement he provided-

---

A Uh huh.

Q -but I'm gonna get my-

Mr. E. J. Campos: Mazzara's is **Number 6**?

Mr. J. M. Feetham: **Number 6**.

Mr. E. J. Campos: Okay.

[Indistinct Comments]

Q And then- okay. So, this one here from Ray Cuevas. And this is the one you were in receipt from Mr. Cuevas. Is that-

A That is-

Q -correct?

A -correct.

Q Okay. I'm gonna make that, Mr. Cuevas's statement, **Exhibit #7**. And then the third one is two pages and it shows James Noble. And you were in receipt of Mr. Noble's statement.

A That is correct, sir.

Q Okay. I'm gonna show this as **Exhibit #8** and it'll be Page 1 and Page 2.

[Indistinct Comments]

Q With that, so you interviewed Mr. Cuevas-

A Yes.

Q -correct? And- and was there- what did- what came about in that interview with Mr. Cuevas? And I don't want to- you know, keep it to what you were

---

told by Mr. Cuevas. We- we've got Mr. Cuevas here to provide any testimony-

A Ex-

Q -but-

A Exactly.

Q -what- what were you told by him?

A I was told that uh- that they were in a vehicle ride going from the east end of Mead Yard to the west end of Mead Yard in the Company-supplied vehicle, and that there was an issue with the windows, whether they were supposed to be up or down. And then off-hand he said he was threatened by her. He cited that Randi said, if I was a man, you'd have no face. He said also that she stated, if I was a man, I'd punch you in the face.

Ms. R. M. Mazzara: I did not.

A He also stated that she shoved him and prevented him from his leaving the situation or going into the building to basically tie up.

Q And that- that's everything that Mr. Cuevas-

A Cuevas-

Q -relayed to you-

A -relayed to me-

Q -in your-

A -and also in his statement.

[Indistinct Comments]

Q Okay. Did he tell you throughout this time this all took place in the vehicle or was it somewhere else? Do you-

A No. To- to my knowledge, it like started in the vehicle, ended- and through that drive from east to west, it basically finished in front of the- the yard office at Mead.

Q And that's what Mi- according to Mr. Cuevas- Cuevas's interview.

A Yes.

Q All right. And you did- did you do a- a separate interview with Mr. Noble?

A Yes.

Q What came about from that interview?

A That Mr. Noble was essentially driving the vehicle for the Brakeman and Engineer from the east end of the yard, driving to the west end of the yard. That he saw the confrontation between the Engineer and the Brakeman, and basically told Ray, you know, apparently- I'm sorry, Ray asked James if he is observing what is going on right now, and James told him, you know, you should probably do something about this.

Q And that's what James told you?

A Yes.

Q And- and- and for the record here, you're referencing Ray, Randi, and James, and- and- and I-

A That is correct.

Q -I want to clarify Ms. Mazzara will be Randi, correct?

A Yes.

Q Ray will be Mr. Cuevas and then James will be Mr. Noble, all right. Just-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A Yes.

Q Just for anyone reading the transcripts to make sure that we got that correct. On- on- so, the purpose of driving in the vehicle from the east end of the yard to the west end of the yard would- what- what's the purpose of that?

A It would be to transport to where they parked the power, which at this night it was at- I believe it was 8 Track down at the east end of the yard, which is not normal. But in order to get the crew off the locomotive to drive the distance of 8 Track to the tie-up location where they can get to the computer and they could physically show that their work is done and that they're done with work for the day.

Q Okay. Once you were done interviewing-

Ms. R. M. Mazzara: What- what day was that? What day was the 15th?

Q Once you were done interviewing-

[Indistinct Comments]

Q -Mr. Noble, Mr. Cuevas, what took place after that?

A Of course they-

Q Your actions-

A My actions-

Q Your- your actions, yes.

Ms. R. M. Mazzara: The 15th was a Thursday.

A -was, let's see, sent them home for the day.

---

[Indistinct Comments]

A I explained to Ray that he would be in IP status on tie-up and arranged that with CMS.

Q Okay. And-

A Uh-

Q And the- the basis for that would be?

A Because the- the confrontation was between Randi Mazzara and Ray Cuevas, and in order to ascertain, I guess you can say, the- who's at fault in an investigation, that we needed both of them here and present.

Q Okay. And so then that would be from the basis of when I look at Exhibit- actually **Exhibit 1** and **3**, which is the-

A Uh huh.

Q -Notice of Investigation of Mr. Cuevas and Ms. Ra- Mazzara, that'd be the basis for the alleged violation of 1.6. Is that correct?

A That is correct.

Q And it lists Quarrelsome. Is that- is that correct on those- those two exhibits, they list Quarrelsome and- and that's part of the rule?

A Yes, they do.

Q Okay. What- from your inquiry at that point in time- and let me ask you this, on- once you're all said and done, did- did you call anyone else from the management side in regards to this incident?

A My immediate supervisor.

Q Okay, and that would be?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A Brian Leslie.

Q Okay. And so, prior to, I- I guess, putting them in IP like you said-

A Yes.

Q -you had the discussion with the Superintendent. Is that correct?

A That is correct.

Q Okay. That- that's normal procedure?

A Yes.

Q Okay. And then- so, the- under 1.6 and wha- I'm gonna- here's Rule 1.6. I'm gonna make that an exhibit. It is **Exhibit #9**, just one page of Rule 1.6. What's listed on the Notice of Investigation for both charged employees is number six, employees- well, I'll go ahead and let you read it-

A Okay.

Q -on that, so- in regards to these proceedings, the outcome of your inquiry after talking to Mr. Leslie.

A Okay. 1.6 is pertaining to Conduct, and in the- under the rule itself it gives seven bullet points.

Q Really, the only bullet point we're gonna highlight is what's addressed in- in the-

A Exactly.

Q -the alleged incident.

A Okay. That would be bullet uh- bullet point number six, Quarrelsome.

Q Okay. Could you define quarrelsome in regards to cases like this?

---

A Yes. In reference to the MAPS Policy, which is the- Union Pacific's discipline policy, I have here.

Q Okay. Do they have a definition of quarrelsome?

A They have basically- on Page 3 of 13, they have the- the policy of conduct, and out here they have 1.6: Conduct:

> Employees must be care- must not be:
>
> Careless of the safety of themselves or others
> Negligent
> Insubordinate
> Dishonest
> Immoral
> Quarrelsome
> or
> Discurse- discourteous.
>
> Any act of hostility, misconduct, or willful disregard of nel- ne- negligence affecting the interest of the Company or its employees is cause for dismissal.

So-

Mr. R. P. Murphy: Can we get a quick recess here so I can narrow down this policy?

Mr. J. M. Feetham: All right. We'll- we'll take a short recess.

[RECESS]

Mr. J. M. Feetham: All right, we're back on record.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MR. J. M. FEETHAM [Continued]
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

A All right. The definition of quarrelsome can be found on Page 10 of 13 of the MAPS Disciplinary Policy in the Glossary sent- section.

> Quarrelsome: When an employee's continued behavior is inclined or disposed toward an angry verbal confrontation with others in the workplace.

Q And that's the definition?

A That is the definition of quarrelsome.

Q Let me see that. I don't know if we need the whole policy.

[Indistinct Comments] Apprx 12:20 Campes arrives

Q Right here. I'm gonna go ahead and mark as Exhibit-

Mr. E. J. Campos: Can we get copies of that?

Mr. J. M. Feetham: The MAPS Policy?

Mr. E. J. Campos: Yeah, what- what the definition is.

Mr. J. M. Feetham: Yeah. I think he's gonna get you copies.

Q It'll be **Exhibit #10**. It'll be Page 1 through 13 and it's Union Pacific Railroad Policy for Managing Agreement Professionals for Success, **Exhibit 10**.

[Indistinct Comments]

Mr. E. J. Campos: All 13 pages, Jerry?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: Yes. I'm gonna go ahead and enter the uh- the whole policy so there's no discrepancy of where the one page came from. We can see it- it's [indistinct comment].

QUESTIONS BY: MR. J. M. FEETHAM [Continued]
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q So, Mr. Murphy, Mr. Cuevas relayed to you what he experienced, and- and I know I already asked you this, but did Ms. Mazzara relay to you her experience in- in regards, other than what you've told us?

A Not that I quite recall via the phone call that took place. I think it was- it was more in regards to let's get your statement from- by Jamie Cramer.

Q Okay. And then I- I guess we'll address the rest of it with Mr. Cramer's testimony and Ms. Mazzara's testimony when we get to that point. Did- at what point in time did you receive- or were you in receipt of Ms. Mazzara's statement?

A It was later- actually, that was probably three days after the fact.

Q Okay.

A I immediately was going on my days off. This happened at the end of my shift. And then was in possession of the statement via electronic through our email system.

Q And did you have a conversation with Mr. Cramer on that day-

A Uh-

Q -regarding that or not?

A Yes.

---

Q Okay. So, the- the basis of the alleged charge, as we see in **Exhibit 1** and **3**, is from the information you had and the definition of quarrelsome in **Exhibit #10**, which is Page 10 of 13, is resulting in the uh- the charge. Is that correct?

A That is correct.

Q And uh- and that's in review with the Superintendent as well.

A That is correct.

Q Okay.

Mr. J. M. Feetham: No further questions at this point in time. Mr. Reeves?

Mr. A. L. Reeves: Yes.

QUESTIONS BY: MR. A. L. REEVES
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q Mr. Murphy, where the alleged actions took place, the vehicle, and in front of the crew room. Is that correct?

A That's correct.

Q Outside of the written testimony, do we have any other equipment or anything that would show this to be valid?

A Nothing that was, I guess, in- in an operable condition. I did research and no one- no one was able to capture footage of what was really anything out there [phonetic].

Q Okay.

Ms. R. M. Mazzara: Inside the office.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. A. L. Reeves: What was that?

Ms. R. M. Mazzara: Ask him inside the office.

Q Did anything go on inside the office?

A Not that I- again, was-

Ms. R. M. Mazzara: Did you look?

A -not able to get the footage from any of that. I don't know what's going on with those cameras, but they were not able to pull footage.

Mr. J. M. Feetham: Is- please for all parties, let's- let's speak up. I want to make sure I get everything.

Unidentified: [Indistinct comment].

Ms. R. M. Mazzara: So, both cameras were not working-

Mr. J. M. Feetham: Let- let- hey, let me- let me get through-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -Mr. Reeves and then-

Ms. R. M. Mazzara: Oh, oh-

Mr. J. M. Feetham: -I'll get to you. You're next, Randi-

Ms. R. M. Mazzara: Thank you.

Mr. J. M. Feetham: -Ms. Mazzara.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MR. A. L. REEVES [Continued]
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q So, the cameras weren't working the car-

A No, I would-

Q -or outside of the shanty.

A No.

Q None of these statements say anything about anything going on inside the shanty.

A No, it doesn't say anything about really inside the shanty-

Q Okay.

A -in that statement in that regards.

Q Okay.

Mr. A. L. Reeves: I- I have no questions- no further-

Mr. J. M. Feetham: Ms. Mazzara, do you have any questions for Mr. Murphy?

Ms. R. M. Mazzara: Okay.

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q What time did you arrive at the office after the incident that took place?

A It would've been sometime after 5:00-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Okay. So, you're not quite-

A -in the-

Q -sure.

A -morning.

Q And where were the two individuals, Noble and Cuevas at that-

A They-

Q -time?

A -were, at that time, in the crew room.

Q Okay, both- probably-

A Probably together.

Q Yes, you know, talking together what they-

Mr. J. M. Feetham: Miss-

Q -put-

Mr. J. M. Feetham: Ms. Mazzara, and- and- and here's another. This- this is a question and answer format. This is all for the conciseness of-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -the transcript.

Ms. R. M. Mazzara: Okay.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: At the end you'll get an opportunity to make a statement to-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -all right?

Ms. R. M. Mazzara: All right.

Mr. J. M. Feetham: So, if you a question, please ask it.

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q So-

Mr. J. M. Feetham: If not, we'll-

Q -you-

Mr. J. M. Feetham: -move on.

Q -arrived at the office at like say what time again, I'm sorry?

A It was after 5:00-

Q Oh-

A -between 5:00 and 5:30.

Q Okay. And you did check to see if the camera outside was working and the camera inside the-

A No.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q -office?

A I do not have access to the software to pull that. I had to request access in the camera.

Q Of the outside one.

A Yes.

Q But you can pull-

A Yeah, I cannot pull the access of the inside one. I do not have the authority to do that. I had to request it and-

Q Oh, you requested-

A -and was not-

Q -both-

A -able to get-

Q -and that was not-

A -the-

Q -working.

A -authority either. Yeah, it was not working.

Q Because there's two cameras in that office that- they give you a reason why they weren't working?

A No.

Q Okay. And the cameras were pulled out of the vehicle for what reason?

---

A There's no cameras in- working cameras in any vehicles that-

Q Yeah, there-

A -I mean, as-

Q -was at-

A -far as-

Q -one time.

A -managing Company-

Q Yeah. Do you know for what reason they were pulled out?

A The Company initiative.

Q Company initiative-

A Yeah.

Q -of what?

A Getting rid of the cameras in all manager's vehicles.

Q Okay. All right. So, as I have not really talked to you about the incident that took place, there's really not much more I can say of you. I'm just saying now, as- as- as far as **Exhibit 10**, **Exhibit 10** on Page- was it- it- the quarrelsome, the def- glossary- under the glossary, the definition of quarrelsome. It says:

> When an employee's continued behavior is inclined or disposed toward an angry verbal confrontation with others in the workplace.

Well, that has been the past history, as I recall, we've had trouble with this.

---

Mr. E. J. Campos: I'd-

Mr. J. M. Feetham: On **10**-

Mr. E. J. Campos: -like to raise an objection.

Mr. J. M. Feetham: Okay, hang on here. Let me- let me help Ms. Mazzara here.

Ms. R. M. Mazzara: So, I don't know where- how that- this is be- who's this- just- just this- just in general and it's not being directed at anybody.

Mr. J. M. Feetham: I'm- I'm not sure. You- I guess you can ask Mr. Murphy on that. I- I- I mean, again, if you got a question for Mr. Murphy- is- is your question to Mr. Murphy on the definition? And I- that's what I'm-

Ms. R. M. Mazzara: Yeah, yeah, because it says when an employee's continued behavior. So, you know, I- I- I'm just questioning that, because continued- this means continuous.

Mr. A. T. Murphy: Uh huh.

Ms. R. M. Mazzara: Okay, continuous behavior quarrel- of being quarrelsome. Okay. That's it.

Mr. J. M. Feetham: No further questions?

Ms. R. M. Mazzara: Just a clarification of that.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: Okay. Mr. Campos, do you have any questions of Mr. Murphy?

Mr. E. J. Campos: Yes.

Mr. J. M. Feetham: Okay.

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q Mr. Murphy, were you- when you interviewed Mr. Cuevas, did- did he tell you that Ms. Mazzara shoved and threatened him?

A Yes, he did.

Q Was that in his statement?

A Yes, it is also in his statement.

Q And in Mrs. Mazzara's statement, **Exhibit #6**, do you see where she says:

> I said, you know, if I was a dude, you wouldn't have a face.

A Yes.

Q According to-

Ms. R. M. Mazzara: That doesn't say dude.

Q -the-

Ms. R. M. Mazzara: That doesn't say dude.

Q -definition of quarrelsome, is that a verbal confrontation-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Ms. R. M. Mazzara: It says man.

Q -in your opinion?

A Yes.

Q Are you familiar with the Union Pacific's Policy to Address Violence and Abusive Behavior in the Work-

Ms. R. M. Mazzara: I said dude.

Q -Workplace?

Ms. R. M. Mazzara: Yeah, he said man.

A Again, going back to the MAPS Policy, that's **Exhibit**-

Mr. J. M. Feetham: **Ten**.

A **-10-**

Mr. E. J. Campos: I've got-

A -and-

Mr. E. J. Campos: I've got the policy I'd like to enter into as an exhibit.

Mr. J. M. Feetham: The- the MAPS Policy?

Mr. E. J. Campos: The Policy to Address Violence and Abusive Behavior in the Workplace.

Mr. J. M. Feetham: Let me look at it.

Mr. E. J. Campos: It's Union Pacific's.

---

Ms. R. M. Mazzara: You know, that's hear- this is all hearsay. There was no camera.

Mr. A. L. Reeves: Stop blurting out.

Ms. R. M. Mazzara: Well, I'm just telling you, man, this is- this is just a kangaroo court.

Mr. A. L. Reeves: All right, write it down. Don't blurt it out. Whatever you want to say, just write it down.

Ms. R. M. Mazzara: Okay.

QUESTIONS BY: MR. E. J. CAMPOS [Continued]
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

A So, Mr. Campos, what-

Q Yes.

A -what was the question?

Q Well, I was-

Mr. J. M. Feetham: He- oh, yeah-

Q -I was-

Mr. J. M. Feetham: -he's looking to enter this. I'm [overtalk]-

Mr. R. P. Murphy: Oh, okay. I thought-

Mr. J. M. Feetham: -and then I'll-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. R. P. Murphy: -it was a question.

Mr. J. M. Feetham: -overrule.

Mr. R. P. Murphy: Okay.

[Indistinct Comments]

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q Mr. Murphy, on this Policy to Address Violence and Abusive Behavior in the Work- Workplace, was this reviewed in your inquiry from- from your standpoint?

A No, I just had the MAPS Policy and, of course, the rule for 1.6.

Q Okay.

Mr. J. M. Feetham: Here's what I'd like to do right now, Mr. Campos. I'm- I'm gonna table this right now. I haven't decided whether I'm gonna enter it yet, because I want to make a- confer a little later on, but I don't want to stop these proceedings. I want to at least get through Mr. Murphy's proceedings, and then when we change witnesses-

Mr. E. J. Campos: You want to confer with who?

Mr. J. M. Feetham: Labor Relations.

Mr. E. J. Campos: Okay.

---

Mr. J. M. Feetham: Yeah. And uh- and do it that way. So, it's gonna save us a little recess and a little time, okay? So-

Mr. E. J. Campos: Okay. Okay, so-

Mr. J. M. Feetham: So, right now it's not an exhibit. Please proceed with your testimony of-

Mr. E. J. Campos: Okay.

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q So, the last question I asked you was about Mrs. Mazzara's statement where she said:

> I said, you know, if I was a dude, you wouldn't have a face.

And I asked you if that was a violation of the policy.

A Yes, that would be quarrelsome.

Q Okay. And you said that the EEO Hotline was called. Who called the EEO Hotline?

A Ray Cuevas did.

Q So, by doing that, was he- was he following the uh- the guidelines of the policy? Are we- are we-

[Indistinct Comments]

Q -are we expected to call EEOC whenever there's a- the- an employee is threatened or verbally abused?

A It would be- EEOC would be a call to them pertaining to equal oppor- equal uh- equal opportunity employment policy. There is another line that has to do with more conduct-type situations. So, internally he called the wrong number, but still his report was still taken and the proper- appropriate departments were notified.

Q When you report a violation, if it's not the EEO- EEO, who would it be made to?

A It would be the OA- it would be to the-

Ms. R. M. Mazzara: Values Hotline.

A -it'd be the Values Hotline.

Q Would it be made to RMCC?

A Or you could go the RMCC route.

Q I have a- a definition- well, the UP workplace violence manual says that workplace violence is defined as any verbal or physical threat to any behavior or physical assault occurring in the workplace. Are you familiar with that?

A Yes.

Q Would you say that Mrs. Mazzara violated that workplace violence?

A I would say that at- at this point that's kind of why we're here, determine the facts of the investigation. I do have- I guess, you can say on- on all three statements from three different individuals, I do have either simil- similar wording or quotes of- of what was state- stated, which is a potential- or- or is a- a policy violation as far as the action. And we have two statements that concur there was some type of contact between the- Randi Mazzara and Ray Cuevas, where there was shoving. And then on

---

Randi Mazzara's statement, she has down that uh- that essentially Ray bumped into her. So, not having camera footage, I'm kind of stuck with the statements.

Q So, you-

A And I just have, I guess you can say, a quote or a threat on all three statements.

Q From Mrs. Mazzara.

A Yes.

Q Including her own statement, her statement saying that:

> You know, if I was a dude, you wouldn't have a face.

Would that be a verbal threat?

A Yes.

Ms. R. M. Mazzara: He has to finish the sentence.

Mr. E. J. Campos: And would you, Mr. Feetham, like me to hold my questions about Mr. Noble's statement or can I ask him about the-

Mr. J. M. Feetham: I- as- as long as we keep it in the realm of what Mr. Noble told him.

Mr. E. J. Campos: Okay.

Mr. J. M. Feetham: I don't want any question asked of Mr. Murphy on what James may have witnessed or seen or- or said unless it was told to him.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. E. J. Campos: Okay.

QUESTIONS BY: MR. E. J. CAMPOS [Continued]
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q When Mister-

Mr. J. M. Feetham: If you keep it in that context, that's fine.

Q Mr. Murphy, can we look at **Exhibit #7**, Mr. Cuevas's statement? The portion where it says he says:

> She said, if I was a- a man, I'd- I'd punch you in the face.

And he says where he- she pushed him.

Ms. R. M. Mazzara: Oh, my God.

Q Let's see, where does it say- all right. Okay, do you see where in Mr. Cuevas's statement he says:

> She gets in my face into like a fighting stance and pushes me.

A Yes.

Q Who is- did Mr. Cuevas relay that to you on the morning of the incident?

A Yes, he did-

[Indistinct Comments]

A -more so on the long- on the lines that-

Mr. A. L. Reeves: Right [phonetic].

---

A -she was physically preventing him from walking into the- the office or getting-

[Indistinct Comments]

A -out of the situation.

Q But he was trying to walk around her-

A Yeah.

Q -and she kept-

A Yes.

Q -getting in front of him? Okay. Mr. Noble's statement, **Exhibit #8**, where he says that she says if she was a man, that he, the Brakeman, would not have a face right now, do you see that part of his statement? It's on the second-

A Yes.

Q -second page. Did he relay that to you that morning as well?

A Yes.

Q Did Mr. Noble tell you that he witnessed the Engineer in the face of the Brakeman and that she put her- her hands on his body?

A Yes.

Q Was that a violation of the MAPS Policy regarding quarrelsome?

A Yes, that would be a violation.

Ms. R. M. Mazzara: I would object to this. Object-

Mr. A. L. Reeves: What's the objection?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Ms. R. M. Mazzara: Object or take a break.

Mr. A. L. Reeves: I'd like to object, Jerry.

Mr. J. M. Feetham: What's your objection?

Ms. R. M. Mazzara: Uh-

Mr. J. M. Feetham: Uh-

Mr. A. L. Reeves: Do you have an objection? What's your objection?

Ms. R. M. Mazzara: [Indistinct comment] the assault issue was dropped. This is not what we're here about. It was dropped.

Mr. A. L. Reeves: We're objecting the fact that the assault issue was dropped and this is just a quarrelsome issue that we're-

Mr. J. M. Feetham: So, what-

Mr. A. L. Reeves: -here-

Mr. J. M. Feetham: -what-

Mr. A. L. Reeves: That the- that the- the- whatever altercations that are being said, that this is a- a 1.6, quarrelsome, investigation and not a investigation due to some altercation.

Ms. R. M. Mazzara: And- and it's hearsay. This is-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: Okay.

Ms. R. M. Mazzara: -all-

Mr. J. M. Feetham: So, for your objection, and maybe it's just mincing terminology here. From what I'm hearing, Mr. Campos is relaying verbiage and statements in regards to the alleged charge in the caption of the Notice of Investigation, which would be quarrelsome.

Ms. R. M. Mazzara: Okay, that's [indistinct comment].

Mr. J. M. Feetham: Uh-

Mr. A. L. Reeves: But- but it seem to be focusing on physical altercations, not just quarrelsome altercation.

Mr. J. M. Feetham: We'd be focusing on anything in regards to the caption of the Notice of Investigation and what took place, okay? On-

Mr. A. L. Reeves: Okay.

Mr. J. M. Feetham: On- and again, Mr. Murphy's knowledge-

Mr. A. L. Reeves: Uh huh.

Mr. J. M. Feetham: -right? And I'm not going outside of that scope. We're

---

sticking within that scope. But altercation and quarrelsome, I'm not sure where the- the- the alleged charge is quarrelsome and that's what- what it's being related to. So, your objection's noted for the record, overruled, and we're gonna proceed.

Mr. A. L. Reeves: Okay.

Mr. J. M. Feetham: Mr. Campos?

Mr. E. J. Campos: Yes.

Mr. J. M. Feetham: Go.

QUESTIONS BY: MR. E. J. CAMPOS [Continued]
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q In your- did Mr. Cuevas do everything that- complied with all the policies from Union Pacific as far as workplace violence and- and what happened that night? Was he- he relayed to- he relayed to you what happened? He-

A Yes, I-

Q -called you?

A -would say he- he did. Actually, he- believe he called the hotline before he even called me, which is within the policy.

Q He did call the hotline, okay.

Ms. R. M. Mazzara: Can we get-

Mr. E. J. Campos: I have no other-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Ms. R. M. Mazzara: Can we get records of that?

Mr. E. J. Campos: -further questions of Mister-

Mr. A. L. Reeves: Huh?

Mr. E. J. Campos: -Murphy.

Ms. R. M. Mazzara: Can we get records-

Mr. E. J. Campos: Thank you.

Ms. R. M. Mazzara: -of him calling the hotline?

Mr. J. M. Feetham: Okay. Mr. Cuevas, do you have any questions of Mr. Murphy?

Ms. R. M. Mazzara: Can we have records of-

Mr. R. Cuevas: No.

Ms. R. M. Mazzara: -him calling the hotline?

Mr. J. M. Feetham: Okay. Mr. Murphy, I'm only have a few and then we'll go around-

Mr. A. L. Reeves: You want it transcribed-

Mr. J. M. Feetham: -the table again. I'll go ahead and just-

Mr. A. L. Reeves: or you want a copy of it?

Ms. R. M. Mazzara: Yeah.

Mr. J. M. Feetham: -address something-

---

Ms. R. M. Mazzara: They should have-

Mr. J. M. Feetham: -that's come up.

Ms. R. M. Mazzara: And the EEOC and fi- the filing of the EEOC.

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q Looking at **Exhibit #7**, Mr. Murphy, which would be Mr. Cuevas's statement, and I guess about in the middle where it- where it- if you could read, I guess, two sentences- two to three sentences- three sentences where it starts it was a 30-second drive. Could you start there and read that on the record, please?

A Yeah, start at:

> It was a 30-second drive back to the office. As we parked, Randi gets out of the vehicle aggressive and gets in my face.

Let me read that:

> Randi gets out of the vehicle all aggressive and gets in my face.

Q And then the next sentence.

A She said a second time, if I was a man, I'd punch you in the face.

Q Would that meet the definition of quarrelsome, which we've covered so far in these proceedings and has been entered into exhibit?

A Yes.

Q On Ms. Mazzara's statement, **Exhibit #6**, towards the bottom there, I guess, do you see the hyphen there?

---

A Yes.

Q Start with that line over to the left and read it down towards the bottom if you would, please.

A I did not push Cuevas, so he says. He bumped into me and claimed I pushed him.

Ms. R. M. Mazzara: Where's that? Where- where is that at?

Mr. J. M. Feetham: Uh-

Ms. R. M. Mazzara: Oh.

Mr. J. M. Feetham: Right after the hyphen.

Q So-

Ms. R. M. Mazzara: Yeah.

Q -let me ask you this, Mis- Mr. Murphy, if there was employees pushing each other as Ms. Mazzara's statement is a testament to what she experienced, would that be a- a- a violation- the- the definition of quarrelsome?

A Yes.

Mr. J. M. Feetham: No further questions at this point in time. Mr. Reeves?

Mr. A. L. Reeves: No questions.

Mr. J. M. Feetham: Ms. Mazzara, do you have any questions for Mr. Murphy?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q Do you have any copy of when he called that hotline? Do you have-

A I don't-

Q -any-

A -have a company- a copy of the EEO Hotline, no.

Q Who does?

A I would imagine it would be with the EEO.

Q And wouldn't they get a copy of that?

A They don't have a copy it.

Q Of the report that he filed with the hotline?

A These gentlemen?

Q Yeah, Ray-

A I'll- I'll leave that-

Q -or-

A -I guess the Hearing-

Q And union-

A -Officer-

Q -would've got one?

A -to ask for that. I didn't-

---

Q You didn't-

A -get one.

Q You never received one?

A I don't have one.

Q Okay.

Mr. J. M. Feetham: Any- any further questions?

Ms. R. M. Mazzara: No. I mean- I mean, I guess can you stop?

Mr. J. M. Feetham: Yeah, you want- you re- we'll take a short recess.

[RECESS]

Mr. J. M. Feetham: All right, we're back on the record. Ms. Mazzara, do you have any more questions of Mr. Murphy?

Ms. R. M. Mazzara: No.

Mr. J. M. Feetham: Mr. Campos, do you have any questions of Mr. Murphy?

Mr. E. J. Campos: Yes.

Mr. J. M. Feetham: Okay.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. R. P. MURPHY, WITNESS

Q Mr. Feetham asked you about the- that part of her statement that said:

He bumped into me and claimed I pushed him.

The other two witnesses, did they ever relay to you that that's what happened?

A No.

Ms. R. M. Mazzara: Who were the other two-

Mr. E. J. Campos: No further-

Ms. R. M. Mazzara: -witnesses?

Mr. E. J. Campos: -questions.

Ms. R. M. Mazzara: Who were the other two witnesses?

Mr. J. M. Feetham: Mr. Cuevas, do you have any questions for Mr. Murphy?

Mr. R. Cuevas: No.

Mr. J. M. Feetham: All right. At this point in time, I don't have any questions of Mr. Murphy. We're gonna recess. I'll excuse you, Mr. Murphy. If you could have Mr. Cramer come in.

Mr. R. P. Murphy: Will do.

[RECESS]

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: Okay, we're back on record. Mr. Murphy's been excused. We got Mr. Cramer here with us. In- in addressing that exhibit, Mr. Campos, that you brought in-

Mr. E. J. Campos: Uh huh.

Mr. J. M. Feetham: -on the stipulation- let me go ahead and enter it, but under the stipulation that when we look at the policy that you so turned in, it- it'll be under the- the second paragraph, the Prohibited Behavior. So, that- that's gonna be, I think, **Exhibit 11**, let me double-check.

Mr. E. J. Campos: Okay. So, that's the only part of that policy I can refer to?

Mr. J. M. Feetham: I- I- well, I mean, the whole document's a exhibit, but, you know, when we look at the testimony we have so far, we're not complete yet, I don't see where weapons or anything else. But, you know, the- the pertinent part, what- what I'm saying is the pertinent part in this document that you presented would be that second paragraph in regards to these proceedings. That will be **Exhibit #11**, Page 1 and 2.

---

Mr. E. J. Campos: I kind of think that the first paragraph-

Mr. J. M. Feetham: One and two, I- I agree. I- what I didn't want is that-

Mr. E. J. Campos: Okay, okay.

Mr. J. M. Feetham: -is there's- I- I don't have any evidence of any weapons and stuff like-

Mr. E. J. Campos: Gotcha.

Mr. J. M. Feetham: -that.

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MR. J. S. CRAMER, WITNESS

Q Okay. Mi-

Ms. R. M. Mazzara: On-

Q -Mr. Cramer-

Mr. A. L. Reeves: Page 1 and 2.

Ms. R. M. Mazzara: On this one?

Mr. A. L. Reeves: Yeah, **#11**.

Ms. R. M. Mazzara: Is- this is **Exhibit 10**?

Mr. A. L. Reeves: Okay, this whole-

Ms. R. M. Mazzara: What's Exhibit-

---

Mr. A. L. Reeves: -thing will be **Exhibit 10**-

Ms. R. M. Mazzara: He- didn't he-

Mr. A. L. Reeves: -[overtalk].

Ms. R. M. Mazzara: -say **Exhibit 11**?

Mr. A. L. Reeves: This whole thing will be **Exhibit**-

Q Mr. Cramer, if you would, please-

Mr. A. L. Reeves: **-11**-

Q -state your name-

Mr. A. L. Reeves: -Page 1-

Q -and occupation.

Mr. A. L. Reeves: -and 2.

A James Cramer, C-R-A-M-E-R, Manager of Road Operations for Los Alamitos [phonetic] and Anaheim.

Q Okay, and railroad employed by and years of service, please.

A The Union Pacific Railroad, 28 years.

Q Did you super- do you supervise the employees who have been charged with responsibility in connection with the incident under investigation?

A Yes.

Q And did you make an inquiry into the incident under investigation?

A Yes.

---

Q What was the result of that inquiry?

A On the day in question, I arrived at my office in Anaheim. I received a call from Mr. Murphy, and apparently his call was to advise me that Ms. Mazzara was en route to come to my office to give me her statement. As soon as I had answered the phone, Ms. Mazzara walked into my office. She- she was already there, so I ended the phone call with Mr. Murphy and focused my attention on Ms. Mazzara to see what the issue was.

At that point, Ms. Mazzara had- I said, what's going on and she said, I re- I screwed up, it's bad. I said, what do you mean you screwed up, what do mean it's bad? And then she proceeded to tell me what had transpired. And what she told me is- lines up directly with the statement that she had gave me. So, after she told me her side of the story, I gave her a- a notepad and a pen and asked her- or a pencil and I asked her to uh- to write out her statement in her words of what had transpired.

Q So, I'm gonna show you **Exhibit #6**. It would be the- would that be the statement that she had- do you- or do you remember seeing it?

A Yes, that's the same statement, which I have the original and copies of as well.

Q Okay. And we do have this as a- a exhibit for these proceedings. What did she tell you in regards when you were- I guess, like interviewed or spoke to her?

A She- what I asked her, I said, what did you- what do you mean you screwed up? And she told me that she had told Mr. Cuevas that if she were a man, she would rip his face off. And then she proceeded to tell me kind of what led up to that. There were some things that transpired throughout the shift that day, something to do with, you know, a window in the vehicle. Anyway, there was some tension and it just transpired to this event.

Q And that- that was- was- that wasn't at Mead Yard was it?

---

A So, as far as where that happened, I think there was some issues in the cab of the locomotive [overtalk]-

Q No, not- not the incident itself. Your- Ms. Mazzara coming to you, where was that?

A That- that was at my office in Anaheim.

Q Okay. So, separate-

A Yeah.

Q -and apart from Mead Yard.

A Yes.

Q Okay.

A Separate and apart from Mead Yard. So, I was not-

Q Okay.

A -there. I did not witness any of this. My role in this was just getting Ms. Mazzara's side of the story and getting her statement.

Q And did you talk to Mr. Cuevas at all in regards-

A I did not.

Q Okay.

A Mister-

Q Uh-

A -Murphy had Mr. Cuevas and Mr. Noble down at Mead Yard, so I had no part in interviewing them.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Okay. Did Ms. Mazzara- I'm reading her statement here. Did Ms. Mazzara say that she was pushed by Mr. Cuevas?

A She did not tell me she was pushed. She said that he bumped into her and that- then, at that point, he accused her of bumping into him.

Q Okay. Did you have any other involvement other than this in regards to these proceedings and these two employees?

A For this event, no.

Q Okay. Did you make any other inquiries?

A No.

Q Okay.

Mr. J. M. Feetham: No further questions. Mr. Reeves, any questions of Mister-

Mr. A. L. Reeves: Yes.

Mr. J. M. Feetham: -Cramer?

QUESTIONS BY: MR. A. L. REEVES
STATEMENTS OF: MR. J. S. CRAMER, WITNESS

Q Mr. Cramer, in regards to Ms. Mazzara's verbal comment, is there any reason why her verbal comments of admittance is not in her statement?

A As far as? I'm sorry, what was the question?

Q As far as having her verbal- her verbal comments upon entering your office versus what she wrote down, I screwed up, this, that and the other, but the comments doesn't state any of that. Is there any reason?

---

A I don't know why she didn't put that in her statement that when she was originally speaking to me, she was just talking to me one on one. And in- in terms of her saying, you know, it's- you know, this is bad, I- I screwed up, was just her telling me- setting the stage for the rest of the dialogue. So, at that point, she told me what she had said to Mr. Cuevas and- so, the- the whole kind of vibe of what she was sharing with me was, you know, at the time, I think she- well, I- I can't speculate of what she felt, but she did tell me she felt like she screwed up.

Q Okay.

Mr. A. L. Reeves: No further questions.

Mr. J. M. Feetham: No further questions?

Mr. A. L. Reeves: No, sir.

Mr. J. M. Feetham: Mr. Mazzara- or Ms. Mazzara, do you have any questions of Mr. Cramer?

Ms. R. M. Mazzara: No, no.

Mr. J. M. Feetham: Okay. Mr. Campos, do you got any questions of Mr. Cramer?

Mr. E. J. Campos: Yes.

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. J. S. CRAMER, WITNESS

Q Be- did you talk to her- were you talking to her and she made these statements about I screwed up, was that before she wrote her statement or-

A Yes.

---

Q -or before- I mean, after?

A Before.

Q Before, okay. And so, before she wrote her statement and after saying, I screwed up, she told you that she told Mr. Cuevas if she was a man, she'd rip his face off?

A She- she did tell me she had said that, and that was following her comment that I screwed up, and I asked her what- what do you mean you screwed up, and she told me about the confrontation and about her telling Mr. Cuevas that if she were a man, she would rip his face off.

Q And so, in her statement, **Exhibit #6**, I don't know if you have it in front of you-

A I do.

Q -in the middle of- of the statement that says,

> I said, you know, if I was dude, you wouldn't have a face.

That- that's- that was- she wrote that in your office?

A Yes. Well, in the crew room-

Q Okay.

A -near my-

Q Right.

A -office, yeah.

Q Okay. Are you familiar with the definition of quarrelsome under the UP MAPS Policy?

A I don't have that in front of me, but I have a kind of idea.

---

Q So, she's being charged with 1.6, both of them are, Mr. Cuevas and Ms. Mazzara are being charged with 1.6, that part that says quarrelsome. For the definition we entered into as an exhibit was from the MAPS Policy. It says:

> When an employee's continued behavior is inclined or disposed towards an angry verbal confrontation with others in the workplace.

Would you say that she was quarrelsome?

A I- I would say yes.

Q Okay.

A Uh-

Q Thank you.

A Yes.

Mr. E. J. Campos: I don't have any other questions.

Mr. J. M. Feetham: Mr. Cuevas, do you have any questions of Mr. Cramer?

Mr. R. Cuevas: No.

Mr. J. M. Feetham: Okay. I got one more, and I think Mr. Reeves or Ms. Mazzara may have one on- on readdress.

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MR. J. S. CRAMER, WITNESS

Q But along the lines here, you just read the definition of quarrelsome, did you not?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A Yes, I read it all.

Q Okay. So, it's just kind of readdressing, but on- on her statement there, would that be the definition of quarrelsome?

A I would agree.

Q Okay.

Mr. J. M. Feetham: No further questions. Mr. Reeves, do you got any questions of Mr. Cramer?

Mr. A. L. Reeves: No, sir, no further questions.

Mr. J. M. Feetham: Ms. Mazzara, do you have any questions of Mr. Cramer?

Ms. R. M. Mazzara: No.

Mr. J. M. Feetham: Mr. Campos, do you have any questions of Mr. Cramer?

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. J. S. CRAMER, WITNESS

Q Mr. Cramer, I entered in an exhibit. It's **Exhibit #11**. It's the Policy to Address Violence and Abusive Behavior in the Workplace. Do you have a copy of that?

A I do not.

Mr. J. M. Feetham: But he will here in a minute.

Q Can- can you read the first paragraph-

---

A Sure.

Q -under Purpose?

A Union Pacific is committed to maintaining a safe work environment free of all forms of violence, including verbal and physical threats. The Company has a zero tolerance policy with respect to all forms of violence in the workplace. This policy applies to all employees, customers, contractors, vendors, visitors, or any individual on Union Pacific property. Individuals subject to this policy are also responsible for compliance with applicable state and federal laws.

Q According to this Mrs. Mazzara's statement, that part that said, you know, if I was a dude, you wouldn't have a face, would you say that was a violation of the violence and abusive behavior in the workplace?

A I would agree.

Q Thank you.

Mr. E. J. Campos: No further questions.

Mr. J. M. Feetham: Mr. Cuevas, do you have any questions for Mr. Cramer?

Mr. R. Cuevas: No.

[Indistinct Comments]

Mr. J. M. Feetham: Okay. I don't either at this point in time, but I think Mr. Reeves or Ms. Mazzara has any questions. I'm gonna allow and turn around to you. Do you have another question for Mr. Cramer?

---

Ms. R. M. Mazzara: Well, I'd like to clarify if I were dude, and- and- and then also-

Mr. J. M. Feetham: But- but-

Ms. R. M. Mazzara: -with what Ray said.

Mr. J. M. Feetham: But re- remember what I said, if you got a question for him, you can clarify it in a question. But if you want to clar-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -clarify your-

Ms. R. M. Mazzara: But-

Mr. J. M. Feetham: -your-

Ms. R. M. Mazzara: But-

Mr. J. M. Feetham: -your statement-

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED
STATEMENTS OF: MR. J. S. CRAMER, WITNESS

Q Didn't I say-

Mr. J. M. Feetham: -by-

Q -to you, you know, if I were to- I was referring to Ray, if I was a dude, you wouldn't have a face, and- and he said, oh, are you threatening me? And if you remember, I said, no, I'm not a dude.

Mr. J. M. Feetham: Ms. Mazzara, a question. I- I'm-

---

Ms. R. M. Mazzara: I did, but I-

Mr. J. S. Cramer: She's asking me if I-

Q Do you remember me-

Mr. J. M. Feetham: Okay.

Q -saying that to you?

A I do. And- and as far as the exact verbiage of if you were- if I were a dude, I'd rip your face off, or you wouldn't have a face-

Q I didn't say ri-

A -I- I don't- I don't remember. I just remember what I thought you said at the time.

Q Yeah.

A As far as the semantics of exactly how it was worded, I'm not, you know, sure if what you wrote is exactly what you said to me. But I- I do remember you saying to me that you told him, I'm not a dude, but I'm not- that's not a threat because I'm not a dude.

Q Right.

A You did say that to me.

Q Okay.

Mr. J. M. Feetham: Any further questions?

Ms. R. M. Mazzara: No.

Mr. J. M. Feetham: Mister-

Mr. E. J. Campos: Yes.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: -Campos?

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. J. S. CRAMER, WITNESS

Q Does the policy, does it- anywhere in the Policy to Address Violence and Abusive Behavior does it say anything about whether it- it's- it- the- the- the verbal threat comes from a- a man or a woman?

A It does not.

Q Thank you.

Mr. J. M. Feetham: Mr. Cuevas, do you got any questions of Mr. Cramer?

Mr. R. Cuevas: No.

Mr. J. M. Feetham: At this point in time, I don't have any questions of Mr. Cramer. We will excuse Mr. Cramer and we will bring in Mr. Noble. Go off the record real quick.

[RECESS]

Mr. J. M. Feetham: All right, we're back on record. I have Mr. Noble present as the Carrier witness. I also have Mr. Karl Wilson who came in and he's just gonna be an observer, but he's here in regards to Mr. Noble's presence.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q Mr. Noble, if you would, state your full name and Employee I.D. Number.

A Yes, James Dale Noble. Employee I.D. Number is 0298164.

Q And you work for Union Pacific Railroad. Is that correct?

A That is correct.

Q And- and on- I'm gonna say on April 15th, 2021, you were working the LOG44 with Ms. Mazzara and Mr. Cuevas. Is that correct?

A That is correct.

Q And is- is that your regular crew? You guys work together consistently?

A That is correct.

Q Okay. On the morning thereabouts when you arrived back, and- and what I'm looking for, Mr. Noble, is just to remain in the caption of the Notice of Investigation here. When you arrived back at Mead Yard, can you translate what you witnessed when the power was tied down and the crew getting back to the yard office?

A Yes.

Unidentified: Okay.

A On the morning of 4-15-21 at around 4:20 a.m., after putting the UP 7029 and the UP 7397 at the bottom of Track 8, I, myself, drove the Jeep to pick up the Engineer and Brakeman to go to Mead Yard Office and tie up. After picking up crew in the Jeep, the Engineer got out and said that I can come back and pick her up, and I said, no and why? And the Engineer said, I know the Brakeman-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Ms. R. M. Mazzara: He has to read his statement to remember.

A -won't let- won't let his window up.

Ms. R. M. Mazzara: That's the procedure.

A At that time-

[Indistinct Comments]

A -I said get in, it's time to go home. So, she got in the Jeep and I drove off. While I was driving, the window on my side was only down a quarter, a quarter open, and, at this time, the Engineer in the backseat told the Brakeman that if he was a man, that he- that he, the Brakeman, would not have a face right now.

[Indistinct Comments]

A And the Brakeman respond to her was asking, are you threatening me? And the Engineer kept talking until arriving at the yard office. Upon getting out of the Jeep, [indistinct comment] Engineer in the face of the Brakeman and put her hands to his body, and staring face-to-face walked to the building. And as I was standing next to the Jeep, not believing what I'm seeing. And then after being told myself, you know, and Brakeman needs to man up. I witness it all on the 4-15-2021.

Q Okay.

[Indistinct Comments]

Q So, this isn't an unusual move. I- I know there's some variances built on the bottom of the yard to the top of the yard and back to the yard office. It really isn't out of the ordinary, maybe different from what your normal practice is, but typical. Is that- would that be fair to say?

A Yeah, typical, but like you said, not normal practice. That night, the power need to be at the bottom of the yard.

---

Q Okay. And your window was down a quarter. I know I've read something in these statements about window being down. Was Mr. Cuevas's window down?

A Yes, it was.

Q Was there- was there a conversation between- well, let me ask you this. Was- was the conversation between Ms. Mazzara and Mr. Cuevas regarding his window or your window?

A His window.

Q His window. And then- so, was Ms. Mazzara asking for his window to be rolled up?

A Yes, she was asking for his window to be rolled up. I looked over at his window. His window wasn't down much more than mine was.

[Indistinct Comments]

Q Okay. What was- what did you witness Mr. Cuevas's response to her request?

A His first was, you know, the window's open for ventilation and circulation.

Q Okay. And then what else did you witness after that, what-

A And-

Q -as far as their conversation?

A And then after that, and that's when the- you know, the conversation went to if I was man, you wouldn't have a face right now.

Q Okay. And that was coming from Ms. Mazzara?

A That is correct.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q What was Ray- Mr. Cuevas's response to that?

A Are you threatening me?

Q Okay. And this is- so, that- that drive is about 30 seconds total, thereabouts, or-

A About 30, 40 seconds.

Q Okay, and all that took place in that 30 or 40 seconds?

A That's correct.

Q Okay. What took place once you got back where you got out of the car? What did you-

A Uh-

Q -witness? And that's what I want to say, to your knowledge of what you saw.

A Right. When we got back and I got out of the vehicle, I heard the Engineer, you know, talking to the Brakeman and I'm watching everything. And then all of a sudden I- the Brakeman's hands were up in the air. And then he actually, he looks at me and says, did you see this? I said, yeah, I'm watching everything.

Q What did you see?

A I saw- at that time, I saw the Engineer put her hands to his body and Mr. Cuevas backed up a little.

Q When you say put hands to his body, can you kind of describe it? I mean-

A Well, yeah-

Q Okay.

---

A -a push.

Q And I need that translated. So, it was a push, just touched him?

A Yeah, it was a push.

Q It was a push.

A Yes.

Q Did it move Mr. Cuevas?

A Well, yeah, it moved him back with his hands up in the air, then he looked me. At the same time, I'm looking at the whole thing and he asked me did I see this- am I seeing all of this, and-

Q Where-

A -my response was yes.

Q Where was the proximity of that from a car? And that was inside the yard office or outside?

A It was outside the office-

Q Okay.

A -next to the Jeep.

Q Next to the Jeep as soon as you-

A Yes.

Q -got out.

A Yes.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Did it continue from there?

A Oh, yeah, it continued from there. Not the touching or the pushing, but the up in the face, walking all the way up to the door. I was standing there watching the whole thing all the way up to the door.

Q So, with two people walking to the door, correct?

A Right.

Q Who was in the front and who was behind?

A Well, mostly the Engineer was in the front of the Brakeman. You know, he was trying to get around to get to the building at that time.

Q So, was- and when you say Engineer, you mean Ms. Mazzara, correct?

A Yes.

Q Was she walking backwards?

A No.

Q Was she-

A She was walking-

Q -side-by-side-

A -ahead.

Q -or-

A Yeah, he's side-by-side going up to the door.

Q Okay. Did it end when you got in the- when they got in the door?

---

A Well, once they got in the door and went inside, I took my grip to the car. And then when I came back from my car to go in the building, that's when the Brakeman was coming down the steps, you know, at me. And I- I just told him, you know, you need to do what you gotta do.

Q Okay.

A And then that's when I walked in the building.

Q So, was it just that one time when you witnessed Ms. Mazzara, as you put it, put hands on his body?

A Yes.

Q Did you witness Mr. Cuevas push or bump or put hands on Ms. Mazzara's body?

A No.

Q Did Mis- did- would you say that conversation between them was a little heated? Well, let me put it this way, was it a normal conversation to you?

A No, it wasn't a normal conversation. It sounded like the Engineer was- was heated towards the Brakeman.

Q And what about the Brakeman towards the Engineer?

A He wasn't saying much. He just had his hands up in the air, you know, trying to get around to get to the building.

Q And then that- that's pretty much all you witnessed at that point in time?

A Yeah, that's all I witnessed at that time.

Q Okay.

Mr. J. M. Feetham: Well, no further questions at this point in time. Mr. Reeves, do

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

you got any questions for Mr. Noble?

QUESTIONS BY: MR. A. L. REEVES
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q Mr. Noble, can you recollect or anything- anything that would give this moment- it seemed like it just went from zero to 10. What happened in between? Was there any moment or would you be privy to any moment that would have- have it escalate so high so fast?

A No, on the- like I said in my statement, once we got into the vehicle, then that's when everything started.

Q So, prior to that you guys were working.

A Correct.

Q And you were finished for the night, so I guess the night went well?

A The night went well like normal.

Mr. A. L. Reeves: No further questions.

Mr. J. M. Feetham: Ms. Mazzara, do you have any questions for-

Ms. R. M. Mazzara: I do.

Mr. J. M. Feetham: -for Mr. Noble?

Ms. R. M. Mazzara: I do.

Mr. J. M. Feetham: Okay.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q Can you tell me how much your window was rolled up?

A Yes, I said it wa- my window was rolled up more-

Q Can you-

A -than halfway.

Q -give me like a-

A Yeah, about halfway down. A quarter of an inch. Maybe- maybe a little bit, a quarter.

Q You said a quarter of the way, so a quarter-

A Right.

Q -of the way of that window was probably about like that, like you normally-

A It was like-

Q -have it.

A -like that, like I normally have-

Q Okay.

A -when I'm driving.

Mr. J. M. Feetham: For- just- just so I can for the record, there were- no hand gestures. It doesn't register here. Can we-

Mr. J. D. Noble: Right.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: -give a- you know, so a measurement. Give me a measurement on this.

Mr. J. D. Noble: Maybe a fourth, four inches.

Mr. J. M. Feetham: Okay.

Ms. R. M. Mazzara: Well, that's not a quarter of the way of the window.

Mr. J. M. Feetham: Do you have any questions?

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: Proceed.

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q A quarter of a window, that window is probably like-

Mr. A. L. Reeves: Ask your question.

Ms. R. M. Mazzara: Okay.

Q Did I not ask you to roll your window up?

A No, you did not ask me. You asked Mr. Cuevas.

Q I asked you if you would roll your window up.

A No, that is incorrect.

Q I did ask you if I could roll your win- if you would please roll your window up. And- and I- then I asked Ray, and both of you-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: And Ms. Mazzara, again, let's keep it in-

Ms. R. M. Mazzara: I can't do it.

Mr. J. M. Feetham: -a question and answer-

Ms. R. M. Mazzara: I-

Mr. J. M. Feetham: -format.

Ms. R. M. Mazzara: Okay.

Q So, I did ask you if you would roll your window up. And I'm used to having you have your window up. As you say in your statement, I would not have requested you to roll up your window. Is that correct?

A No, you did not ask-

Q Because-

A -me to roll my window up.

Q Because normally, at times when I do ask you, James, would you roll your window up, you do-

Mr. J. M. Feetham: Ms. Mazzara-

Ms. R. M. Mazzara: No, I- how am I gonna get clarification on this?

Mr. J. M. Feetham: You'll have an opportunity to provide your testimony when we ask your questions. What I'm trying to do, like I've explained, I want you to ask him a question.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: But your answer- you're answering your own question with a statement and I can't allow that in this-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -format.

Ms. R. M. Mazzara: Okay.

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q Do you recall me, James- I mean, excuse me, Mr. Cuevas, following me up the stairs?

A No, you both were walking up the stairs at the same time. That's what I recollect.

Q All right, but you don't remember really.

A Yeah, I do remember.

Q Who opened the door?

A You did.

Q How many times did it take me to open the door?

A Maybe once or twice.

Q And where was Ray standing at that time?

A He was leaning up against the rail.

---

Q No, he was right there with me, because I held the-

A No, he was-

Mr. J. M. Feetham: Ms. Mazzara-

A -behind you.

Mr. J. M. Feetham: Ms. Mazzara, again-

Q Okay, and- and didn't I hold the door open for him?

A No, at the time, once you opened the door and went in, I walked to my vehicle.

Q I didn't hold the door open. I said and didn't [phonetic]-

Mr. J. M. Feetham: Ms. Mazzara, Ms. Mazzara, please continue. If you got a question for him, a- ask the question.

Q Did you see me hold the door open for Ray?

A No, I did not. Once- once I-

Q Okay.

A -you opened the door and you started to go inside, I walked to my vehicle.

Q When I went to my vehicle, do you recall you were sitting at the computer in the office when I said, you need to man up? In other words, do you remember that?

A Yeah, I was sitting at the computer and you were-

Q Okay.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A -walking down the hallway, going out the door, and you said, you guys need to man up.

Q And you said-

A I didn't-

Q -it-

A -say anything.

Q At- at the time, in your statement, you said Ray and you. Is that correct?

A Yeah. You said you both need to man up and you walked out the door.

Q Okay. So, it wasn't- I wasn't addressing Ray at the time. It was just you.

A Well, I don't know who you was re- addressing at the time-

Q I was-

A -because I- I don't-

Q I was-

A -know exactly what-

Q I said-

A -that meant.

Q I said that just to you and not you and Ray.

Mr. J. M. Feetham: Ms. Mazzara, Ms. Mazzara, questions please.

Ms. R. M. Mazzara: Okay.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q I- I said that- I made that statement just to you.

A Well-

Q Was- how else did- I addressed that statement just to you.

A I don't know who you were addressing it to because you were walking out the door and I'm at the computer-

Q You were the only one there.

A -doing my work.

Mr. J. M. Feetham: Ms. Mazzara, please, we- if- we-

Mr. A. L. Reeves: You can't cross-examine.

Mr. J. M. Feetham: I'm not trying to make it-

Mr. A. L. Reeves: Just- just ask-

Mr. J. M. Feetham: -difficult for you.

Mr. A. L. Reeves: -a question.

Ms. R. M. Mazzara: How- I-

Mr. J. M. Feetham: Hang- hang on.

Mr. A. L. Reeves: [Indistinct comment]

Mr. J. M. Feetham: I'm not trying to make it difficult for you.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q Did I not tell you to man up?

A Yeah, you were walking out the door and I'm at the computer and my back is to you. You're walking out the door and you said, you two need to man up, and you walked out the door.

Q Okay.

Ms. R. M. Mazzara: That's it, thank you.

Mr. J. M. Feetham: Okay. Mr. Campos, do you have any-

Mr. E. J. Campos: Yes.

Mr. J. M. Feetham: -for Mr. Noble?

Mr. E. J. Campos: Yes.

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q Mr. Noble, thank you for being here. You said when your day was done you left the power in Track 8?

A That is correct.

Q And then you drove the vehicle down to pick up the crew?

A That is correct.

Q What kind of vehicle was it?

A A Jeep.

Q Type of vehicle?

A A Jeep.

Q Jeep, four doors?

A Yes.

Q And you were driving?

A That is correct.

Q Who was- where- where were the rest of the crew seated?

A Well, the Brakeman was in the passenger seat and the Engineer was in the backseat.

Q Okay. It's been- it's been testified earlier by Mr. Murphy, but I'm gonna ask you, how far is it from Track 8 to the yard office, how far of a drive?

A I don't know, about 30, 40 seconds.

Q Thirty, 40 seconds.

A Yeah.

Q So, a quarter mile, maybe less than that?

A Yeah, a quarter mile or less.

Q Okay, okay. The Engineer asked you to roll up your window?

A No, she did not ask me.

Q Did she ask Ray to roll up his window?

---

A Yes.

Q And did he?

A Well, no, because it wasn't down far enough to have any effect.

Q And then what happened?

A And then that's when the uh- the Engineer told him that if she was a man, he wouldn't a face right now.

Q Was she- did she say it in a normal voice-

Ms. R. M. Mazzara: [Indistinct comment].

Q -or was she- her voice raised?

Ms. R. M. Mazzara: That needs to be entered as an exhibit.

A Her voice was raised.

Q She was yelling?

A Yes.

Mr. A. L. Reeves: What?

Ms. R. M. Mazzara: It's a legal document.

Q Did you consider what she said to Mr. Cuevas about if he was a man, he wouldn't have a face, did- did you consider that as a threat?

A Well, yes.

Q A verbal al- altercation?

A Yes.

---

Q Did you say anything after you heard her say that?

A No, I just wanted to hurry up and get to the yard office.

Q Was Mister- what was Mr. Cuevas's response to her telling him that he was- if she was a man, he- he wouldn't have a face?

A His response was, are you threatening me?

Q And- and what was her response?

A Well, she just kept talking all the way up to the office.

Q Do you know what- she didn't respond to him saying that?

A Well, no. Well, kind of yes, she did respond to him saying that, but, you know, I'm driving, trying to hurry up and get to the office and get out of that vehicle.

Q So, she was arguing with him?

A Yes.

Q Or- or was he arguing back?

A No, he was not.

Q He was quiet?

A Yes.

Q So, Mr. Cuevas was never quarrelsome-

A No.

Q -as far as what you witnessed.

A No.

Q Did uh- did you say anything to the Engineer while you were driving-

A No.

Q -up to the office?

A No, I did not.

Q Once you were at the yard office and the vehicle was stopped, what happened?

A Well, once we got to the yard office and it was stopped and I got out of the vehicle, it was on the right side of the vehicle towards the front of the- of the vehicle.

Q So-

A And- and then I just stand there and just watch the Engineer initiate the argument and then the touching and the pushing.

Q So, when- when the Engineer and the Brakeman exited the vehicle, it was on the same side?

A That's correct.

Q And did Mr. Cuevas try to walk around the- the- the vehicle to go inside the office?

A Yes, he did.

Q And what happened then?

A Well, at- at that point, the Engineer was in front of him, you know, shouting and screaming, whatever. I wasn't really listening to any of it. It was just a bunch of noise to me. Sounded like a bunch of noise.

---

Q Was she the only one talking, screaming?

A Yes.

Q So, you never looked back to see- or did you see her put her hands on him?

A Yes, I did. I was watching the whole thing.

Q And- and you said that Mr. Cuevas had his hands in the air?

Ms. R. M. Mazzara: Like this.

A Hands in the air.

Q Why- why did he have his hands in the air?

A Well, I can only speculate, but-

Mr. J. M. Feetham: Okay, what- let me- I- I don't- I think that's a question better for Mr. Cuevas-

Mr. E. J. Campos: Okay, okay.

Mr. J. M. Feetham: -Mr. Campos.

QUESTIONS BY: MR. E. J. CAMPOS [Continued]
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q So- so, did you see Mr. Cuevas trying to walk around Mrs. Mazzara?

A Oh, yeah. At that time, he was trying to walk around and get to the building, but the Engineer kept in his face all the way up the steps, all the way to the door.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Okay. So, you think at that- in your opinion, was Ms. Mazzara quarrelsome?

A Yes.

Q Thank you.

Mr. E. J. Campos: No que- no further questions.

Mr. J. M. Feetham: Mr. Cuevas, do you have any questions for Mr. Noble?

Mr. R. Cuevas: No.

Mr. J. M. Feetham: Okay, just- just one.

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q How long do you think, from your experience, that this went on from the time, I guess, that you deem it started until the time it ended? What's the timeframe? And it just needs approximation. I don't- I wouldn't expect you to have a-

A I would-

Q -stopwatch.

A -say about maybe 30, 40 seconds up to the parking lot, and then out the vehicle maybe another minute and a half. Maybe less than three minutes.

Q Okay, less than three minutes.

A Correct.

Q Then they- the put hands on body, which is a quote from you in testimony-

---

A Uh huh.

Q -once, multiple times?

A Just once.

Q Once.

A Yes.

Q And once you got out of the car at the yard office.

A That's correct.

Mr. J. M. Feetham: No further questions. Mr. Reeves?

Mr. A. L. Reeves: No, sir. No further questions.

Mr. J. M. Feetham: Ms. Mazzara?

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q Do you recall Mr. Cuevas saying I pushed him? He goes, you pushed me. Do you remember him saying that?

A Mr. Cuevas said, are you seeing this and I said-

Q No-

A -yes.

Q -I asked you, do you recall Mr. Cuevas saying, you pushed me and I said- and do you recall me saying he bumped into me?

A No, I do not.

---

Q Of course not. Do you want to show- well, show- show us how I pushed Cuevas?

Mr. J. M. Feetham: Well-

Ms. R. M. Mazzara: We can't do that.

Mr. J. M. Feetham: No, we can't-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -because the- the trans- I mean-

Ms. R. M. Mazzara: All right.

Mr. J. M. Feetham: -you can describe it. I kind of asked him to describe it.

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: [Indistinct comment]

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q So, how fast were you driving to take that drive from the bottom of eight to Mead Yard?

A Well, when we started off, I was driving like maybe 15 miles an hour, but then one- once I heard you say that to uh- to him, then I stepped on the gas a little bit to hurry up to get to the office.

Q Do you recall me, once again, asking you to roll your window up a little?

A You did not ask me.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Do you recall me saying, before I got in the vehicle, do you mind rolling your windows up because they were all the way down?

A You did not ask that.

Q Do you recall me asking me- or to wait and you go drop Ray off at the office and come back and get me?

A Yes, that's in my statement.

Q Do you recall me asking Ray, since he wouldn't roll his window up and you either, to sit in the backseat and I'd sit in the front?

A No.

Ms. R. M. Mazzara: All right, that's it.

Mr. J. M. Feetham: No further?

Ms. R. M. Mazzara: No further.

Mr. J. M. Feetham: Mr. Campos?

Ms. R. M. Mazzara: I can't [overtalk]-

Mr. E. J. Campos: Yeah.

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q One more question, Mr. Noble. What did you mean when you said, I witnessed it all and I'm still shocked?

A Well, yeah.

Q When you- you wrote that in your statement, what-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A Well, yes-

Q -what- what'd-

A -I did.

Q -you mean?

A Because as I was standing there, I witnessed this all and ev- everything going down. I was standing there like is this really happening right now.

Q And- and you're talking about the- the verbal altercation.

A That's correct.

Q Okay, thank you.

Mr. E. J. Campos: No more questions.

Mr. J. M. Feetham: Mr. Cuevas, do you have any questions of Mr. Noble?

Mr. R. Cuevas: No.

Ms. R. M. Mazzara: I have a question.

Mr. J. M. Feetham: Okay, I don't have any, but Mr. Reeves- Mr. Reeves, do you have any?

Mr. A. L. Reeves: No. No further.

Mr. J. M. Feetham: Okay, Ms. Mazzara?

Ms. R. M. Mazzara: Uh-

Mr. J. M. Feetham: Okay.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q As a Conductor, isn't it your responsibility, Noble, to kind of be in charge of your Brakeman?

A What do you mean be in charge of my Brakeman?

Q Well, aren't you responsible for the Brakeman's- in the safety of the Brakeman, the Brakeman's behavior, etcetera, if it gets out of hand?

A No, I'm in charge of a job, performing [phonetic]-

Q And- and isn't that part of your responsibility is this Brakeman?

A Yeah, my responsibility- part of my responsibility is the crew and the safety of the crew.

Q That's correct.

A That's correct.

Q So, I'm just trying to clarify, you don't remember rolling up the- him rolling up his window or- upon my request?

A You requested the window be rolled up and no, the window was not rolled up.

Q And I- and do you recall me asking you to roll your window up?

A You did not ask me to roll my window up.

Q How many times did I ask Ray to roll his window up?

A Maybe twice.

Q What do you think the temperature was that evening- that morning?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A Well, it wasn't cold enough.

Q Cold enough for-

A I don't know, maybe 50, 60.

Q Well, it was mid- okay, thank you.

Ms. R. M. Mazzara: That's all.

Mr. J. M. Feetham: Mr. Campos?

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. J. D. NOBLE, WITNESS

Q Do you remember- do you remember if there was any discussion from Mr. Cuevas as to why he wouldn't roll his window up?

A No.

Q Okay.

Mr. E. J. Campos: No further questions.

Mr. J. M. Feetham: Okay. Mr. Cuevas, do you have any questions for Mr. Noble?

Mr. R. Cuevas: No.

Mr. J. M. Feetham: And I don't. At this time, Mr. Noble and Mr. Wilson, you are excused. We'll take a short recess and we'll start with Ms. Mazzara's testimony.

[RECESS]

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: All right, back on record. All Carrier witnesses have been excused. We just have the charged and their representatives present with us today. I'll stay in order of call like I did throughout these proceedings.

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

Q Ms. Mazzara, please state your name and your assignment on the day in question.

A Randi Mazzara, Engineer, LOG44 of the 14th.

Q Okay. And you worked with Mr. Cuevas and Mr. Noble that day- evening to the next morning. Is that correct?

A That is correct.

Q A regular-assigned crew?

A Yes.

Q Okay. So, I guess I don't want to go and digress too- too much prior to this. When you guys came to an end on your tour of duty, I guess you got the engines back to Mead Yard. That's correct?

A Yes.

Q Okay. Just kind of go from there and give us what took place.

A Well, it was evening of a lot of- it didn't go smoothly from the beginning of the evening. So, we get to the bottom of Mead Yard, put away the power.

---

And I- I- we- I've had a- I had put in a safety hotline issue because I addressed the manager about it and then I- he never got back to me. And so, I was told to put it on the safety hotline. And with all this, I feel there's retaliation, especially that evening, with the fact of putting in the safety hotline. I had gotten off the power and I knew what was to be expected that evening when I got almost stepped in the vehicle and I had asked James, can you please roll up your window. He didn't. Ray, can you roll up your window, and they didn't, and they were all the way down.

Otherwise, normally they're up, like James had said, a quarter, and I'll either lean towards James or I'll- you know, I'm fine with a quarter of the way up unless he's going like 40, 50 miles an hour. But none of them had rolled their windows up. And so words ensued. I- I said, well, can- before the words ensued, I said to them, well, can you take Ray to the office and come back because with myself having breast cancer twice and health- my concerns and then having surgery on my throat, this- the left side of my head had been bothering me, and I didn't know it was due to this growth. And that's why I think the cold air has really been bothering it.

But aside from that, when I almost stepped in the vehicle, I stepped back out and they wouldn't- I asked them to roll their window up. They wouldn't roll them up. I asked to- the Conductor if he could take the Brakeman to the office and come back and get me. No. I asked Ray if he could get in the back and I'll get in the front and that way, Ray, you can drive with the window down. No, just get in the truck. We want to go home. So, we get to the office- no, in the vehicle I was so frustrated with them and the retaliation that I was experiencing that evening with them.

Q Let me- I want to interrupt you one second. I just want to make a stipulation, right? So, we're- we're gonna remain focused on the caption of the Notice of Investigation, which you're doing, but the- these proceedings are to cover that. As far as the retaliation or anything that's beyond this scope, we'll- when these proceedings are done, we can address that.

A Okay.

Q Okay.

---

Mr. E. J. Campos: But I- I have an objection. You said you made a- a hotline- value hotline-

Mr. J. M. Feetham: Well, first of all, what's-

Ms. R. M. Mazzara: No, no-

Mr. J. M. Feetham: -your objection?

Ms. R. M. Mazzara: -no, no-

Mr. J. M. Feetham: Hey, hey-

Ms. R. M. Mazzara: -the safety-

Mr. J. M. Feetham: -stop.

Ms. R. M. Mazzara: -hotline.

Mr. J. M. Feetham: Hey-

Mr. E. J. Campos: Safety hotline.

Mr. J. M. Feetham: What's your objection?

Mr. E. J. Campos: My objection-

Mr. J. M. Feetham: Let's [phonetic] address-

Mr. E. J. Campos: -is-

Mr. J. M. Feetham: -your objection.

Mr. E. J. Campos: -was it- was it that you- that she made that complaint that night?

---

Ms. R. M. Mazzara: No, no, no, no.

Mr. E. J. Campos: So, I say that we have- that that be- not be- that it be omitted from the transcription because we're here to determine the facts of that night-

Mr. J. M. Feetham: Okay.

Mr. E. J. Campos: -not anything that happened before that night.

Mr. J. M. Feetham: Okay. So- so, let me clarify this, and I'm not gonna allow this to get out of control, okay? We're gonna remain where we can have a clear and concise transcript.

Your objection. So, your objection about her mentioning the safety hotline, all right. It's in the testimony. I don't see an issue with it. She moved on to address what I asked her to do, which was taking place.

Now, there's a few other things I already addressed when she's using retaliation and I'm sticking to that, and I'll- I'll- I'll reiterate that retaliation is really separate and apart from this, and this is not the forum to address it. And we can- once we convene from these proceedings, we can get

together and address the retaliation.

The safety hotline, she mentioned that- that she entered it. It's related to the retaliation-

[Indistinct Comments]

Mr. J. M. Feetham: -so that falls in- according to her, so that falls in with the stipulation. If it's something along those lines, we will meet after we are adjourned from these proceedings and handle that accordingly.

Mr. E. J. Campos: Are you saying you'll meet with her or you'll meet with all of us?

Mr. J. M. Feetham: If she's the one making the claim, then her and I are gonna get together and talk about it, but it's gonna be after these proceedings. These proceedings aren't about that, it's about the caption of the Notice of Investigation.

Mr. E. J. Campos: Will you allow me to question her about that safety hotline-

Mr. J. M. Feetham: Does it-

Mr. E. J. Campos: -complaint?

---

Mr. J. M. Feetham: You were just objecting that she's bringing it in and now you're telling me you want to question her-

Mr. E. J. Campos: Well, you're telling me you're allowing her to bring it, that-

Mr. J. M. Feetham: I-

Mr. E. J. Campos: -it- it goes-

Mr. J. M. Feetham: Is there-

Mr. E. J. Campos: -with retaliation.

Mr. J. M. Feetham: Is there any evidence of a safety hotline here at all? Any exhibits-

Ms. R. M. Mazzara: Yes.

Mr. J. M. Feetham: -or anything other than what she just stipulated?

Mr. E. J. Campos: I don't know. I don't have all the exhibits.

Mr. J. M. Feetham: I can te- I do. There's-

Mr. E. J. Campos: Is there-

Mr. J. M. Feetham: -not.

Mr. E. J. Campos: -one? There is-

Mr. J. M. Feetham: There-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. E. J. Campos: -not, okay.

Mr. J. M. Feetham: So- and I'm gonna remain it that way, that this is not the forum for a safety hotline either. All right. So, I want to keep us focused on that. If there's something in a retaliatory nature, there's a policy that addresses this. We'll convene after these proceedings and address that is what- is how I'm addressing your objection.

Mr. E. J. Campos: All right.

Mr. J. M. Feetham: Okay. So, it's noted for the record-

Mr. E. J. Campos: Okay.

Mr. J. M. Feetham: -right, and- but we're gonna proceed, okay?

Mr. E. J. Campos: I- I ask that everything be related to the night of the 14th.

Mr. J. M. Feetham: And that's what we're doing.

Mr. E. J. Campos: Okay.

Mr. J. M. Feetham: I've already made my stipulation in regards to what she just testified to. I addressed it, right? And what you're saying, too, which is the same thing that I- I just addressed. I rolled the safety hotline into the retaliatory

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

remarks she mentioned, because it's all encompassing one [phonetic], as she stipulated it, and it falls under that stipulation that that will be addressed once we convene these proceedings.

Mr. E. J. Campos: Okay.

Mr. J. M. Feetham: Okay? Are you good with that?

Mr. E. J. Campos: Yeah.

Mr. J. M. Feetham: Okay. I just- I mean, you're asking me to omit uh- omit it and then now you're telling me you want to talk about it. So-

Mr. E. J. Campos: Well, if you're not gonna omit it, then I want to ask her a question about it.

Ms. R. M. Mazzara: That's in-

Mr. J. M. Feetham: We're not gonna talk about it.

Ms. R. M. Mazzara: That's in my statement.

Mr. J. M. Feetham: It's gonna- we're gonna remain with the caption of the Notice of Investigation, okay?

Mr. E. J. Campos: Exactly.

Mr. J. M. Feetham: And that's what you want and-

Mr. E. J. Campos: That's-

---

Mr. J. M. Feetham: -that's what we're gonna do. Okay?

Mr. E. J. Campos: Okay.

Mr. J. M. Feetham: All right.

QUESTIONS BY: MR. J. M. FEETHAM [Continued]
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

A So, I had-

Q But- so, go ahead, but le- let's focus on you got in the car and it was about the windows, right? So, let's-

A Yeah-

Q -go from-

A -before-

Q -there.

A -before entering the vehicle, I noticed all the windows were down. So, before stepping in, I- well, I stepped in, I backed- I backed out because I- this- this situation just didn't feel right, and so I asked both of them if they would roll their window up and they didn't. And then I said, okay, how about if you drop Ray off the off- off at the office and come back and get me. No. Okay, Ray, how about if you get in the backseat? No. That would've been an easier- and you can get in the back and I'll get in the front. No, just get in the vehicle. We want to go home.

So, I asked again if they would roll their windows up and they wouldn't. And that's when I said- because I was so distressed, I said to Ray, if I were a dude, you wouldn't have a face. And he said, oh, are you

---

threatening me? And I emphatically said, no, I'm not a dude, you know. And I- and I just- I just had it that whole evening with them.

And then to not just- I requested that they roll their windows up. Their windows were not down. I mean, yeah, they weren't even down. They weren't- they weren't even as- as- as it's been said, they weren't even up. They were completely down. And if, like Ray or James, as he says his was up, we wouldn't have an issue. We wouldn't be here today.

Q So, your- and let me ask you this, if the windows had been rolled up, there wouldn't have been any- any-

A Any-

Q -quarrel- alleged quarrelsome-

A If-

Q -charge?

A -it was up, as Mr. Noble states, we wouldn't have had a problem, because I usually lean over that, you know. And that was not the case this evening. And even here, as I- I have wrote this- this as a-

Mr. A. L. Reeves: If I may?

Mr. J. M. Feetham: Yeah.

Mr. A. L. Reeves: Randi is motioning towards an exhibit she'd like to present.

QUESTIONS BY: MR. J. M. FEETHAM [Continued]
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

Q And then just kind of explain it real quick and then I'll see- see if I can enter it.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

A So, then during dri- the drive back to the office, I- I asked both if they could roll their windows up some. I asked Ray if he would put his window up a little. No. I said, I'm making the request. No. And so I said [coughing]-excuse me, that is when I said, you know, if I was a dude, you wouldn't have a face. He says, that's a threat. And I said, no, I'm not a dude. And so, anyway- and I said he was being ignorant, which he was for just denying me of my spec- little request of rolling the window up. But, I mean, with all of this, it's uh- it's been very difficult.

Q Let- let me ask-

A No, I-

Q -you this-

A -I mean, I'm wondering if- I mean, it's like why are you treating me differently?

Q -you- so- so, let me get the question for you, but first off, this- the document you handed me-

Mr. A. L. Reeves: Yes.

Q -and this is your email to Brian Leslie, Superintendent. Is that correct?

A Correct.

Q Okay. I'm gonna make that Exhibit- I think it's 11- EXHIBIT 12

Unidentified: **12**.

Q -**Exhibit 12**. So, it's a matter of record now. So-

A I mean, I'm also protected by-

Mr. A. L. Reeves: Let him finish talking.

Ms. R. M. Mazzara: Oh.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q So, once you- once you got back, it was a 30-second car ride with-

A I don't know if it was 30 seconds.

Mr. E. J. Campos: I object to **Exhibit #12** being entered. What is the relevance of **Exhibit #12**?

Mr. J. M. Feetham: So, the relevance, when I look at this, she had a contact with Jamie Cramer. It- it's just in relation to- to her statement for this incident. That's why I- I allow it to be entered.

Mr. E. J. Campos: Well, she's addressing it to Mr. Leslie, and everything she's saying here she's already testified to.

Mr. J. M. Feetham: Okay. So, then I don't see why there'd be an exception to it. It's not adding anything new or any, you know, revelation.

Mr. E. J. Campos: Well, and then she-

Mr. J. M. Feetham: It's to- it's pertinent to the caption of the Notice of Investigation, therefore-

Mr. E. J. Campos: First-

Mr. J. M. Feetham: -that's why I allow it, Mr. Campos.

---

Mr. E. J. Campos: Well, I- I don't agree because she's talking about retaliation again with the issue of the safety hotline. She's talking about her retirement date. I mean, these things are irrelevant.

Mr. J. M. Feetham: Okay. So- and I will give you the retirement date's irrelevant. But she- this is in regards to the caption of the Notice of Investigation. I've already stipulated that any retaliatory-type tactics or hotline or both will be addressed after these proceedings, okay? It- it's-

[Indistinct Comments]

Mr. J. M. Feetham: -it's **Exhibit #12** in the record.

Mr. E. J. Campos: Well, then why don't you talk to her about it after the investigation instead of allowing this to be en- entered as a- as- as an exhibit, because like you were saying, you're gonna talk about the retaliation after. That has nothing to do with what happened on that night.

Mr. J. M. Feetham: Okay.

Mr. E. J. Campos: Nobody's being charged with- Ray is not being charged with uh- with threatening her.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: No.

Mr. E. J. Campos: So, I don't understand.

Mr. J. M. Feetham: Okay. So, you- you- Mr. Campos, I've already made a- a note on the record. Your objection's noted for the record, overruled, and we're gonna proceed.

Mr. E. J. Campos: Okay.

QUESTIONS BY: MR. J. M. FEETHAM [Continued]
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

Q All right. So, once you got back to the yard office, what took place? When you're getting out of the car, tell me what took place then.

A Okay. Well, so after-

Q What'd you do, let me ask you that?

A Okay.

Q What did you specifically-

A But-

Q -do?

A -I- I want to make it clear when- when he said, oh, are you threatening me and I said no, emphatically I said no, you know, I mean- I mean, those are kind of like loose words. I was just trying to bring his attention to my- my digress, you know, I mean, how I was feeling. So, in-

Q Would there be a better way to verbalize that-

---

A No-

Q -than what you said?

A -not with this individual, not at all.

Q There's no other way to do it?

A I pleaded, I made a request, I asked him. All those options that I had given him and the Conductor, they were reluctant.

Q So, let me ask you this, Ms. Mazzara, when you told Mr. Cuevas that, you feel that's absolutely necessary to say?

A I was so frustrated-

Q Is that an excuse-

A -to that point- well, you know, I just thought it would be- I mean, is this because I'm a woman? I mean, I just- I- I- I've heard that these guys had done the same thing-

Q So- so, a- again, we're not gonna heard, said. I want to stick to the facts-

A Well, it wasn't a-

Q -of the case.

A -threat. It wasn't a threat, but it was something to get their attention to say, hey, you guys, can we just close the window for God's sake?

Q Okay. Let me ask you this then, did you mean it as a threat?

A No.

Q Okay.

---

A It was a false statement. I mean-

Q We-

A -you know?

Q -can't- now, I'm gonna have to ask Mr. Cuevas this, and I will ask him this, but I have to wait until I get to his testimony-

A Well, when-

Q -and you can't answer that.

A -when he asked me, are you threatening me, I said no.

Q Okay.

A I'm a female. Look at- I'm a hun- 5'4", 112 pounds, okay?

Q And I'm-

A We get to the office, windows are still down, and I don't know how long it takes to the office- get to the office, but-

Q So, you- when you don't know how long, give- give me some kind of estimate?

A I don't know. It was-

Q Was it an hour?

A No, not an-

Q Okay.

A -hour.

Q Half hour?

A No, it was like maybe-

Q Fifteen minutes?

A -three minutes.

Q Okay, three minutes.

A Yeah, I mean-

Q Okay.

A -from- you know, from standing-

Q So, if-

A -outside to get to the office, so-

Q -would you say that's a short car ride?

A Yeah.

Q Okay.

A So, we get to the office and I don't know, I- I see James. He's going back to the vehicle and doing this, doing that. It's not-

Q What did you-

A He's-

Q What did you do-

A He's not-

Q -once you got there?

A -standing there. I got out and I was giving Ray crap for just not even being a man. He's just being his- a- his just ignorant self.

Q Do you think your actions were appropriate?

A Yeah. You know, I was, it was. I did not hit him, push him. I'm standing there. He rolls his body into me and he's- and I felt his stomach and he goes, you pushed me. And I said, I didn't push you. You bumped into me. And we- I went up to- to the office and I turned around and there's Ray right behind me and he stops on the steps. I don't know if he was chasing me for another dig or what- I mean, for another quarrelsome situation.

Q Well, what-

A And when I went to open the door, it took me like three times. He's right there. I held the door for him.

Q Okay. Well, let me ask you this, what you just explained, what you just testified to, is that an angry verbal confrontation between you and Mr. Cuevas?

A Which part? Where I held the door open for him?

Q No, your- your- your verbal confrontation in the car and as soon as you got out of the car.

A I wasn't- yeah, I was upset.

Q So, it was an-

A I was upset-

Q -angry verbal-

A -because-

Q -confrontation.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A Yeah, because he didn't- he didn't honor my reque- I mean, come on man, you know what, I mean, I just asked him if he could shut his window, roll his window up. I asked James. None of them did it-

Q Was there-

A -and it was on purpose.

Q Was there any other way that we could've handled this other than having, as you testified to, an angry verbal confrontation?

A I gave them options and they just ignored them.

Q So, then the resolution is to be quarrelsome?

A I guess I should've just walked to the office.

Q Do you think that would've been more appropriate?

A Well, I know if they would've gone and dropped Ray off at the office, it'd-

Q All right. Here's-

A -probably-

Q Here's what- I don't think you can testify what they would've or would-wouldn't have done, all right? And- and that's why I'm trying to- try and keep this specific.

A I- I- you know-

Q Do you handle-

A -the- that whole evening I was battling with Ray.

Q So, let- let me ask you this, do you feel you've handled this in the appropriate manner?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A No. I mean, I wish I- I- now, as I look back, yes. But at the time, I mean, the whole evening was just an evening-

Q Okay. And-

A -of-

Q -you-

A -with these two.

Q -you did have a conversation with Mr. Cramer, correct, after the fact, after you'd gone home-

A Yeah.

Q -or left the yard office?

A Yeah, even- even Manny- I mean, Eddie, excuse me.

Q And- and when you had that conversation, I mean, you were here during Mr. Cramer's testimony, correct? And can- I'm gonna ask you, did you feel regretful on how you handled this when you were talking to Mr. Cramer?

A No, because I myse- no, I- no. I mean, it's the truth. What I told him was the truth.

Q But you don't- so, you don't regret how you handled it.

A Hey, it happened, so I- regrettably, sure. But, you know, I- I don't think there was any other way to do it because when I spoke to Mr. Campos about what transpired that evening, you know, I think he felt a little sorry for me of what I was dealing with.

Q Let- let me ask you this, you- you said- and- you said you were giving, and I'm gonna use the term crap. And you said you were giving- once you got out of the vehicle, you were giving Mr. Cuevas crap.

---

A I was giving him crap?

Q Yeah. You used different terminology, but-

A I did?

Q Yeah. What was the conversation about between the car and up to the-

A I-

Q -door-

A You know-

Q -when you got-

A -what-

Q -there?

A -I don't remember.

Q You don't remember?

A I don't remember. It was very short.

Q Were you yelling?

A I don't remember.

Q Was your voice raised?

A You know, it's all- yeah, it was just like kind of- yeah, probably, but not screaming, yelling I don't think, you know.

Q Okay.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A But, I mean, I just walked- I don't know about this- he- he thought I- he was ensuing me up the stairs, you know-

Q Were-

A -and I turned-

Q Were-

A -around and I- and I looked back at him and he stopped.

Q When you guys were going up the stairs, were you side-by-side, one ahead of the other, what was it?

A No. I was ahead of him and that's when he was following me like he wanted another- start another confron- you know, start-

Q What-

A -an- instigate another-

Q Was he talking to you at that point in time? Let me-

A No.

Q Let me-

A No.

Q What-

A I- I was going up to the- the office. Went to- I was- I was gonna go tie up. And I think he was following behind me to ensue another-

Q But you can't assu- I'm- I'm asking you not-

A Can't-

---

Q -to assume what he was gonna do.

A No.

Q I'm asking you what you saw or heard.

A Okay. So, I go up the stairs and I look to see Ray behind me, not- I mean, he was probably about maybe five feet, and I looked and he had his hand on the rail. I looked and he stops.

Q Did he say anything?

A No.

Q Did he put his hands on you?

A No. But then I walked- pro- proceeded to get that- go up to the door and he's up there right- right behind me, like-

Q Did he- did he say anything then?

A No.

Q Did he push you-

A We didn't have a-

Q -then or put his hands on-

A The only thing-

Q -you then?

A -I said was something about- because it took me like three times to get the door open and it kind was- just kind of said something to myself about the door. And I opened the door and held it for him. And I went inside and got my- you know, and it's like so much hap- goes on with this job with these two that you just think it's another day-

---

Q Okay.

A -you know. So-

Q When- when did this all end? I mean, what-

A When did this-

Q -what happened when you went inside? Did it end then?

A When it- when it- when I got my stuff and I was ready to leave to go home, there's James sitting at the computer, and I just said, you guys need to man up.

Q And then what did-

A And then-

Q -you do after that?

A And when I went outside, Ray is in the vehicle and I don't know who he's talking to. And I knew he was talking to somebody because of the- what took place. And I just yelled out to him and I said, tell him the truth, Ray. Make sure you tell him the truth, and that was it.

Q Okay.

A And I- then I found out I was-

Q Uh-

A -pulled. I went to Anaheim and-

Mr. J. M. Feetham: No further questions. Mr. Reeves, do you have any questions?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MR. A. L. REEVES
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

Q Ms. Mazzara, how long have you been on the LOG44?

A I- almost a year and a half.

Q And would you say in that year and a half working on the for- the 44 has been stressful?

A Yes.

Mr. E. J. Campos: I object.

Mr. J. M. Feetham: All right-

Mr. E. J. Campos: I object.

Mr. J. M. Feetham: -yeah, Mr. Reeves, I want to keep in line with the caption of the Notice of Investigation. So, my- my concern here is-

Mr. A. L. Reeves: Okay.

Mr. J. M. Feetham: -is April 15th, 2021 at approximately-

Mr. A. L. Reeves: Okay, the day-

Mr. J. M. Feetham: -at 0500 hours.

Mr. A. L. Reeves: -in question. Okay.

Mr. J. M. Feetham: All right?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

QUESTIONS BY: MR. A. L. REEVES [Continued]
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

Q Working on the LOG44, Ms. Mazzara, I'm noticing in the statements, what- like I asked with Mr. Noble, how did it go to 10 and awry from getting off the power to the shanty, which sounds like probably-

A Because I knew they-

Q -a minute and-

A -would deliberately-

Q -a half probably [phonetic]?

A -refusing my request. They had both the windows down. I mean, any of the- these gentlemen in here would roll their window up a little, you know, anybody. Anybody on this railroad would roll their window up a little except-

Mr. J. M. Feetham: Ms. Mazzara, just answer the question, please.

Ms. R. M. Mazzara: Oh.

Q Do you remember the question?

A You know, I- I- I- I just, you know- no, go ahead and repeat it.

Q How did it get from zero to 10-

A Go from zero to 10-

Q -in a 40-second-

A -in 40-

Q -drive?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A Well, we don't really know if it was a 40-second drive.

Q A two-minute drive.

A All right. Well, it- it started not from the drive, but it started from that evening and it was just building up, building up, you know, and it came to this point. I mean, if this happened during the beginning of the day, I probably wouldn't think anything of it, but what I- what I experienced throughout the whole day working with them, it reached this point. And that's pretty bad, because that is- this is not me. I- I- and I- I did not push him or use my hands. Oh, for God's sakes, you-

Mr. J. M. Feetham: Miss-

A -know, that-

Mr. J. M. Feetham: -Mazzara, please-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -let's just answer the question.

QUESTIONS BY: MR. A. L. REEVES [Continued]
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

A But to answer your question, it was just a whole lot of things that transpired that day on that job and it finally, you know, just- I just couldn't stand it anymore. I just blew up because they are just so- so nasty.

Mr. E. J. Campos: I object.

Ms. R. M. Mazzara: Oh-

Mr. J. M. Feetham: Yeah, so-

Ms. R. M. Mazzara: -is that to that?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. E. J. Campos: I- I object to that.

Mr. J. M. Feetham: -so-

Ms. R. M. Mazzara: They are [laughing].

Mr. J. M. Feetham: -what I want to avoid for the means of due process for these proceedings and a concise transcript, please refrain from any accusations in regards to that.

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: All right?

Ms. R. M. Mazzara: Yeah.

Mr. J. M. Feetham: We're- we're- I want to stick to the-

Ms. R. M. Mazzara: They are just two very difficult-

Mr. J. M. Feetham: I-

Ms. R. M. Mazzara: -individuals.

Mr. J. M. Feetham: I- okay. I want to stick to the facts and what took place. Please proceed, Mr. Reeves.

Mr. A. L. Reeves: I have no further questions.

Mr. J. M. Feetham: Mr. Campos, do you have any questions for Ms. Mazzara?

---

Mr. E. J. Campos: Yes.

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

Q Ms. Mazzara, your statement, you wrote:

> I said, you know, if I was a dude, you wouldn't have a face.

Do you agree that that's what you wrote and said?

A That's what the statement says.

Q And when you got back to the yard office, you said you went into the crew room and then you came back out, and Mr. Cuevas was in the car- in the vehicle on the phone and that you went up to the vehicle?

A I just- yeah, I gue- you know, I really can't remember. All I do remember just is saying, and I was probably like maybe 20 feet or so, I just said, make sure you tell the truth, Ray. Make sure you tell the truth.

Q Did you ever try to open the vehicle door?

A I can't remember.

Q Okay.

Mr. E. J. Campos: No further questions.

Mr. J. M. Feetham: Mr. Cuevas, do you have any questions of Ms. Mazzara?

Mr. R. Cuevas: No.

Mr. J. M. Feetham: I don't have any further questions at this point in time. We'll start with Mr. Cuevas's

---

testimony. We'll take a short, real- real quick recess and we'll be right back.

[RECESS]

Mr. J. M. Feetham: All right, we're back on record.

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MR. R. CUEVAS, CHARGED

Q Mr. Cuevas, if you would, state your name and your assignment on the day in question.

A Raymond Cuevas, Brakeman on the LOG44.

Q And you work regularly with Ms. Mazzara and Mr. Noble. Is that correct?

A Yes, I do.

Q And you worked with them on the day in question, which would be the morning of April 15, 2021.

A That is correct.

Q Okay. And I'll do the same with you that I did pretty much with everyone else. Let's start when you got the power to the bottom- I guess, it's the bottom of Mead Yard. That'd be accurate, right, before-

A Yeah.

Q -you got in the car?

A Yes.

Q What took place?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A The Conductor, James Noble, went down to the bottom of Mead, had to go pick us up. And as we get into the vehicle, the Engineer, Randi Mazzara, demanded like- like ordering us to close the window, but the window was o- you know, opened like it was cracked open and open about three inches. So, that night what nobody is saying is Randi was coughing that night. I have a wife that has an autoimmune disease, so that night I'm trying to stay away from her because she'd-

Ms. R. M. Mazzara: I wasn't-

A -been coughing.

Ms. R. M. Mazzara: -coughing. I had a mask and I wasn't coughing.

A So, because of COVID and everything, I just left the window open because there was a need for circula- for ventilation. So, this is about a 30-second drive back to the office, and as we parked- I mean, as we're driving, because she didn't get her way, all of a sudden she just [indistinct comment] out. If I was a man, you'd have no face. I'm like wow. So, it was like a 30-second drive back to the office. But as we parked, she- she whips around and I could see her just like all aggressive waiting for me. She gets in my face and-

Q Were you out of the car at that point?

A Yeah, I'm- or no. When she gets out of the vehicle, she gets out first. So, I'm- I'm looking like, oh, man, I'm not trying to get into this. You know, this- it's- it's too late in the morning. I'm- I'm trying to go home and I'm like, oh, my gosh, here it goes. So, as soon as I get out of the vehicle, she's waiting for me. I mean- I mean, you know-

Q She- when you say waiting for you, gi- give a better description. What's that mean? Were you sitting in the car or-

A Uh-

Q -out of the car?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A She gets out of the car, she whips around. I'm still in the vehicle and she's there waiting for me like standing, like looking directly at me to get out.

Q And you're sitting in the passenger seat of the-

A Yes.

Q -car?

A For a split, maybe two or three seconds, I'm just looking like wow. So, I mean, I'm just gonna get out of here. So, I get out the vehicle and boom, she just starts in me.

Q What- when- when- when starts in you, give me- give- what was she saying?

A The- well, the second time she tells me if uh- if I was a man- now, she's saying, if I was a man, I'd punch you in the face. So, then she gets in my face like and takes like a fighting stance and I'm like in shock like whoa. And then, you know, she pushes me, so I- I throw my hands up like, man, I want no part of this. I'm just trying to remove myself from the situation. I'm trying to do whatever I can to de-escalate the situation and just get away, but-

Q Did you say anything to her?

A No, I just in shock. I was just quiet. And when she pushed me, I looked over at- at- to my left and I saw James there, and I said, James, are you seeing this? And he's like yeah. So, I'm just- I'm just trying to get away, but she's in my face. I mean, she's going- rant and raving and I'm just like-

Q So-

A -trying to escape, you know.

Q -were you still in the car at this point or were you out-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A No-

Q -of the car?

A -we were on the side of the vehicle.

Q Both of you were out of the car on the side of the vehicle.

A Yes.

Q Okay.

A And- and I'm- I'm just trying to walk away. I'm just trying to get to the office, but she is in there and blocking me. And I try to go up to the steps and she's come to the side, and I'm like- I'm just trying to navigate away from her. I'm just trying to get away. I don't want no part of this situation.

Q At any point in time, from the car to- up to the door there where you saying anything to her?

A No, and I didn't say not one word. I mean, I- I could see in her eyes there was no speaking. So, I was like I don't want no part of this. I'm not gonna talk to her. I just want to remo- remove myself as fast as possible.

Q Were- and I've asked this of everyone else, were you walking side-by-side, was she ahead of you, you ahead of her?

A When I was walking, she was- she was trying to block me and I'm just trying to- every time I kept trying to go to the stairs she would block me.

Q What do you mean by block?

A She was blocking my path to me. I was trying to get up the stairs to the office and she was trying-

Q When-

---

A -to block me in, tried to-

Q So-

A And she-

Q So- so, I don't want you to assume what she was trying to do. I want to- make an assum- you know, testify to where she was physically. Was- so, if you were making your way to the stairs, was she in front where you couldn't go straight to the stairs, you had to go around?

A Yes.

Q Okay. And then how long did that continue?

A A few seconds until I just gave up and backed off and just tried to wait for her to just go in the office. And I waited, and then she- I don't know if she went inside or whatever, but I went in and got my stuff. As soon as I come back outside, James' like hey, go- go do what you need to do. And I know what- what he's doing, referring to call a manager. So, [overtalk]-

Q Okay. So- so, again, I'm- I'm just gonna caution you here, Mr. Cuevas, because we can't assume what-

A Okay.

Q -some other employee was doing. All right?

A Right.

Q Okay. So, you went and you got your stuff. You left the yard office.

A So, yeah, I'm- I'm leaving the office and I'm just trying to get away from her. So, I go into the Company vehicle, because it was the only vehicle open. So, I go in there and sit in there and I'm trying to call the manager, and here she comes following me back. I'm like, wow, she's going for round two. She rips- she's ripping the door open and she's yelling, but I got the- I got the phone-

Q So, she-

A -to my ear.

Q -actually ripped the door open?

A Well, she grabbed it real fast.

Q Did it open?

A Yes, it did.

Q The door did open?

A Yes.

Q Okay.

A So, as soon as she opened the- flung the door open wide, I'm like, wow, here we go. So, I'm on-

Q Did she-

A -the phone.

Q -close the door or-

A I don't know because as soon as she opened that door, I opened my door and then I started walking away towards the end of my- I'm just trying to get to the Anaheim Street [phonetic] just walk away from her.

Q So, let- let me ask you this, when you went in your car to make a phone call, correct?

A The Company vehicle.

Q Yeah. Were you in the passenger seat or the driver's seat?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A I was in the backseat. I was trying to hide.

Q In the backseat on the-

A Yes.

Q -passenger side, on the driver's side?

A On the back- on the back passenger side.

Q Back passenger side. Which door do you say she opened?

A She opened the door on my left. I believe it was the driver door.

Q Not the door you were sitting next to.

A No.

Q Okay. And then you opened your door and-

A I opened-

Q -got out?

A -my door and I exited and just got away from her as fast-

Q Did you-

A -as I could.

Q -say anything to her?

A No, I was on the phone trying to talk to Murphy.

Q Did she say anything to you?

---

A She- yes, she was yelling, but I couldn't tell because it went straight to the voicemail. So, I'm trying to listen and trying to get through, but I- all I hear is yelling. So, she's just yelling at me, following me and-

Q How long did that take place?

A About three seconds of yelling- of her yelling.

Q Three seconds of yelling?

A Yeah.

Q Okay. And then what happened after that?

A I- I just took off and walked as far away as I can from the yard until I looked back and I saw her just give up, and then started walking back to her car.

Q So, when you were- did- did you put your hands on her or bump into her-

A I- I never-

Q -or pushed her?

A I never touched her at all. If- the only thing I ever did was I just put my hands up to- I don't want no- like I said, as a gesture of I don't want no part of this. I'm just trying to remove myself from the situation. I just want to get away.

Q Did you ever elevate your voice or raise your voice?

A No, and I- I-

Q And I'm talking this whole alleged-

A No, I never-

Q -confrontation.

---

A I pretty much never said nothing. Just pretty much stayed quiet.

Q Now, I'm gonna go back to the window. Is there- I guess you gave the reasoning why you didn't roll the window up?

A Yes.

Q Okay.

Mr. J. M. Feetham: No further questions at this point in time. Mr. Campos?

Mr. E. J. Campos: Yes.

Mr. J. M. Feetham: Go ahead.

QUESTIONS BY: MR. E. J. CAMPOS
STATEMENTS OF: MR. R. CUEVAS, CHARGED

Q So, it's been stated that your day was done and you put the power in Track 8. The vehicle picked you up. It had four doors, a Jeep. Noble was driving and you were sitting in the passenger seat and she was behind you?

A Yes.

Q And it- it's your testimony that when she asked you to raise the window up, she was coughing and so you decided that because of that you needed ventilation.

A Yes.

Q When you- did you tell her that, that you weren't gonna ro- roll the window up because of that?

A I- I- I don't remember saying anything.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Okay.

A I just remember just trying to stay quiet and just get out of this, just get home.

Q And- and how- you testified and I forget how uh- how much was the window open?

A Probably about- it was only cracked open like three, four inches.

Q Three or four inches, okay. And- and it's been stated before, but I'm gonna ask you again, how far is that ride from Track 8 to the yard office?

A Probably like 30 seconds.

Q And that's how long it took you?

A Around that time.

Q Okay. So, in the vehicle, she has testified that she told you if you were a dude, she'd rip your face off. Is that correct?

A Yes.

Q She- she did say that to you?

A Yes, she did.

Q Did you feel threatened?

A Yes.

Q Did you ever say- did you ever respond to her when she said that? Did you ever respond?

A Yeah, because I felt like I was threatened. I asked her, are you threatening me?

---

Q And- and what did she say?

A She just went off on a rant and I- I just-

Q When you say she went off on a rant, what- what do you mean?

A Well, she kept on yelling.

Q And what was she yelling?

A Something about calling me ignorant and- I can't quote exactly, but she was just going off and I just kind of just tuned everything out.

Q So, was she acting aggressively?

A Yes.

Q Was she argumentative?

A Yes.

Q Was she confrontational?

A Yes.

Q Was she combative?

A Yes.

Q And- and you didn't say anything back to her when she- she was doing all these things, saying all these things-

A No-

Q -to you?

A -I was just trying to remove myself from what was going on.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q And when you got to the yard office, you said you- you opened the door to get out?

A Yes.

Q She got out first?

A She got out first.

Q And she was behind you-

A Yes, she was-

Q -when she got out?

A Yes.

Q And when you exited the vehicle, where was she?

A Standing right there waiting for me.

Q At- at- on the side of your door or-

A When you open the door, as I get out, she is facing me right there a foot away.

Q And what was she saying?

A At first, I couldn't- because when I put the window up, I just heard like-

Ms. R. M. Mazzara: So, you put the window up.

A -[indistinct comment] so- so, you know, we- we parked the car and she gets out, she whips around and I can see her and she's going off now. And I step out of the vehicle and-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Do you remember what she was saying to you as you were trying to get out of the vehicle?

A Yeah, that was the second time. She said, if I was a man, I'd punch you in the face. I felt like- like she was baiting me, and then- because I wouldn't fall for the bait and-

Mr. J. M. Feetham: You're-

A -I was just- just trying to leave.

Mr. J. M. Feetham: Mr. Cuevas, I- I want to remind you, don't make assumptions on someone else's intentions, okay? Let's stick to the facts of what you witnessed and heard.

Mr. R. Cuevas: Okay.

QUESTIONS BY: MR. E. J. CAMPOS [Continued]
STATEMENTS OF: MR. R. CUEVAS, CHARGED

Q So, you felt threatened?

A Yes.

Q And so, when- when you got out the car, she was saying- what was she saying to you? What did she say, do you remember?

A That she was gonna punch me in the face.

Q And after that, did she- what did she say?

A After that she pushed me.

Q That's- that's when she pushed you?

A Yes.

Q Now, when she pushed you, did you step towards her or were you- what-what were you doing?

A No, I was-

Q Were you just-

A -when she pushed-

Q -standing there?

A I was standing, but I was caught off guard, so when she pushed me, I kind of went back with my hands up.

Q Was that- was that before you tried to walk around her?

A That was- that was before I tried to walk around her and-

Q And so, as you were trying to walk around her, what would she do?

A She was blocking my path and she still was trying to argue.

Q And at that point, were you still not saying anything?

A Never said anything, other than I looked over to my left to the Conductor and I said, are you seeing this, are you watching this? The only thing I would say is [phonetic] I wasn't talking to her. I was talking to my Conductor.

Q So, you never got in a verbal altercation with her? You were never quarrelsome-

A No, I-

Q -with her?

---

A -never got into a verbal confrontation, never said anything.

Q So, when you went into the office, then what happened? Both of you were in the office?

A I grabbed my stuff and then got out as fast as I can and went straight to the Company vehicle.

Q While you were in the office, was there anything said between you and Ms. Mazzara?

A No.

Q Okay. So, when you exited the office, where'd you go?

A I went down the stairs, the Mead Yard stairs, and went straight into the Company vehicle because it was still left open. And I got inside so I can have some privacy and get away from Randi to make my phone to a-

Q Where-

A -manager.

Q Where were you sitting in the vehicle?

A The backseat.

Q Passenger side or-

A Uh-

Q -driver's side?

A Rear- rear- rear backside.

Q Driver's side or passenger side?

A Passenger side.

---

Q Okay, passenger side. And was the door closed?

A Yes, all four doors were closed.

Q And they were unlocked?

A Unlocked.

Q Okay. So, how long were you in the vehicle with the doors closed before she reappeared?

A Probably about 20 seconds.

Q And did she came to your door?

A No, she came to the passenger- I mean, sorry, the left side dri- the driver door and yanked it open.

Q And opened it. And-

A Yes.

Q And what did you do? Or what did she say when she opened the door?

A I don't know. She started ye- as soon as she started yelling, I just opened my door and just went the opposite direction.

Q So, she was yelling? She wasn't-

A Yes.

Q -talking?

A No, she was yelling.

Q And you don't remember what she was saying?

---

A No, because I had the phone and with the ringing, I'm just trying to like tune it out and get away.

Q So- so, then what did you do when she was yelling at you?

A I left, I left. I went the opposite way and walked the opposite direction of her.

Q Did you ever say anything to her?

A I never said not one word.

Q And you got out and- and- and started to walk away. Did she follow you?

A Yes.

Q She did follow you?

A Yeah. She whipped around and then I looked back and I- it looked like she quit and just went back to her car.

Q Did you- did you feel threatened?

A Yes.

Q Did you try to es- de-escalate the- the incident?

A Yes, I did.

Q How?

A By removing myself.

Q Are you aware of the violence and abuse- abusive behavior policy-

A Yes.

Q -at Union Pacific?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A Yes, I am.

Q Is that why you notified your supervisor?

A Yes, I'm very aware with the policy. It's a zero policy, that's why- you know, I have a family to take care of. I'm not gonna jeopardize my job over an argument, so that's why I'm just trying to get out of there.

Q Did you report the incident to Omaha?

A Yes, I did.

Q Who- who-

A I- I called the EEO.

Q The EEOC? Okay.

A And I believe I spoke to Kristen [phonetic] was her name.

Q Okay. Was a report filed?

A Yes. The EEO report was filed and also a police report was filed.

Q Do you remember the file number?

A No.

Q Okay. And- and a police report was filed.

A Yes.

Q By EEO?

A Yes. And uh- and a statement was taken by Mr. Noble by the police department.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Mr. Noble- the UP Police Department?

A Yes, by the Union Pacific Police.

Q They talked to Mr. Noble?

A Yes, they did.

Q And they didn't talk to you?

A Yes, they spoke to me.

Q So, you gave them a statement?

A No, I did not.

Q But they took a statement from Mr. Noble?

A Yes, they did as a witness.

Q Okay. And what came out of that police-

Ms. R. M. Mazzara: They took a-

Q -when you had that-

Ms. R. M. Mazzara: -statement from me too.

Q -interaction with the police when they were asking you questions, did anything come out of that?

A I don't know, I don't know.

Q Did they ever call you after to- to follow up?

A No.

Q Did EEOC call you to follow up- to follow-up?

---

A Yes.

Ms. R. M. Mazzara: No, they called you.

Q And- and what did that- what happened there?

A They just advised me what was going on, that- you know, the way it works out with the Company, me being pulled out of service until everything gets figured out, and that was it.

Q So, you are being charged with a really serious offense, 1.6-

A Yes.

Q -which will terminate your service here with Union Pacific for being quarrelsome. Were you ever quarrelsome?

A I was never quarrelsome.

Mr. E. J. Campos: I have no further questions.

Mr. J. M. Feetham: Mr. Reeves, do you have any questions for Mr. Cuevas?

Mr. A. L. Reeves: No questions.

Mr. J. M. Feetham: Ms. Mazzara, do you have any questions for Mr. Cuevas?

Ms. R. M. Mazzara: Yes, I do.

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED
STATEMENTS OF: MR. R. CUEVAS, CHARGED

Q You know, Ray, we would never be here today if it wasn't for the window-

---

Mr. E. J. Campos: That is not-

Q -right?

Mr. J. M. Feetham: Mi- Mi-

Mr. E. J. Campos: -a question?

Mr. A. L. Reeves: Ask a-

Ms. R. M. Mazzara: I- I-

Mr. A. L. Reeves: -question.

Ms. R. M. Mazzara: No, I get it. I said it.

Mr. A. L. Reeves: You're making- making a statement.

Ms. R. M. Mazzara: I had a question mark.

Mr. A. L. Reeves: Ask a question.

Ms. R. M. Mazzara: Okay.

Q So, Ray, you're saying the window was down?

A The window was cracked open about three or four inches.

Q Okay. Well, you know, if that win- the window cracked three to four inches, we wouldn't be here.

Mr. J. M. Feetham: Ms. Mazzara, do you have a question for Mr. Cuevas?

Ms. R. M. Mazzara: Okay.

---

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. R. CUEVAS, CHARGED

Q You said you were trying to de-escalate the situation, Mr. Cuevas. Tell me how you were trying to de-escalate the situation?

A One, by not trying to get into an argument with you; two, by walking away; three, by removing myself; and four, trying to avoid you; five, by you coughing that night, I was not trying to be anywhere near you.

Q I was not coughing. You were talking to who on the phone when you were sitting in the front of the vehicle when you say I started yelling at you? You were talking to who?

A I was trying to- I was attempting to call Murphy and-

Q And-

A -the EEO.

Q Okay, and who were you speaking to when I said, tell him the truth, Ray, tell him the truth?

A I don't remember you saying tell him the truth.

Q Yeah. So, you just use yelling, correct?

A Are you talking about when I was in the vehicle and you-

Q In the-

A -were trying to-

Q -front seat.

A -come-

Q Yes.

---

A -back at me?

Q You were in the front seat on the phone talking to I don't know who, and- and you're referring to me yelling at you, correct, when I was saying, tell him the truth, Ray, tell him the truth, correct?

A I don't understand your question.

Q You were sitting in the front seat and who- who were you talking to at that time when I came up to you?

A I was calling UP officials for help.

Q Okay. I saw you talking to somebody and I- I had thought it was perhaps Mr. Campos.

A No. I was trying to call a manager.

Q But as I've stated several times now, you were in the front seat and you never correct me as you said you were in the backseat talking on the phone.

A I was in the backseat.

Q Okay. And then also, you said that I pushed you, but actually it was you that rolled your body in-

Mr. J. M. Feetham: Ms. Mazzara, a- a question for Mr. Cuevas, please.

Ms. R. M. Mazzara: Okay.

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. R. CUEVAS, CHARGED

Q Did you hear me say to you that you bumped into me?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

A No.

Q Well, I said I bumped- you bumped into me. You don't recall that?

A No.

Q Saying that you bumped into me when you rolled your body into me?

A I rolled my body into you?

Q That is correct.

Mr. J. M. Feetham: Ms. Mazzara, again, we need a question.

Ms. R. M. Mazzara: Okay.

Q And you said- do you recall you saying I pushed you?

A I don't remember that.

Q And you don't recall me saying I didn't push you, you bumped into me?

A You never said that.

Q I did. Okay, let me see if I have any more questions. Did he just want- this PO that called you just wanted to know what had occurred, correct?

A He wanted to make a- have me fill out a police report.

Q He had you fill out- do you have a copy of that?

A He wanted to have me-

Q Oh, so you did not fill out a police-

A I did not.

---

Q Because he called me too.

Ms. R. M. Mazzara: Do you have the officer's name, Eddie?

Mr. J. M. Feetham: Okay. This is- this is a question for Mr. Cuevas, please.

Ms. R. M. Mazzara: Oh.

Mr. J. M. Feetham: Just- just so you know, Mr. Campos is representing Mr. Cuevas. He's not here to provide testimony.

Ms. R. M. Mazzara: Oh.

Mr. J. M. Feetham: If it's not what you're looking for, I guess we could find it [phonetic].

Ms. R. M. Mazzara: Okay.

QUESTIONS BY: MS. R. M. MAZZARA, CHARGED [Continued]
STATEMENTS OF: MR. R. CUEVAS, CHARGED

Q So, as I was opening the door to get into the office, do you recall where you were standing?

A I was trying to get away from you.

Q You were standing right- how many times did I- it take for me to open the door and I held it for you, Ray? How many- how many times did it take me for- you were standing right there watching my fingers shake. How many?

A Uh-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Q Trying to see if my fingers were shaking, let me clarify that. I wasn't shaking.

A Randi, I was trying to get away from you the whole time.

Q You were standing right at the door, Ray.

Mr. J. M. Feetham: Ms. Mazzara- Ms. Mazzara, we need to kle- keep this in a question and answer. We're here to discover-

Ms. R. M. Mazzara: Okay.

Mr. J. M. Feetham: -testimony.

Ms. R. M. Mazzara: Okay. So, why don't we-

Unidentified: I mean, whatever you want me to say.

Ms. R. M. Mazzara: -what else do we need to do here?

Mr. A. L. Reeves: Are you through questioning?

Mr. J. M. Feetham: Do- do you have any questions [overtalk]-

Ms. R. M. Mazzara: No, I'm done questioning him-

Mr. J. M. Feetham: Okay.

Ms. R. M. Mazzara: -because he's not truthful.

Mr. J. M. Feetham: Miss- Ms. Mazzara-

---

Ms. R. M. Mazzara: I- I have-

Mr. J. M. Feetham: -I've-

Ms. R. M. Mazzara: -the right.

Mr. J. M. Feetham: -already cautioned you about making accusations, okay? That's not the purpose of this investigation, all right?

Ms. R. M. Mazzara: So, what is the purpose then?

Mr. J. M. Feetham: Just- the- get testimony and discover the facts of what took place.

Ms. R. M. Mazzara: But it's-

[Indistinct Comments]

Ms. R. M. Mazzara: -all hearsay.

Mr. J. M. Feetham: Ms. Mazzara, do you have any more questions for Mr. Cuevas?

Ms. R. M. Mazzara: No.

Mr. J. M. Feetham: Thank you. I don't have any more questions of Mr. Cuevas. What I'd like to do, I- I got a few more for Ms. Mazzara, and- and then we'll- we'll almost be there. Unless someone else brings something up, we can get to the closing. And- and, of course, I'll give everyone else a turn since I've gone back to Ms. Mazzara.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

So, are- are you ready for just a few questions, Miss-

Ms. R. M. Mazzara: Sure.

Mr. J. M. Feetham: -Mazzara?

QUESTIONS BY: MR. J. M. FEETHAM
STATEMENTS OF: MS. R. M. MAZZARA, CHARGED

Q Okay. And all I really want to address is your conversation with Mr. Cramer. I don't- I- I guess it would've been the morning of the 15th afterwards.

A Uh huh.

Q It- when you told- Mr. Cramer testified that you said that it's bad. Do you recall that?

A Well, yeah, the situation was bad because of what had occurred.

Q So- so, can you define bad? If you go to Mr. Cramer and you're telling him it's bad, what- what's- what's bad?

A The confrontation that- what happened with Noble, Cuevas and I.

Q Okay, on that morning.

A On that morning-

Q Okay.

A -correct.

Q Okay.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: I got no further questions. Mr. Campos?

Mr. E. J. Campos: No.

Mr. J. M. Feetham: Mr. Cue- well, I should've got Mr. Reeves. I'll go to Mr. Cuevas. Do you got any questions for Mi- Ms. Mazzara?

Mr. R. Cuevas: No, I don't.

Mr. J. M. Feetham: Mr. Reeves, do you got any questions for-

Mr. A. L. Reeves: No.

Mr. J. M. Feetham: -Ms. Mazzara? Okay. I don't have any either. Unless anyone else has anything to present at this point in time, we can take a short recess and- and we can get to the closing statements.

Ms. R. M. Mazzara: Let's get to the closing statements.

Mr. J. M. Feetham: I- I think the reps want a- a recess and then we'll do that. It won't be an extended period-

Ms. R. M. Mazzara: How-

Mr. J. M. Feetham: -[overtalk].

Ms. R. M. Mazzara: -long do we have- shall we take?

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: Whatever they need, but generally it's 15, 20 minutes, no more than 30. I'll- I'll make the stipulation let's not make it any more than 30 and we can get this closed out. All right? So, we're gonna go off record. Give me two clicks.

[RECESS]

Mr. J. M. Feetham: All right, we're back on record. One last stipulation here. Ms. Mazzara and Mr. Reeves, Mr. Campos and Mr. Cuevas, do you have anything- any further evidence to present at this point? The last time we asked that it was no. I want to make sure we don't have anything else. We'll get the closing statements.

Mr. E. J. Campos: No.

Mr. J. M. Feetham: Anything else left to-

Mr. A. L. Reeves: No.

Mr. J. M. Feetham: -present?

Mr. E. J. Campos: No.

Mr. J. M. Feetham: Okay. So, Ms. Mazzara, would you care to make a closing statement on your behalf?

Ms. R. M. Mazzara: Yes, I would.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: All right, feel free.

Ms. R. M. Mazzara: Okay.

**CLOSING STATEMENT**
**of Ms. R. M. Mazzara, Charged:**

As it's been said, I have worked for the LOG44 for about a year and a half now and with that, I mean, this crew has been very difficult to work with. And I, myself, have filed an EEOC against the crew for their behavior issues and being 1.6. And I don't know, is it because I'm a female that-

Mr. J. M. Feetham: Can I- can I interrupt you real quick? I- I- I want to- I- and I'm gonna re-stipulate it. And anything related to any EEO or retaliation-type thing that I've already stipulated on, as soon as we adjourn here, we need to sit down with Mr. Reeves and we're gonna go through and see if there's any other reporting we need to do in regards to that. So, I'd just like us to- let's kind of focus on these proceedings here today.

Ms. R. M. Mazzara: All right, excuse me. Okay. It's-

Mr. J. M. Feetham: And-

Ms. R. M. Mazzara: -my closing statement, you know.

---

Mr. J. M. Feetham: Yeah.

Ms. R. M. Mazzara: Okay.

**CLOSING STATEMENT**
**of Ms. R. M. Mazzara, Charged (Cont.):**

Well, excuse me, let me start again. That evening, it we- I'm sorry that the things had- had occurred the way they did, but these two had been very insubordinate that evening and it just reached a point where it just got out of control and they knew. They were ready- with the windows down, I know they planned, they schemed, and- and as a result, this is what happened.

And Ray's out service, I'm out of service, and they should've probably thought about my request a little more instead of being indignant in just not rolling the windows up, because all the windows were down. If the windows were up, even if it was up a quarter like he's- Mr. Noble was stating, this would- we'd never be here. Ray would be working, I would be working. This would never have happened. But maybe this is what needed to be happened for them to realize their antics needed to stop. And that's what occurred that evening.

Yes, I threatened Ray, but I al- he said- I also said no when he asked, oh, are you threatening me? And I said no, I'm not threatening you. I'm not a dude. And, of course, you know, loose words, you know, and- and things are flying, you know. I mean, it's- you just gotta understand a female in my position, what- what she has been going through with these two individuals that are getting their kicks out of treating me like this or other individuals. It's- it's just-

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

the Company has done nothing to protect me. Nobody's stepped up with any authority. I mean, they- they just won't learn. And I've just- I'm sorry that it happened, but maybe it was meant to happen, you know.

Unfortunately, these guys should've thought about this, you know. I made a request, James, can you close your window? No. Ray, can you close your window? No. Okay, here- you know, I gave them options. Hey, about if you drop Ray off at the office and come back and get me? No. Okay, how about Ray, you sit in the backseat and I'll sit in the front? No. You know, so there was some options. And in that vehicle, it was mid-40's- mid-40's that evening. Yes, I had a jacket on, and it's the wind. It's not the- it- the cold as much as it's the draft that's bothered me.

So, all I did was make a kindly request. Once again, no. And that's when I so-called threatened Mr. Cuevas because he was being ignorant, and that's not a bad word. You get- you know, of my request. And it was a simple request, a couple cranks of the- the window to go up about a quarter of the way like Mr. Noble said he had his window, which he didn't. And then- I mean, I- I hold these two accountable for their actions that evening. And Mr. Campos is aware of what took place that day, too, because I vented on him. So, it wasn't only in the vehicle; it's what took place that whole day on the job. And- and I think that's about it. That's all I have to say for now.

Mr. J. M. Feetham: Okay, thank-

Ms. R. M. Mazzara: Thank you.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

Mr. J. M. Feetham: -thank you, Ms. Mazzara. Mr. Reeves, would you care to make a closing statement on behalf of Ms. Mazzara whom you have represented?

Mr. A. L. Reeves: No closing statement. I think Ms. Mazzara has closed well enough.

Mr. J. M. Feetham: Okay, thank you. Mr. Cuevas, do you care to make a closing statement on your behalf?

Mr. R. Cuevas: Yes.

Mr. J. M. Feetham: Feel free.

**CLOSING STATEMENT**
**of Mr. R. Cuevas, Charged:**

I just to thank uh- thank this proceeding for hearing my voice. You know, I love working for the railroad. I would never do anything to jeopardize my job. I never once quarreled with Randi, never provoked her. I'm a victim of workplace violence and I just want to get back to work and take care of my family. Thank you.

Mr. J. M. Feetham: All right, thank you, Mr. Cuevas. Mr. Campos, would you care to make a closing statement on behalf of Mr. Cuevas whom you have represented?

Mr. E. J. Campos: Yes.

MR. R. CUEVAS
EMPLOYEE ID: 0040057

MS. R. M. MAZZARA
EMPLOYEE ID: 0229159

---

**CLOSING STATEMENT**
**of Mr. E. J. Campos on Behalf of Mr. R. Cuevas:**

Mr. Cuevas is being charged with a 1.6, Quarrelsome. Today, these charges were no way proven. No- no way, shape or form were they proven. The definition of quarrelsome under the UP policy is when- when an employee's be- continued behavior is inclined or disposed towards an angry verbal confrontation with others in the workplace.

From everyone's testimony today, including Mrs. Mazzara's, who just now in her closing statement admitted to threatening Mr. Cuevas, is guilty of- of being quarrelsome. On the other hand, Mr. Cuevas, by all accounts, the three- or the- his statement and Mr. Noble's statement, the only other two people that were there that witnessed this uh- this- this confrontation, all state that Ra- Mr. Cuevas was in no way confrontational or argumentative, aggressive, assaultive, combative, confron- or warlike, which is *Webster's* definition of quarrelsome.

When- under questioning by myself, Mr. Cuevas said that she was aggressive and argumentative. And- and the fact that she admitted she came out from the vehicle and got- stayed- stoo- stood in front of him and confronted him again after they reached the uh- the yard office, is- is another example of- of being quarrelsome. And- and not only that, after they went in the office and they exited- Ray exited and went into the vehicle to make his phone call as- as is required by UP's policy, she came out and confronted him a second time.

And so, Ray, in his testimony- Mr. Cuevas has- has- has testified that he put his hands up and tried to get away from her. Never once raised his voice as was

---

testified to by Mr. Noble as well. I- I just can't get over the fact that, you know, she wrote in her statement that if I was dude, I'd rip your face off. That alone is-

Ms. R. M. Mazzara: I didn't say rip.

Mr. E. J. Campos: You don't interrupt me, please.

**CLOSING STATEMENT**
**of Mr. E. J. Campos on Behalf of Mr. R. Cuevas (Cont.):**

That alone, it- it will, I believe, seal her fate. Mr. Cuevas never confronted her. He never raised his voice. He never put his hands on her. He tried, in fact, to get around her to- to- to de-escalate the situation and to walk away, but she kept confronting him.

NEVER SAID RIP HIS FACE

Mr. Cramer testified that she told him, I screwed up. And also, that if- if he was a man, he'd- she'd rip his face off. I mean, I don't know what else to say that can prove that Mr. Cuevas is innocent. He did everything he could to de-escalate the situation. And I ask those that are reading the transcripts find in his favor, that he be put to- to work immediately with full back pay, and given credit for his va- time- his vacation time. And that's all I've got to say.

Mr. J. M. Feetham: All right, thank you. This investigation and hearing is closed. The evidence will be transcribed and carefully considered, and after a decision has been reached, you will be notified of that decision in accordance with our working agreement. Thank you.

# Investigation and Hearing Log

Date: 12-May-21 Time: 10:00 Exhibits: 1 Thru 12

**Servcie Unit:** Los Angeles

**Hearing Officer:** JM Feetham

**Union Representative**

Name & Tilte / Organization

| |
|---|
| Alex Reeves - BLET LC * |
| Edward Campos - Smart-TD LC |
| Anthony Ray - Smart-TD * |
| |
| |

**Decision Due:**

___ 7 Day Decision
X 10 Day Decision
___ 15 Day Decision
___ 20 Day Decision
___ 30 Day Decision

ANR = Assistant National Rep

**Present at Investigation Hearing**

| Name | Position | Purpose | Copy | Address |
|---|---|---|---|---|
| Karl Wilson | LC | Observer | | |
| Randi Mazzara | Eng | Charged | | |
| Raymond Cuevas | BR1 | Charged | | |
| James Noble | Con | Witness | | |
| James Cramer | MRO | Witness | | |
| Richard Murphy | SMTO | Charging MGR | | |
| | | | | |
| | | | | |
| | | | | |

Instructions to Transcriptionist:

| |
|---|
| |
| |
| |
| |
| |

Ex. #1

BUILDING AMERICA®

04/23/2021

Randi Mazzara
Employee ID: 0229159
2221 E South Redwood Dr
Anaheim, CA 92806

Subject: NOTICE OF INVESTIGATION

Dear Randi Mazzara:

Please report to Ictf Admin. Blding, 2401 E. Sepulveda Long Beach, CA at 10:00 hours on 05/03/2021 for the hearing to develop the facts and determine your responsibility, if any, in connection with the below charge.

> On 04/15/2021, at the location of 2400 E. Anaheim Ave, Wilmington, CA, 90477, at approximately 05:00 hours, while employed as a ENGINEER, you allegedly acted with hostility toward another employee. This is a possible violation of the following rule(s) and/or policy:
> 1.6: Conduct - Quarrelsome

Under the MAPS Policy, this violation is a Dismissal event. Based upon your current status, if you are found to be in violation of this alleged charge, Dismissal may result.

Please be advised that this hearing will also satisfy the procedural requirements as specified by the Federal Railroad Administration in 49 CFR Part 242, Qualification and Certification of Conductors and/or 49 CFR Part 240, Qualification and Certification of Locomotive Engineers/Remote Control Operator, as applicable.

The investigation will be conducted in accordance with applicable provisions of the collective bargaining agreement between the Company and the organization representing your craft or class. You are entitled to representation and to present witnesses at your own expense in accordance with the agreement. Any request for postponement must be submitted in writing, including reason therefore, no less than 48 hours prior to the date scheduled. A copy of your written request for postponement must be given to me. I can be reached at phone number 562-490-7051.

*The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an Hours of Service (HOS) covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected not to attend the hearing.

Respectfully,

Richard Murphy
Sr Mgr Train Ops

Please Arrange to Appear as a Witness:
James Cramer
James Noble

cc: James Dale Noble, 5731 Cerritos Ave, Cypress, CA, 90630 - Us Certified Mail Return Receipt (Rre) Electronic
James Stephen Cramer, jscramer@up.com - E-Mail
Jerry M Feetham, jerryfeetham@up.com - E-Mail
Lon Simmons, 5728 Alviso Ave, Los Angeles, CA, 90043 - Us Certified Mail Return Receipt (Rre) Electronic
Lon Simmons, localchairman@blet660.com - E-Mail
Richard P Murphy, rpmurphy@up.com - E-Mail

Ex. #2

UNION PACIFIC

BUILDING AMERICA®

05/07/2021

Randi Mazzara
Employee ID: 0229159
2221 E South Redwood Dr
Anaheim, CA 92806

**Subject: POSTPONEMENT OF HEARING Requested by Union**

Dear Randi Mazzara:

Requested by Union, a postponement of the hearing has been received related to the Notice of Investigation dated 04/23/2021 regarding Randi Mazzara's alleged Rule violation on 04/15/2021.

This hearing is hereby **postponed until** 05/12/2021 at 10:00 hours to be held at the following location: Ictf Admin. Blding, 2401 E. Sepulveda Long Beach, CA. All other provisions of the original Notice of Investigation remain the same.

* The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an HOS covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected to not attend the hearing.

Respectfully,

Richard Murphy

**Please Arrange to Appear as a Witness:**
James Cramer
James Noble

cc: James Dale Noble, 5731 Cerritos Ave, Cypress, CA, 90630 - Ups Next Day
James Stephen Cramer, jscramer@up.com - E-Mail
Jerry M Feetham, jerryfeetham@up.com - E-Mail
Lon Simmons, 5728 Alviso Ave, Los Angeles, CA, 90043 - Ups Next Day
Lon Simmons, localchairman@blet660.com - E-Mail
Richard P Murphy, rpmurphy@up.com - E-Mail

BUILDING AMERICA®

Ex.#3

04/23/2021

Raymond Cuevas
Employee ID: 0040057
1020 N. Lagoon Ave
Wilmington, CA 90744

Subject: NOTICE OF INVESTIGATION

Dear Raymond Cuevas:

Please report to Ictf Admin. Blding, 2401 E. Sepulveda Long Beach, CA at 10:00 hours on 05/03/2021 for the hearing to develop the facts and determine your responsibility, if any, in connection with the below charge.

> On 04/15/2021, at the location of 2400 E. Anaheim Ave, Wilmington, CA, 90477, at approximately 05:00 hours, while employed as a BRAKEMAN (ONE), you allegedly acted with hostility toward another employee. This is a possible violation of the following rule(s) and/or policy:
> 1.6: Conduct - Quarrelsome

Under the MAPS Policy, this violation is a Dismissal event. Based upon your current status, if you are found to be in violation of this alleged charge, Dismissal may result.

Please be advised that this hearing will also satisfy the procedural requirements as specified by the Federal Railroad Administration in 49 CFR Part 242, Qualification and Certification of Conductors and/or 49 CFR Part 240, Qualification and Certification of Locomotive Engineers/Remote Control Operator, as applicable.

The investigation will be conducted in accordance with applicable provisions of the collective bargaining agreement between the Company and the organization representing your craft or class. You are entitled to representation and to present witnesses at your own expense in accordance with the agreement. Any request for postponement must be submitted in writing, including reason therefore, no less than 48 hours prior to the date scheduled. A copy of your written request for postponement must be given to me. I can be reached at phone number 562-490-7051.

The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an Hours of Service (HOS) covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected not to attend the hearing.

Respectfully,

Richard Murphy
Sr Mgr Train Ops

Please Arrange to Appear as a Witness:
James Cramer
James Noble

cc: Edward Jesus Campos, 115 Geneva Walk, Long Beach, CA, 90803 - Us Certified Mail Return Receipt (Rre) Electronic
Edward Jesus Campos, campos1422@yahoo.com - E-Mail
James Dale Noble, 5731 Cerritos Ave, Cypress, CA, 90630 - Us Certified Mail Return Receipt (Rre) Electronic
James Stephen Cramer, jscramer@up.com - E-Mail
Jerry M Feetham, jerryfeetham@up.com - E-Mail
Richard P Murphy, rpmurphy@up.com - E-Mail

Ex. #4

BUILDING AMERICA®

05/07/2021

Raymond Cuevas
Employee ID: 0040057
1020 N. Lagoon Ave
Wilmington, CA 90744

**Subject: POSTPONEMENT OF HEARING Requested by Union**

Dear Raymond Cuevas:

Requested by Union, a postponement of the hearing has been received related to the Notice of Investigation dated 04/23/2021 regarding Raymond Cuevas's alleged Rule violation on 04/15/2021.

This hearing is hereby **postponed until** 05/12/2021 at 10:00 hours to be held at the following location: Ictf Admin. Blding, 2401 E. Sepulveda Long Beach, CA. All other provisions of the original Notice of Investigation remain the same.

* The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an HOS covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected to not attend the hearing.

Respectfully,

Richard Murphy

**Please Arrange to Appear as a Witness:**
James Cramer
James Noble

cc: Edward Jesus Campos, 115 Geneva Walk, Long Beach, CA, 90803 - Ups Next Day
Edward Jesus Campos, campos1422@yahoo.com - E-Mail
James Dale Noble, 5731 Cerritos Ave, Cypress, CA, 90630 - Ups Next Day
James Stephen Cramer, jscramer@up.com - E-Mail
Jerry M Feetham, jerryfeetham@up.com - E-Mail
Richard P Murphy, rpmurphy@up.com - E-Mail

Ex.#5

**Postponement Request.**
localchairman to: RPMURPHY 04/30/2021 08:01 PM
Cc: "Brian Leslie"

History: This message has been replied to.

1 attachment

Investigation Postponement Request R. Mazzara E.eml

*** PROCEED WITH CAUTION - This email was sent from outside the Company ***

Mr. Murphy
Ref R. Mazzara (EID# 229159)Pending Investigation Postponement request.
Have not received a reponse per our conversation and or my email of 4/28.
Please call or send email acknowledging the below attached copy of postponement request.

Thanks in advance.

Lon Simmons/LC Div.660 Localchairman@blet660.com
323 377-9179 cell

Sent from my Verizon, Samsung Galaxy smartphone

Ex. #6

4/14 LOG44 R MAZZARELL 0229159

AFTER SECURING POWDER IN TRK 8
COND NOBLE + BRAKEMAN CUEVAS WERE
IN THE FRONT SEATS OF THE [illegible], BECAUSE
OF ALL THE WINDOWS DOWN ON BOTH DRIVER
+ PASSENGER I HAD ASKED IF COND NOBLE
COULD DROP BRAKEMAN CUEVAS AT THE
DEPOT AND COME BACK AND GET ME "NO"
I HAD ASKED CUEVAS IF HE WOULD SIT IN
THE BACK AND I UP FRONT THAT WAY
HE COULD HAVE THE WINDOW DOWN "NO"
JUST GET IN THE BACK HE WANTS TO
GO HOME SAYS HE. DURING DRIVE TO OFFICE
I ASKED THEM IF THEY COULD ROLL WINDOWS UP SOME - I ASKED
RAY IF HE WOULD PUT HIS WINDOW UP A LITTLE - "NO"
I'M [illegible] A REQUEST. "NO" AND SO
I SAID YOU KNOW IF I WAS A DUDE YOU
WOULDN'T HAVE A FILE HE SAID THAT'S
A THREAT I SAID HE [illegible] A DUDE AND
SAID HE WAS BEING [illegible] - [illegible] & JAMES
WAS DOING THIS ON PURPOSE AS ALL THE
OTHER [illegible] ISSUES THAT [illegible]
DURING THE EVENING - I DID NOT
PUSH CUEVAS SO HE SAYS HE BUMPED INTO
ME AND CLAIMED I PUSH HIM.
NOBLE & CUEVAS HAVE BEEN ACTING OUT
DUE TO THE SAFETY [illegible] ISSUE
WHICH HAS NOT BEEN ADDRESSED AS OF YET
R [illegible] [illegible]

Ex. #7

We the LOG-44 parked our power at the bottom of Mead Yard track #8. The conductor James Noble picked us up. As we got in the vehicle. The Engineer Rana Mazzara demanded I close my window. Because Randy has been couching and also due to covid. I left my window up. Randy then said "If I was a man, you'd have no face I said are you threatening me? I then advised her not to speak to me. It was a 30 sec drive back to the office. As we parked. Randy gets out of the vehical all aggressive and gets in my face. she said a second time "If I was a man Id punch you in the face." she gets in my face into like a fighting stance and pushes me. I try to walk away but she wont let me pass into the office. She's in my face, blocking me from going up the Mead Yard stairs. I eventually step around her and go into the office where I was trying to go. I went back outside into a company vehicle so I could call a manager. she follows me back outside and tries to open the vehicle door and argue so more. I exit the vehicle and walk away again.

Raymond Cuevas
LOG-44 Brakeman
0040057

Ex.#8 pg.1

To whom it may Concern:

ON friday morning around 04:20AM (4/15/21) After Putting up 7029 and up 7937 at the bottom of Trk 8, I drive to Pick up the Eng and Brakeman to go to Mead yard office and tie up, After Picking up crew in the Jeep the Eng. got out and Said that I can come back and Pick her up and Said no and why and the Eng Said I know the brakeman won't let his Window up I Said get in its time to go home So She got in the Jeep and I drove ~~up~~ off while

Ex. #9

1.6 - Conduct

Employees must not be:

1. Careless of the safety of themselves or others
2. Negligent
3. Insubordinate
4. Dishonest
5. Immoral
6. Quarrelsome
   or
7. Discourteous

Any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty or to the performance of duty will not be tolerated.

**Rule Updated Date**
April 6,2010

building as I was standing next to jeep not believing what I am seeing. after being told myself and brakeman needs to man up I witness it all and am still shocked.

Con: James D. Noble
Q298164
4|15|21

Ex. #10

# UNION PACIFIC RAILROAD
# POLICY FOR MANAGING AGREEMENT PROFESSIONALS FOR SUCCESS (MAPS)

Effective September 15, 2015
Last Updated November 1, 2019

## Table of Contents

**Policy for Managing Agreement Professionals for Success (MAPS)**


**Section 1: GENERAL GUIDELINES:** ....................3
**Section 2: REPRESENTATION; COMPENSATION:** ....................3
**Section 3: RULE AND POLICY VIOLATIONS:** ....................3
**Section 4: TRAINING:** ....................5
**Section 5: ADMINISTRATION:** ....................5


**APPEDICIES**


**Appendix A: MAPS Process Matrix**....................7
**Appendix B: MAPS Frequently Asked Questions**....................8
**Appendix C: Glossary**....................13
**Appendix D: Discipline Transition Plan to MAPS**....................14
**Appendix E: Rules Matrix**....................15

pg. 2

## Section 1: GENERAL GUIDELINES:

Union Pacific is committed to be a railroad where our customers want to do business, our employees are proud to work, shareholder value is created, and the safety of the public and our employees is our top priority.

All railroad professionals are expected to work safely, honestly, and to treat others with respect. Compliance with workplace rules and policies is necessary to meet the commitments of Union Pacific and to fulfill certain regulatory requirements.

The objective of this Policy is to provide a meaningful and effective process to address rule and policy violations in a consistent and fair manner. Certain rule or policy violations and/or patterns of behavior may be so serious that suspension or dismissal from service may result.

Union Pacific's COMMIT Program and Attendance Policies are separate from this Policy. The management of those policies, or other Company policies not listed here, will be governed under the terms and conditions of those separate policies.

This Policy applies to all agreement professionals and replaces all previous Company policies pertaining to discipline.

## Section 2: REPRESENTATION; COMPENSATION:

**2.1** This Policy does not alter the terms and conditions of the controlling collective bargaining agreement provisions pertaining to employees' right to a formal investigation.

**2.2** An employee charged with a rule or policy violation may elect to waive formal hearing and accept the proposed MAPS status. Employee must be allowed the opportunity to discuss whether to waive or proceed with a formal hearing with his/her designated Union Representative.

**2.3** Employees will be compensated under the terms of the controlling collective bargaining agreement provisions for actual time spent participating in training required under this Policy. If an employee is suspended from service due to a regulatory requirement, the employee will receive the straight time rate of pay for participation in required training.

## Section 3: RULE AND POLICY VIOLATIONS:

**3.1** <u>**Conduct:**</u> Employees may be removed from service and subject to potential dismissal from employment for a single violation of **Rule 1.6: Conduct**[1] or other serious policy or rule violations as listed in **Appendix A.**

**3.1.1** Employees who are found to be insubordinate or careless of the safety of themselves or others through repeated failure to comply with rules or policy, will be charged with a violation of

[1] 1.6: Conduct, Employees must not be: Careless of the safety of themselves or others, Negligent, Insubordinate, Dishonest, Immoral, Quarrelsome or Discourteous. Any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty or to the performance of duty will not be tolerated. (Rule update April 7, 2010)
Note: "Discourteous" conduct charges may result in, training, and/or dismissal depending on the circumstances.

Rule 1.6, removed from service, and subject to dismissal pending an investigative hearing.

**3.1.2** The Senior Vice President, Department Head or designee must be consulted prior to charging an employee with potential dismissal from service for a Rule 1.6 violation or other Company policies.

**3.2** **Federal Law[2]:** Regulations that mandate removal from duty or require suspensions from service for certain rule or policy violations apply and are controlling for all crew members working in a position requiring an FRA license.

**3.3** **Retention Periods:** Substantiated charges for rule violations will remain on the employee's record for thirty-six (36) months. If the employee elects to sign a hearing waiver, the retention period is reduced to twenty-four (24) months. The anniversary date of the violation will be used to determine record retention.

**3.4** **Progressive Handling for Multiple Violations:** An incident involving a potential violation of a rule or policy will be managed as described in Appendix A. Rule or policy violations that trigger remedial training, regardless of rule category, will be taken into account for progression and can potentially lead to dismissal from service.

**3.4.1 Training Event 1 or 2:** When an employee is found to be in violation of a rule or policy that triggers a first training event and the employee commits a subsequent triggering rule or policy violation during the retention period, the new retention period starts with the date of the subsequent violation.

**3.4.2 Dismissal:** When an employee is found to be in violation of a rule or policy while in Training 2 status; the employee will be held from service pending a formal hearing. Following an investigation, a determination will be made by the responsible supervising manager whether to permanently dismiss the employee from service subject to the approval of the Senior Vice President, Department Head or designee.

**3.5** **Root Cause Analysis:** Employees will be expected to provide the facts related to rule or policy violations for purposes of safety performance analysis and risk mitigation.

**3.6** **Arbitration Decisions:** If a dismissed employee is returned to service as the result of a court decision or an arbitration decision or award, the conditions of the decision or award will be controlling for the purposes of adjusting the employee's record. If a decision or award is silent with regard to the employee's record, the employee's record will revert to the status of a Training 2 with a thirty-six (36) month retention period from the date of the decision or the award. The time spent in dismissed status will not apply to the retention period of a prior violation.

**3.7** **Rule 1.5: Drugs and Alcohol:** Violations will be handled in accordance with existing regulatory, policy and collective bargaining agreement requirements. The time in dismissed status resulting from a Rule 1.5 violation is not taken into account for the purposes of computing the retention period for violations that were on the employee's record prior to returning to service from successful completion of the Employee Assistance Program (EAP).

An employee who is charged following an incident or policy violation, which also results in a Rule 1.5 violation, will not be eligible for the Employee Assistance Program. Such Rule 1.5 violation will be

[2] See 49 CFR §240.117, 119; 49 CFR §242.405

considered a termination offense.

## Section 4: TRAINING:

**4.1** **Requirements:** Employees will be required to successfully complete any associated training at the direction of management. An employee also may be required to continue to participate in training prescribed by management after returning to service. An employee's failure to successfully complete the required training may result in dismissal from service.

**4.2** **Responsibilities** Managers are responsible for ensuring that scheduling, delivery and documentation of the training is completed.

The employee is responsible for compliance with the applicable Hours of Service reporting after participating in a training session.

## Section 5: ADMINISTRATION:

**5.1** **Review:** The designated General Chairmen or National Union Officer representing employees covered by this Policy or the managers administering this Policy may request periodic review of the actions taken under this Policy with the Senior Vice President, Department Head or his/her designee.

## APPENDIX A: MAPS Process Matrix (Updated November 1, 2019)

NOTE: Refer to the terms and conditions described within the Policy.

| RULE CATEGORY | ACTION | | |
|---|---|---|---|
| **Incidents**<br>• Incident occurs involving rule or policy violation | TRAINING 1 | TRAINING 2 | DISMISS |
| **Decertification Rules (conductors & engineers)***<br>• Suspend and comply with 49 CFR Part 240, 242 processes | | | |
| **Termination**<br>• Rule 1.5 Drugs & Alcohol, 1.6 Conduct (see Section 3.1 footnote), 1.7 Altercation, 1.12 Weapons,<br>• Violations of Ethics & Business Conduct Policy and its Associated Policies (see SSI Item 10I)<br>• Felony Conviction<br>• Overstaying leave of absence without authority | DISMISS | | |

**INCIDENTS:** Non compliance could potentially result in serious or life-threatening consequences for employees or the public or could compromise safe railroad operations. This includes repeated or deliberate failure to comply with instructions.

**DECERTIFICATION RULES:** Noncompliance requires suspension/revocation of a train and engine service employee's FRA license. If the FRA thresholds for speed or FRA reporting threshold requirements under the controlling regulations are not satisfied, the rule violations will be treated as a "Triggering Event" under MAPS.

***See 49 CFR Part 240, 49 CFR Part 242, and Appendix E to Part 242 regarding regulatory requirements related to prohibited conduct for FRA certified engineers and conductors and suspension periods.**

# APPENDIX B: MAPS Frequently Asked Questions (Updated November 1, 2019)

## General

**1) Why was the discipline policy changed?**
The policy was changed to separate coaching feedback from the discipline process.

**2) Does this policy constitute a labor agreement?**
No, this is a Company policy.

## Transition

**3) Will all suspensions from service be eliminated or reduced?**
No. FRA certified professionals remain subject to the legal mandates and suspension requirements found in the regulations.

**4) How will alleged rule or policy violations that occurred before the effective date of the new policy be handled at the time the policy is updated?**
Incidents occurring prior to the effective date of this Policy will be handled under the discipline policy in effect at the time of the incident. All active "Conference" statuses will be removed and the employee's current status updated to "None." The applicable collective bargaining agreement rules for disputing a rule or policy violation charge will not change under MAPS.

**5) Does proactive training count in the progression toward potential dismissal under the MAPS policy?**
No. Proactive training is not the result of a triggering event violation or charge. An employee can attend proactive training multiple times and it will become part of the employee's permanent record but is not considered remedial training under the MAPS policy.

## MAPS Training

**6) Who conducts required training events?**
A qualified manager designated by the department or service unit general manager or equivalent department supervisor. Management also may have qualified agreement professional subject matter experts conduct portions of the training.

**7) How is training documented?**
Successful completion of training will be recorded electronically in the Learning Management System (LMS) and made a permanent part of the employee's training record.

**8) Are employees paid for time spent during a training session?** The sessions, including attendance at proactive MAPS training, will be conducted while the employee is on duty and under pay. The controlling collective bargaining agreements apply. Employees who are suspended due to a regulatory requirement will be paid at the straight time rate for attending mandatory training while in suspended status.

**9) If an employee is required to travel to attend training, will the employee be entitled to reimbursement for travel expenses if training takes place at a location other than the employee's reporting point?**
Yes, if the training takes place at an away-from-home terminal location. The Company will provide

instructions regarding reimbursement for reasonable, necessary expenses.

**10) What if the employee fails to attend, actively participate or complete the training?**
The employee may be charged with failure to comply with instructions or insubordination. Failure to comply is a triggering event that will move the employee to the next step in the MAPS Policy progression.

## Rule and Policy Violation Handling

**21) Does a violation of a Company policy (see SSI 10I) result in a dismissal charge?**
Charges issued for violations of Company policies are governed under the terms and conditions of those policies. Depending on the circumstances surrounding a violation, the employee may be charged with dismissal or some lesser charge, such as failure to comply.

**22) What are the retention periods for a rule or policy violation?**
Thirty-six (36) month retention on the employee's work record if a hearing is conducted and charges upheld or twenty-four (24) months if the employee elects to waive a formal hearing.

**23) When does the retention period for a rule or policy violation begin?**
It begins on the incident date; e.g., an incident involving a rule or policy violation took place on March 1, 2019; the 24 month anniversary date is March 1, 2021.

**24) Does this policy change any time limits for initiating a charge or the right to an investigative hearing?**
No. Time limits and rights to hearings are controlled by applicable collective bargaining agreements and federal regulations.

**25) If a Rule 1.5: Drugs and Alcohol violation coincides with another alleged rule violation, are the two violations handled together or separately?**
They are handled separately.

**26) Will an employee who tests positive for drugs or alcohol as the result of an incident involving a rule or policy violation resulting in remedial training or dismissal be eligible to participate in the Employee Assistance Program?**
No. The employee will be charged with violation of Rule 1.5 and, if proven, will be dismissed from service.

**27) Will violations of the attendance policy be included in the progressive handling of policy violations under MAPS?**
No. Attendance polices will be managed separately.

## Decertification Events

**28) How should a rules violation identified from a ride or an event recorder be treated?**
If a decertification rule is potentially violated, the regulation governing decertification applies and will be handled in accordance with the MAPS progression.

**29) May all train crew members be charged with responsibility for a decertification event, as defined by 49 CFR Parts 240/242, even if only one crew member's FRA certification is revoked?**
Yes. The rule violation will be handled as specified in **Appendix A** of the Policy.

**30) If an employee is suspended due to FRA decertification, can the employee work in another TE&Y class of service?**
No. TE&Y employees are required to have a valid FRA license for all classes of service which they may be able to protect and are not permitted to work in another class of service while in suspended status.

## Dismissal and Reinstatement

**38) Can an employee be dismissed for a single rule or policy violation?**
Yes. An incident can be so egregious or have such serious consequences that the employee can be removed from service and charged with a safety, conduct rule and/or policy violation.

**39) What happens if a dismissal is overturned by the labor board?**
The situation is dependent on whether the employee is exonerated or returned without pay. See Section 3.7

**40) Can an employee still be terminated for being absent without authority or leave?**
Yes, pursuant to the terms and conditions of the controlling collective bargaining agreement.

## APPENDIX C: GLOSSARY

**TRIGGERING EVENT:** An incident involving a rule or policy violation resulting in dismissal or remedial training under the MAPS progression. Employees who violate Rule 1.5, Drugs and Alcohol, in conjunction with a triggering event violation will not be eligible for a one time return to service opportunity through EAP and will be terminated from service.

**The following definitions, while not all inclusive or absolute, are intended to guide the determination of whether various acts by employees meet necessary criteria to be considered a violation of applicable Dismissal Rules:**

**ALTERCATION:** When an employee's actions cause or result in a quarrel characterized by physical activity such as pushing, shoving or fighting.

**CARELESS OF SAFETY:** When an employee's actions or failure to take action demonstrate an inability or an unwillingness to comply with safety rules as evidenced by repeated safety rules infractions or when an employee commits a specific rule(s) infraction that demonstrates a willful, flagrant, or reckless disregard for the safety of themselves, other employees or the public.

**DISHONEST:** When an employee's actions or statements constitute lying, cheating, theft or deception.

**FELONY CONVICTION:** The conduct of an employee leading to the conviction of a felony in state or federal court is prohibited. Guilty pleas, diversion programs, deferred decisions or adjudication, and other alternative sentencing or adjudication procedures, regardless of local nomenclature, are considered convictions under this policy.

**FRAUD:** When an employee's actions or statements are intentional misrepresentations of fact for the purpose of deceiving others so as to secure unfair or unlawful gain.

**IMMORAL:** When an employee's actions are contrary to commonly accepted moral principles.

**INSUBORDINATION:** When an employee's actions or statements indicate a refusal (as opposed to a failure for cause) to carry out the instructions of a supervisor which are work, safety or policy related and which conform to accepted Company and industry practice, or when an employee demonstrates gross disrespect toward a supervisor. **NOTE:** Any failure to comply with Union Pacific's Drug and Alcohol Policy will be considered insubordination.

**NEGLIGENT:** An employee demonstrates negligence when his or her actions or failure to take action causes, or contributes to, the harm or risk of harm to the employee, other employees, the general public or company property.

**QUARRELSOME:** When an employee's continued behavior is inclined or disposed toward an angry verbal confrontation with others in the workplace.

**THEFT:** When an employee's action is intended to and/or results in the taking and/or removing of property or other items of value from the Company, its customers, or other employees without proper authority.

# APPENDIX E: Rules Matrix (Updated July 16, 2019)

Note: The rules and/or policies in effect at the time of the incident are controlling. Please refer to the applicable General Orders, and other official publications of policy or instructions.

## Critical Rules

The Critical Rules list is located in System Special Instruction, Item 10: Rule Supplements and Amendments. Please refer to the applicable General Orders, and other official publications of policy or instructions.

## Decertification Rules

| DECERTIFICATION EVENTS (CERTIFIED ENGINEERS AND CONDUCTORS | |
|---|---|
| **FRA Regulation** | **Description** |
| 240.117(e)(1)<br>242.403(e)(1) | Stop before passing signal |
| **Rule Number** | **Rule Description** |
| 5.4.7 | Display of Red Flag or Red Light |
| 9.5 | Where Stop Must be Made |

| FRA Regulation | Description |
|---|---|
| 240.117(e)(2)<br>242.403(e)(2) | Speed/Restricted Speed |
| **Rule Number** | **Rule Description** |
| 6.27 | Movement at Restricted Speed<br>(When the Violation Results in a FRA Reportable Incident) |
| 6.28 | Movement on Other than Main Track<br>(When the Violation Results in a FRA Reportable Incident) |
| 6.31 | Maximum Authorized Speed (exceeds speed by 10 MPH) |

| FRA Regulation | Description |
|---|---|
| 240.117(e)(3)<br>242.403(e)(3) | Air Brake Test |
| **Rule Number** | **Rule Description** |
| 30.3.2 | Initial Terminal Air Brake Test |
| 30.4.1 | 1000 Mile Inspection Tests |
| 30.5.1 | Transfer Train |
| 30.7.1 | Application of Release Test |
| 38.1.2 thru 38.1.5 | Passenger/Commuter Brake Tests |

| FRA Regulation | Description |
|---|---|
| 240.117(e)(4)<br>242.403(e)(4) | Main Track Authorization |
| **Rule Number** | **Rule Description** |
| 6.3 | Main Track Authorization |
| 15.2 | Protection by Track Bulletin Form B |
| 6.32.2 | Automatic Warning Device |

| FRA Regulation | Description |
|---|---|
| 240.117(e)(5)<br>242.403(e)(12) | Tampering |
| **Rule Number** | **Rule Description** |
| 1.23.1 | Locomotive Mounted Safety Devices |
| 35.3.1 | Operator Equipment |

| FRA Regulation | Description |
|---|---|
| 240.117(e)(6)<br>242.403(e)(12) | Drug and Alcohol |
| **Rule Number** | **Rule Description** |
| 1.5 | Drug and Alcohol |
| | (FRA Test, blood alcohol 0.04) |

| DECERTIFICATION EVENTS (CERTIFIED CONDUCTORS) | |
|---|---|
| **FRA Regulation** | **Description** |
| 242.403(e)(6)<br>218.99 | Shoving or Pushing Movements |
| **Rule Number** | **Rule Description** |
| 6.5 | Shoving Movements |

| FRA Regulation | Description |
|---|---|
| 242.403(e)(7)<br>218.101 | Leaving Rolling and On-Track Maintenance-of-Way Equipment in the Clear |
| **Rule Number** | **Rule Description** |
| 7.1 | Switching Safely and Efficiently |
| 81.8.1 | Avoiding Fouling Hazards |

| FRA Regulation | Description |
|---|---|
| 242.403(e)(8)<br>218.103 | Hand-Operated Switches, Including Crossover Switches |
| **Rule Number** | **Rule Description** |
| 8.2 | Position of Derail Switches |
| 8.8 | Switches Equipped with Locks, Hooks, or Latches |
| 8.9.1 | Testing Spring Switch |
| 8.11 | Switches in Sidings |
| 8.12 | Hand-Operated Crossover Switches Attached to Main Track |
| 8.19<br>8.19.1 | Automatic Switches Other than Main Track/ Radio Controlled Switches |
| 9.13 | When Instructed to Operate Dual Control Switches by Hand Other than Main Track |
| 9.13.1 | Hand Operation of Dual Control Switches Other than Main Track |

| FRA Regulation | Description |
|---|---|
| 242.403(e)(9)<br>218.105 | Additional Operational Requirements for Hand-Operated Main Track Switches |
| **Rule Number** | **Rule Description** |
| 8.3 | Main Track Switches |
| 8.12 | Hand-Operated Crossover Switches Attached to Main Track |
| 8.19 | Automatic Switches Other than Main Track |
| 9.13 | When Instructed to Operate Dual Control Switches by Hand Other than Main Track |
| 9.13.1 | Hand Operation of Dual Control Switches Other than Main Track |
| 9.17 | Entering Main Track at Hand-Operated or Spring Switch |
| 10.1 | Authority to Enter CTC Limits |
| Item 10K | Main Track Switches |

| FRA Regulation | Description |
|---|---|
| 242.403(e)(10)<br>218.107 | Additional Operational Requirements for Hand-Operated Crossover Switches |
| **Rule Number** | **Rule Description** |
| 5.13 | Blue Signal Protection of Workmen |
| 8.12 | Hand-Operated Crossover Switches Attached to Main Track |

| FRA Regulation | Description |
|---|---|
| 242.403(e)(11)<br>218.109 | Hand-operated Fixed Derails |
| **Rule Number** | **Rule Description** |
| 8.2 | Position of Switches |
| 8.20 | Derail Location and Position |

## Dismissal Events

| Rule/Policy | Description |
|---|---|
| 1.5 | Drugs and Alcohol (Rule "G") |
| 1.6 | Conduct:<br>Careless of Safety<br>Negligent<br>Insubordinate<br>Dishonest<br>Immoral<br>Quarrelsome<br>Discourteous |
| 1.12 | Weapons |
| 1.7 | Altercation |
| 1.6.2 | Felony Conviction |
| Policies See SSI Item 10 I | Violations of Company policies including the Policy on Ethics and Business Conduct which incorporates other policies by reference including, but not limited to the EEO Policy, can result in discipline including dismissal from employment. |

Ex:# 11

BUILDING AMERICA

# Policy to Address Violence & Abusive Behavior in the Workplace

## Purpose

Union Pacific is committed to maintaining a safe work environment free of all forms of violence, including verbal and physical threats. The Company has a zero tolerance policy with respect to all forms of violence in the workplace. This policy applies to all employees, customers, contractors, vendors, visitors, or any individual on Union Pacific property. Individuals subject to this policy are also responsible for compliance with applicable state and federal laws.

## Prohibited Behavior

The Company will not tolerate or condone any form of violence or threats of violence committed by or against its employees, contractors, customers/clients, vendors, suppliers, or visitors in the course of conducting business, while on Company property, traveling on Company business, or when using the Company's computer network, systems or equipment. Company policy related to its computer and communications network is more fully explained in separate policies, including but not limited to the Information Governance Policy and associated Rules.

## Weapons

Union Pacific employees and all other individuals on Company property or involved in Union Pacific business off Company property are prohibited from possessing or hiding weapons in facilities, equipment, or vehicles used in operations while on such property, or on their persons, which includes but is not limited to grips, suitcases, gym bags and purses. This prohibition applies even if the individual is licensed to carry a concealed handgun under state law. Only Union Pacific Police and on-duty law enforcement officers acting in an official capacity are authorized to possess weapons on Company property.

For purposes of this policy, a "weapon" shall mean any device, instrument, material or substance (animate or inanimate) that is used to threaten, or is capable of causing, death or bodily injury. This prohibition includes but is not limited to firearms, knives with a blade longer than three inches, tasers, stun guns and pepper sprays. Union Pacific Police are authorized to make the final determination of whether a particular item constitutes a weapon under this policy.

## Violations of Policy

Alleged violations of this policy will be investigated. All proven violations of this policy will result in appropriate disciplinary action up to and including termination of employment with the Company, as well as possible civil or criminal prosecution when appropriate.

## Reporting Violations

Anyone who has experienced, witnessed, or has knowledge of any prohibited conduct must report the incident as soon as possible to the Response Management Communication Center (RMCC) at 888-877-7267 (888-UPRR-COP) and a management supervisor.

Pg. 2

If an emergency situation exists, contact a local law enforcement agency immediately and then, when time and circumstances permit, report the incident to the RMCC.

**Recognizing and Addressing Violent and Potentially Violent Behavior**

Actual threats should always be taken seriously and reported as described in this policy. This includes aggressive or hostile behavior that creates a reasonable fear of injury to another person.

When someone in the workplace is exhibiting behaviors that raise concerns about potentially violent behavior, you should trust your instincts and seek assistance. Often, early intervention by a supervisor can help prevent escalation of troubling behavior or a troubling situation.

For guidance and assistance please initiate contact with your supervisor or another resource listed:

- Your Departmental HR Director (non agreement)
- Employee Assistance Program Help Line 1- 800-779-1212
- EEO Hot Line at 866-877-3362
- Drug and Alcohol Info Help Line 1-800-840-3784
- Peer Support Help Line 1-800-877-5707
- Your local Occupational Health Nurse

Intervening early in a threatening or potentially violent situation is vital to preventing its escalation. The employee FOCUS website provides additional information about how to recognize the early warning signs of potentially violent behavior.

**Additional Information**

Please direct any questions related to this policy to the Director - RMCC at 402-544-9630.

Training resources can be found in the Learning Management System by searching "Workplace Violence."

# EXHIBIT D

Ex. #6

4/14 W6944 R MABBARI [illegible] 022915[illegible]

AFTER SECURING POUCHES IN TRK 8 COND Noble + BRAKEMAN CUEVAS WERE IN THE FRONT SEATS OF THE [illegible], BECAUSE OF ALL THE WINDOWS DOWN ON BOTH DRIVER + PASSENGER I HAD ASKED IF COND Noble COULD DROP BRAKEMAN CUEVAS AT THE DEPOT AND COME BACK AND GET ME "NO" I HAD ASKED CUEVAS IF HE WOULD SIT IN THE BACK AND I UP FRONT THAT WAY HE COULD HAVE THE WINDOW DOWN "NO" JUST GET IN THE BACK HE WANTS TO GO HOME [illegible] HE. DURING DRIVE TO OFFICE I ASKED IF THEY COULD ROLL WINDOWS UP SOME – I ASKED RAY IF HE WOULD PUT HIS WINDOW UP A LITTLE – "NO" I'M MAKING A REQUEST. "NO" [illegible] SO I SAID YOU KNOW IF I WAS A DOG YOU WOULDN'T HAVE A [illegible] HE SAID THAT'S A THREAT I SAID NO I'M [illegible] A DUDE AND SAID HE WAS BEING [illegible] [illegible] [illegible] WAS DONE THIS [illegible] AS ALL THE OTHER [illegible] ISSUES THAT [illegible] DURING THE MEETING – I DID NOT PUSH CUEVAS SO HE SAYS HE [illegible] ME [illegible] CLAIMED I PUSH HIM.

NOBLE + CUEVAS HAVE BEEN ACTING OUT DUE TO THE SAFETY [illegible] ISSUE WHICH HAS NOT BEEN ADDRESSED AS OF YET

[illegible]

# EXHIBIT E

# WITNESS STATEMENT

**TO BE COMPLETED BY UNION REPRESENTATIVE OR SOMEONE WHO IS AWARE OF THE OCCURRENCE**

LOCOMOTIVE ENGINEERS AND CONDUCTORS MUTUAL PROTECTIVE ASSOCIATION
4000 TOWN CENTER, SUITE 1250, SOUTHFIELD, MI 48075-1407
1-800-514-0010 ◆1-877-633-1910 FAX

I am employed as a locomotive Engineer with **UNION PACIFIC** and I am acquainted with the details of the act or acts which occasioned the

Check one [] SUSPENSION [] DISCHARGE of **(0188832 125-041) RANDI MAE MAZZARA**

To be completed by Witness - Details of occurrence are as follows:

I A.L. Reeves was in Attendance of and witnessed to Actual investigation held on May 11th 2021 Randi Mazzara was accused of a Verbal threat Against a Fellow co-worker Ray Cuevas. The charges were upheld.

YOU MAY REACH ME AT THE ADDRESS OR TELEPHONE NUMBER BELOW IF ANY ADDITIONAL DETAILS ARE REQUIRED

Telephone No. 323 691 9010 — A. R[signature] (Signature of Witness)

Date June 6th 2021 — Alex Reeves V.L.C Blet 660 (Name Title and Union - Print or Type)

Address 4001 Inglewood Ave 101/651 (Number & Street) Redondo Beach (City) CA (State/Province) 90278 (Zip/Postal Code)

# EXHIBIT F

**Brotherhood of Locomotive Engineers & Trainmen**
Union Pacific Western Lines & Pacific Harbor Line, Inc.
1902 Orange Tree Lane, Suite 110
Redlands, CA 92374
(909) 792-1200
(909) 792-1211 FAX

B.P. Carr
General Chairman

June 23, 2021

Emailed 6/23/2021
<u>Return Email Requested</u>

Ms. Jim Boyle, Manager, Labor Relations
Union Pacific Railroad Company
1400 Douglas Street Stop 0710
Omaha, NE 68179-0710

Org. File No. E-33707

Dear Mr. Boyle:

Herein is an appeal on behalf of Engineer R.M. Mazzara, EID No. 0229159, for compensation for all time lost, including time lost while attending the investigation in Long Beach, California, in connection with Claimant's assessment of a **Maps Dismissal** per the **Managing Agreement Professional for Success (MAPS)** Discipline Policy, letter dated May 21, 2021. Further, Claimant's annual vacation rights should be restored, and she should be compensated accordingly. In addition, Claimant's personal record should be completely expunged of any notation or record pertaining to this case.

Engineer Mazzara, (hereinafter referred to as "Claimant"), a Union Pacific Railroad Company (hereinafter referred to as "Carrier") employee, had been employed approximately thirty-two (32) years with the Carrier at the time of the investigation.

Senior Manager Train Operations (SMTO) R.P. Murphy testified on May 12, 2021,

> "Regarding the alleged uh- alleged confrontation that took place between the Engineer, Randi Mazzara, and himself. As far as virtually what- what he said to me was that he was shoved and threatened that morning". **(Tr. Pg. 26)**

As a result of his preliminary investigation SMTO Muphy's scheduled a formal investigation charging Claimant with an alleged violation of the General Code of Operating Rules 1.6: Quarrelsome. Claimant received a NOTICE OF INVESTIGATION dated April 23, 2021, as read into to record **(Tr. Pg. 11 - 13) (Exhibit 1)**:

> Dear Randi Mazzara:
>
> Please report to ICTF Administrative Building, 2401 East Sepulveda, Long Beach, California, at 1000 hours on 5-3-2021, for the hearing to develop the facts and determine your responsibility, if any, in connection with the below charge.
>
> On 4-15-2021, at the location of 2400 East Anaheim Avenue, Wilmington, California, 90477, at approximately 0500 hours, while employed as a Engineer, you allegedly acted with hostility towards another employee. This is a possibleviolation of the following rule and/or policy:
>
> 1.6: Conduct – Quarrelsome
>
> Under the MAPS Policy, this violation is a dismissal event. Based upon your current status, if you are found to be in violation of this alleged charge, dismissal may result.
>
> Please be advised that this hearing will also satisfy the procedural requirements as specified by the Federal Railroad Administration in 49 CFR,

242, Qualification and Certification of Conductors and/or 49 CFR Part 240, Qualification and Certification of Locomotive Engineers/Remote Control Operator, as applicable.

The investigation will be conducted in accordance with applicable provisions of the collective bargaining agreement between the Company and the organization representing your craft or class. You are entitled to representation and to present witnesses, at your own expense, in accordance with the agreement. Any request for popo- postponement must be submitted in writing, including reason thereof, no less than 48 hours prior to the date scheduled. A copy of your written request for postponement must be given to me. I can be reached at phone number 562-490-7051.

The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an Hours of Service covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected not to attend the hearing LC CAMPOS ATTENDED AND REPRESENTED CUEVAS WHILE ON DUTY ON HIS JOB - NOT RESTED
Respectfully, Richard Murphy, Senior Manager of Train Ops

After a postponement, the formal investigation was held on May 12, 2021. Following the hearing Claimant received a letter, **NOTIFICATION OF DISCIPLINE ASSESSED** dated May 21, 2021, in which she was Dismissed from all service with the Carrier.

This application of the MAPS policy is unlawful, violates the Railway Labor Act, and violates established principles of constitutional due process and industrial due process.

The BLET is currently conferencing this dispute with the Carrier and maintains the position that the MAPS policy and its implementation violate Section 2 and Section 7 of the Railway Labor Act. The BLET raised this issue by letter on November 10, 2015 and the Carrier replied on November 11, 2015. The parties met in conference on December 2, 2015, and expect to meet again after a significant discussion of the issues, including the retroactive application of MAPS item No. 35, regarding terminations after three FRA decertifications.

Under the Railway Labor Act, the Carrier must bargain with the BLET over the implementation of policies that either conflict with an established agreement or that impact wages, hours, or working conditions. Contrary to that obligation, the Carrier unilaterally implemented the MAPS policy.

Even apart from its duty to bargain over these types of changes, this particular change violates constitutional and industrial due process. This change is an "ex post facto" change that applies a new rule to the past-conduct of engineers. Previously, the "look back" period for these FRA violations was limited. After enough time passed, the decertification was no longer considered and was not part of the engineer's record.

But now, the Carrier seeks to apply its rule in a new way to that past conduct. Many of them made decisions with respect to past decertification's on the established basis that those offenses would "clear" at some point and would no longer be a basis for progressive discipline. The Carrier has changed the deal – and cannot do so retroactively against these engineers.

A fundamental basis of discipline is that an employee must have notice of a rule in order to conform his conduct to it. That is why retroactive, ex post facto rules like this violate due process. Engineers – at the time of the earlier decertification – could not have matched their conduct to this rule because it did not exist. Therefore, the rule cannot in application "look back" to old conduct that was taken under a different set of rules. To hold otherwise would violate due process on both an industrial and a constitutional scale.

Apart from this due process issue, further discipline against old offenses would amount to "double jeopardy" – a well-established principle that says you can't punish someone twice for the same offense and you can't fail to impose punishment for an unreasonable period of time while holding the possibility of punishment over the employee.

The use of this look-back to trump up charges also violates progressive discipline – you can't discipline an employee simply for having been disciplined too many times. Progressive discipline requires progressively more severe discipline for each violation until the final discipline of dismissal. That did not happen here, largely because each instance of discipline was cleared from the engineer's record.

This retroactive change in policy cannot be applied in this case or in general and the Carrier risks a major dispute if it does so, particularly while the parties continue to conference the matter.

It was clear in testimony Claimant was not going to receive a fair and impartial hearing. The Conducting officer, Mr. J.M. Feetham, cut Claimant off several times during questioning, interrupted her closing statement and continuously steered testimony away from a safety hotline complaint, spoken of in Claimant's statement **(Exhibit 6),** and an EEOC claim mentioned in Claimants closing statement which was cut off. It does not take an astute reader to realize there was a history with this crew that led to this incident which was being buried by the Carrier's hearing officer. This history should have been laid bare on the record to allow for a full and impartial hearing. Was Claimant subject to retaliation due to previous reports or complaints she made concerning her crew?

Testimony **(Tr. Pg. 46/47)** revealed there was a camera outside the yard office as well as inside the office. SMTO Murphy testified he could not pull the tapes of those cameras to view it. The record is muddled concerning the cameras due to Claimant and SMTO Murphy talking over each other. However, the Carrier's Police can access those cameras and view the contents. It was also testified to that the Carrier Police took a report from both the Claimant and Brakeman Cuevas. The Carrier's hearing Officer never asked questions concerning the Police reports or their camera access. Was the Police investigation the reason workplace violence charge was never alleged?

Claimant testified she worked this job with this crew for about a year and a half. Conductor Noble and Brakeman Cuevas both testified the ride from the engines to the yard office was approximately 30 to 40 seconds. Claimant, the Conductor and Brakeman testified a verbal exchange took place outside the yard office, the conductor walked to his car and upon his return to the yard office the brakeman was walking outside, they passed each other as the Conductor was walking in. Brakeman Cuevas and Claimant both testified there was no interaction in the office. The brakeman left the office and entered the yard vehicle to make a phone call to report the verbal exchange. While he was making the phone call Claimant exited the yard office and approached the vehicle, opened the door, and told the brakeman to "tell the truth". The Brakeman then exited the vehicle, walked away and Claimant departed the area and headed for home. While all times are not specifically testified to a reasonable person could conclude the entirety of the incident was less than 5 minutes. Conductor Noble testified **(Tr. Pg.103**) the time frame from when the crew entered the vehicle to when the Brakeman and Claimant entered the building to be less than three minutes.

1.6 – Quarrelsome is defined in Carrier **Exhibit 10** as follows: "When an employee's **continued** behavior is inclined or disposed toward an angry verbal confrontation with others in the workplace". The record is silent to any previous allegations of angry verbal confrontations with others. This is a dismissal charge of a 32-year employee and the record reflects a one-time incident. The Carrier has allowed others who have had far more volatile exchanges remain in service after anger management training. The narrowing of testimony to a three (3) to five (5) minute snapshot of time to end a thirty-two-year career, without regard to the history of the crew is unconscionable. Were allegations made by the Claimant that led to subsequent retaliation? The record was intentionally steered away from all such testimony and is to flaw the record. Claimant spoke to the previous complaints in her testimony and in **Exhibit 6**.

A review of Carrier **Exhibit 10** makes it clear that a Dismissal charge is reserved for the most serious, egregious, or repeated offenses. **Exhibit 10**, Q&A #38 is a question and answer which reads as follows:

**Q. Can an employee be dismissed for a single rule or policy violation?**

A. Yes. An incident can be so egregious or have such serious consequences that the employee can be removed from service and charged with a safety, conduct rule and/or policy violation.

Claimant admitted using colorful language but denies pushing the Brakeman as alleged. There is simply no offense here that is so egregious or having such serious consequences that warrant this heavy-handed discipline. This was a petty argument that started with a window open on a 30 – 40 second ride that has its roots in an intentionally undetermined

previous incident. There was no physical injury, and the physical contact must have been questioned by the Carrier as it was not charged.

It is the position of this Committee that the discipline imposed was arbitrary and excessive due to the Carrier's failure to provide substantial evidence Claimant was culpable of allegedly violating Rule 1.6: Quarrelsome, as contained in the General Code of Operating Rules, effective April 1, 2015, Safety Rules, effective June 01, 2018, and in the System Special Instructions, effective June 01, 2018, with which he was charged.

CONCLUSION: The claim is made in accordance with the December 1, 1997 modification agreement which includes the 1996 System Discipline agreement. The Committee requests that you allow the claim as presented, including but not limited to the aforementioned.

Sincerely,

Brian Carr

B. P. Carr

cc: L. Simmons, Local Chairman, BLET Division 660
A. Villalobos, Secretary/Treasurer, BLET Division 660

# EXHIBIT G

**BUILDING AMERICA®**

August 4, 2021

Mr. B. P. Carr
General Chairman – BLE&T
1902 Orange Tree Lane, Suite 110
Redlands, CA 92374

RE: UP File: 1759052
BLET File: E-33707

Dear Sir,

I am writing in response to your appeal on behalf of Engineer R. Mazzara, EID 0229159 "for compensation for all time lost, including time lost while attending the investigation in Long Beach, California, in connection with Claimant's assessment of a Maps Dismissal per the Managing Agreement Professional for Success (MAPS) Discipline Policy, letter dated May 21, 2021. Further, Claimant's annual vacation rights should be restored, and she should be compensated accordingly. In addition, Claimant's personal record should be completely expunged of any notation or record pertaining to this case."

Claimant was dismissed from service for conduct when she threatened and made unwanted physical contact with a co-worker. Claimant admitted she threatened her co-worker and pushed him. The transcript and exhibits prove Claimant was physically and verbally abusive, threatening, confrontational, quarrelsome, and provocative. Her behavior would not be accepted in any environment, anywhere, in any industry. This was an entirely one-sided event as the brakeman did not react in kind to Claimant's attempts to provoke him.

**UNION PACIFIC RAILROAD**
1400 Douglas Street, 7th Floor
Omaha, Nebraska 68179

**James T. Boyle**
Manager
Labor Relations

P 402-544-6607
F 402-271-3926
E jboyle@up.com

The Carrier takes efforts to protect its employees from the type of behavior Claimant exhibited. Employees should feel safe from physical and verbal assaults in the workplace. The Carrier's actions dismissing Claimant from service were consistent with that goal. Claimant was dismissed on the following charge:

> On 04/15/2021, at the location of 2400 E. Anaheim Ave, Wilmington, CA, 90477, at approximately 05:00 hours, while employed as a ENGINEER, you allegedly acted with hostility toward another employee. This is a possible violation of the following rule(s) and/or policy:
>
> 1 6: Conduct – Quarrelsome

Claimant was hired June 19, 1989.

The facts are not in dispute. Claimant was called for the LOG-44 at Mead Yard with two (2) other employees: Conductor J. D. Noble (employee I. D. 0298164) and Brakeman R. Cuevas (EID 0040057). The crew had completed the work associated with their assignment. Conductor Noble was driving a Jeep to drive Claimant and Brakeman Cuevas to the depot to tie up for the day. Claimant took exception to the position of the front windows and allegedly asked the other employees to roll up them up since she was in the back seat.

The co-workers declined to roll up the windows either due to COVID, to keep the air moving, or because Claimant was coughing. The reason for keeping the windows down is immaterial. Claimant reacted in a hostile, aggressive, manner by threatening Brakeman Cuevas. Claimant acknowledged on the record and in her written statement[1]

---

[1] Exhibit 6

that she threatened bodily harm to Brakeman Cuevas for refusing to roll up his window. She wrote "…so I said "Ya know if I was a dude you wouldn't have a face"" Claimant reiterated this fact during her testimony. It is a matter of fact Claimant threatened Brakeman Cuevas.

Claimant continued her assault of Brakeman Cuevas by pushing him with both hands in the chest. She continued her harassment by walking in Brakeman Cuevas' way, preventing him from entering the depot. Brakeman Cuevas eventually got to the yard office. When he went back outside Claimant went after him again. Claimant was relentless in her hostile pursuit of Brakeman Cuevas.

Brakeman Cuevas provided a written statement[2] providing he asked if Claimant had threatened him and informed her not to speak to him any further. Claimant did not let it go and continued to threaten and harass Brakeman Cuevas apparently trying to provoke him to react to her antagonistic behavior.

> The engineer Randy Mazzara demanded I close my window. Because Randy has been coughing and also due to COVID. I left my window down. Randy then said "if I was a man, you'd have no face" I said are you threatening? I then advised her not to speak to me. It was a 30 sec drive back to the office. As we parked, Randy gets out of the vehicle all aggressive and gets in my face. She said a second time "If I was a man I'd punch you in the face" She gets in my face into like a fighting stance and pushes me. I try to walk away but she won't let me pass into the office. She's in my face, blocking me from going up the Mead Yard stairs. I eventually step around her and go into the office where I was trying to go. I went back outside into a company vehicle so I could call a manager. She follows me back outside and tries to

[2] Exhibit 7

> open the vehicle door and argue so more. I exit the vehicle and walk away again."

The only way the incident stopped from escalating was Brakeman Cuevas' effort to remove himself from the hostile environment. Based on his written statement, she threatened him once, then a second time, prevented him from entering the yard office, then followed him out to continue her harassment of Brakeman Cuevas.

The Organization alleged her actions were not continuous. This is in reference to the definition of quarrelsome[3]. Claimant's harassment and threats were continuous throughout the episode. She could have stopped while in the Jeep but she chose to continue to threaten and harass Brakeman Cuevas. Her anger manifested itself into verbal threats, unwanted physical contact, and continued to direct her hostility at Brakeman Cuevas.

Conductor Noble witnesses most of the events. He testified that Claimant threatened Brakeman Cuevas and, upon being physically assaulted, Brakeman Cuevas simply raised his hands in the air hoping Claimant would cease. Only Brakeman Cuevas' action prevented this incident from getting completely out of hand.

Brakeman Cuevas testified after he had been threatened that he only tried to get away from Claimant.

> Q So, as I was opening the door to get into the office, do you recall where you were standing?

---

[3] Exhibit 10 P. 10 - QUARRELSOME: When an employee's continued behavior is inclined or disposed toward an angry verbal confrontation with others in the workplace.

A I was trying to get away from you.

Q You were standing right- how many times did I- it take for me to open the door and I held it for you, Ray? How many- how many times did it take me for- you were standing right there watching my fingers shake. How many?

A Uh-

Q Trying to see if my fingers were shaking, let me clarify that. I wasn't shaking.

A Randi, I was trying to get away from you the whole time. (Tr. 194 at 19-34)

Brakeman Cuevas' actions did not warrant the type of reaction he received from Claimant. Claimant's admitted actions were unwarranted and unacceptable.

The Carrier proved by the standard of substantial evidence that Claimant was quarrelsome and discourteous. There was no justification for Claimant's outburst. The Carrier had just cause to dismiss Claimant from service. The assessment was consistent with the MAPS Policy.

As consequence for behaving in a quarrelsome and discourteous manner when she threatened Brakeman Cuevas then continued her harassing, threatening, and hostile behavior, Claimant was dismissed for violating Rule 1.6. Claimant initiated a verbal assault on her co-worker who did nothing more refuse to roll up his window. The conditions did not justify any type of reaction as Claimant demonstrated. It is an undisputed matter of fact Claimant's behavior exceeded any acceptable level of work-

related behavior in violation of Rule 1.6. The record provides just cause for the decision to dismiss.

Rule 1.6 requires employees to behave in a manner to create a safe and respectful workplace. The purpose of the rule is to establish expectations to protect employees from verbal and physical assaults. When employees find themselves victimized by such behavior, they can know that there are avenues to address such unwanted behavior.

Although Claimant received all due process consideration, the Organization alleged the hearing officer prevented Claimant from explaining other issues tangential to the incident under charge. It also implied the Carrier deliberately did not present video evidence of the verbal and physical abuse as evidence.

A review of the record reveals Claimant discussed issues involving an EEO charge and other concerns. The hearing was called to develop the facts whether Claimant acted with hostility toward another employee. The other issues may by themselves be relevant but not to the incident under charge. The hearing officer has a responsibility to hold a fair and impartial investigation and, through the course of the investigation, to develop the fact of the incident under charge. The hearing officer was fulfilling his duties to keep the investigation focused on the charge while allowing Claimant some range to testify in her own words. The hearing was not held regarding EEOC charges; it was held regarding her improper behavior of April 15, 2021. An EEOC charge and safety hotline complaint were unrelated to Claimant threatening and being

openly hostile to Brakeman Cuevas. The allegation the hearing officer prevented Claimant from offering relevant testimony is not supported by the record.

The charging manager testified that he attempted to retrieve video of the incident yet was unable to download it as he did not have access. This did not prevent each witness from offering first person testimony of the events as they occurred. Just as relevant is the Organization did not request a recess to secure the video. Video evidence may have ben relevant but, based on the record, would not have altered the facts as presented. Claimant's rights were not prejudiced in the absence of video footage of the incident.

Claimant received all due process consideration and received a fair and impartial hearing. Claimant was fully apprised of the nature of the charges made. The investigation was held in a timely manner. During the investigation, Claimant and his representative could examine and cross-examine any of the witnesses present at the hearing. The finding of guilt was based solely upon information brought forth during the investigation. Viewing the record, Claimant was afforded substantial procedural due process. There exists no basis to conclude otherwise. Accordingly, your appeal must remain denied.

Sincerely,

James T. Boyle
Manager – Labor Relations
Union Pacific Railroad

Attached:
Claimant's Discipline History

# EXHIBIT H

**Org. File # E-33707**
**Carrier File # 1759052**

**Case No. 121**

# EMPLOYEES EX PARTE SUBMISSION

## Before

## PUBLIC LAW BOARD NO. 7721

### Chairman and Neutral Member

### Edwin Benn Esq.

**STATEMENT OF CLAIM:**

Herein is an appeal on behalf of Engineer R.M. Mazzara, EID No. 0229159, for compensation for all time lost, including time lost while attending the investigation in Long Beach, California, in connection with Claimant's assessment of a **Maps Dismissal** per the **Managing Agreement Professional for Success (MAPS)** Discipline Policy, letter dated May 21, 2021. Further, Claimant's annual vacation rights should be restored, and she should be compensated accordingly. In addition, Claimant's personal record should be completely expunged of any notation or record pertaining to this case.

**<u>STATEMENT OF FACTS</u>:**

Engineer Mazzara, (hereinafter referred to as "Claimant"), a Union Pacific Railroad Company (hereinafter referred to as "Carrier") employee, had been employed approximately thirty-two (32) years with the Carrier at the time of the investigation.

Senior Manager Train Operations (SMTO) R.P. Murphy testified on May 12, 2021,

> "Regarding the alleged uh- alleged confrontation that took place between the Engineer, Randi Mazzara, and himself. As far as virtually what- what he said to me was that he was shoved and threatened that morning". **(Tr. Pg. 26)**

As a result of his preliminary investigation SMTO Muphy's scheduled a formal investigation charging Claimant with an alleged violation of the General Code of Operating Rules 1.6: Quarrelsome. Claimant received a NOTICE OF INVESTIGATION dated April 23, 2021, as read into to record **(Tr. Pg. 11 - 13) (Exhibit 1)**:

> Dear Randi Mazzara:
>
> Please report to ICTF Administrative Building, 2401 East Sepulveda, Long Beach, California, at 1000 hours on 5-3-2021, for the hearing to develop

the facts and determine your responsibility, if any, in connection with the below charge.

On 4-15-2021, at the location of 2400 East Anaheim Avenue, Wilmington, California, 90477, at approximately 0500 hours, while employed as a Engineer, you allegedly acted with hostility towards another employee. This is a possibleviolation of the following rule and/or policy:

1.6: Conduct – Quarrelsome

Under the MAPS Policy, this violation is a dismissal event. Based upon your current status, if you are found to be in violation of this alleged charge, dismissal may result.

Please be advised that this hearing will also satisfy the procedural requirements as specified by the Federal Railroad Administration in 49 CFR, 242, Qualification and Certification of Conductors and/or 49 CFR Part 240, Qualification and Certification of Locomotive Engineers/Remote Control Operator, as applicable.

The investigation will be conducted in accordance with applicable provisions of the collective bargaining agreement between the Company and the organization representing your craft or class. You are entitled to representation and to present witnesses, at your own expense, in accordance with the agreement. Any request for popo- postponement must be submitted in writing, including reason thereof, no less than 48 hours prior to the date scheduled. A copy of your written request for postponement must be given to me. I can be reached at phone number 562-490-7051.

The Rail Safety Improvement Act requires employees obtain their mandatory rest before attending a hearing. If you work an Hours of

> Service covered position and you have not obtained the mandatory rest prior to commencement of the hearing, you cannot, consistent with the requirements of the RSIA, be allowed to attend or participate in the hearing and will be considered as having elected not to attend the hearing
>
> Respectfully, Richard Murphy, Senior Manager of Train Ops

After a postponement, the formal investigation was held on May 12, 2021. Following the hearing Claimant received a letter, **NOTIFICATION OF DISCIPLINE ASSESSED** dated May 21, 2021, in which she was Dismissed from all service with the Carrier.

This application of the MAPS policy is unlawful, violates the Railway Labor Act, and violates established principles of constitutional due process and industrial due process.

The BLET is currently conferencing this dispute with the Carrier and maintains the position that the MAPS policy and its implementation violate Section 2 and Section 7 of the Railway Labor Act. The BLET raised this issue by letter on November 10, 2015 and the Carrier replied on November 11, 2015. The parties met in conference on December 2, 2015, and expect to meet again after a significant discussion of the issues, including the retroactive application of MAPS item No. 35, regarding terminations after three FRA decertifications.

Under the Railway Labor Act, the Carrier must bargain with the BLET over the implementation of policies that either conflict with an established agreement or that impact wages, hours, or working conditions. Contrary to that obligation, the Carrier unilaterally implemented the MAPS policy.

Even apart from its duty to bargain over these types of changes, this particular change violates constitutional and industrial due process. This change is an "ex post facto" change that applies a new rule to the past-conduct of engineers. Previously, the "look back" period for these FRA violations was limited. After enough time passed, the decertification was no longer considered and was not part of the engineer's record.

But now, the Carrier seeks to apply its rule in a new way to that past conduct. Many of them made decisions with respect to past decertification's on the established basis that those offenses would "clear" at some point and would no longer be a basis for progressive discipline. The Carrier has changed the deal – and cannot do so retroactively against these engineers.

A fundamental basis of discipline is that an employee must have notice of a rule in order to conform his conduct to it. That is why retroactive, ex post facto rules like this violate due process. Engineers – at the time of the earlier decertification – could not have matched their conduct to this rule because it did not exist. Therefore, the rule cannot in

application “look back” to old conduct that was taken under a different set of rules. To hold otherwise would violate due process on both an industrial and a constitutional scale.

Apart from this due process issue, further discipline against old offenses would amount to “double jeopardy” – a well-established principle that says you can’t punish someone twice for the same offense and you can’t fail to impose punishment for an unreasonable period of time while holding the possibility of punishment over the employee.

The use of this look-back to trump up charges also violates progressive discipline – you can’t discipline an employee simply for having been disciplined too many times. Progressive discipline requires progressively more severe discipline for each violation until the final discipline of dismissal. That did not happen here, largely because each instance of discipline was cleared from the engineer’s record.

This retroactive change in policy cannot be applied in this case or in general and the Carrier risks a major dispute if it does so, particularly while the parties continue to conference the matter.

It was clear in testimony Claimant was not going to receive a fair and impartial hearing. The Conducting officer, Mr. J.M. Feetham, cut Claimant off several times during questioning, interrupted her closing statement and continuously steered testimony away from a safety hotline complaint, spoken of in Claimant's statement **(Exhibit 6),** and an EEOC claim mentioned in Claimants closing statement which was cut off. It does not take an astute reader to realize there was a history with this crew that led to this incident which was being buried by the Carrier's hearing officer. This history should have been laid bare on the record to allow for a full and impartial hearing. Was Claimant subject to retaliation due to previous reports or complaints she made concerning her crew?

Testimony **(Tr. Pg. 46/47)** revealed there was a camera outside the yard office as well as inside the office. SMTO Murphy testified he could not pull the tapes of those cameras to view it. The record is muddled concerning the cameras due to Claimant and SMTO Murphy talking over each other. However, the Carrier's Police can access those cameras and view the contents. It was also testified to that the Carrier Police took a report from both the Claimant and Brakeman Cuevas. The Carrier's hearing Officer never asked questions concerning the Police reports or their camera access. Was the Police investigation the reason workplace violence charge was never alleged?

Claimant testified she worked this job with this crew for about a year and a half. Conductor Noble and Brakeman Cuevas both testified the ride from the engines to the yard office was approximately 30 to 40 seconds. Claimant, the Conductor and

Brakeman testified a verbal exchange took place outside the yard office, the conductor walked to his car and upon his return to the yard office the brakeman was walking outside, they passed each other as the Conductor was walking in. Brakeman Cuevas and Claimant both testified there was no interaction in the office. The brakeman left the office and entered the yard vehicle to make a phone call to report the verbal exchange. While he was making the phone call Claimant exited the yard office and approached the vehicle, opened the door, and told the brakeman to "tell the truth". The Brakeman then exited the vehicle, walked away and Claimant departed the area and headed for home. While all times are not specifically testified to a reasonable person could conclude the entirety of the incident was less than 5 minutes. Conductor Noble testified **(Tr. Pg.103)** the time frame from when the crew entered the vehicle to when the Brakeman and Claimant entered the building to be less than three minutes.

1.6 – Quarrelsome is defined in Carrier **Exhibit 10** as follows: "When an employee's **continued** behavior is inclined or disposed toward an angry verbal confrontation with others in the workplace". The record is silent to any previous allegations of angry verbal confrontations with others. This is a dismissal charge of a 32-year employee and the record reflects a one-time incident. The Carrier has allowed others who have had far more volatile exchanges remain in service after anger management training. The narrowing of testimony to a three (3) to five (5) minute snapshot of time to end a thirty-two-year career, without regard to the history of the crew is unconscionable. Were allegations made by the Claimant that led to subsequent retaliation? The record was

intentionally steered away from all such testimony and is to flaw the record. Claimant spoke to the previous complaints in her testimony and in **Exhibit 6**.

A review of Carrier **Exhibit 10** makes it clear that a Dismissal charge is reserved for the most serious, egregious, or repeated offenses. **Exhibit 10**, Q&A #38 is a question and answer which reads as follows:

> **Q. Can an employee be dismissed for a single rule or policy violation?**
>
> A. Yes. An incident can be so egregious or have such serious consequences that the employee can be removed from service and charged with a safety, conduct rule and/or policy violation.

Claimant admitted using colorful language but denies pushing the Brakeman as alleged. There is simply no offense here that is so egregious or having such serious consequences that warrant this heavy-handed discipline. This was a petty argument that started with a window open on a 30 – 40 second ride that has its roots in an intentionally undetermined previous incident. There was no physical injury, and the physical contact must have been questioned by the Carrier as it was not charged.

It is the position of this Committee that the discipline imposed was arbitrary and excessive due to the Carrier's failure to provide substantial evidence Claimant was

culpable of allegedly violating Rule 1.6: Quarrelsome, as contained in the General Code of Operating Rules, effective April 1, 2015, Safety Rules, effective June 01, 2018, and in the System Special Instructions, effective June 01, 2018, with which he was charged.

**CONCLUSION**:

The claim is made in accordance with the December 1, 1997 Modification Agreement which includes the 1996 System Discipline Agreement. The Committee requests that you allow the claim as presented, including but not limited to the aforementioned.

Respectfully Submitted,

B.P. Carr

B.P. Carr, General Chairman
Brotherhood of Locomotive Engineers and Trainmen
1902 Orange Tree Lane, Suite 110
Redlands, CA 92374

# EXHIBIT I

AWARD NO. 121
CASE NO. 121

**PUBLIC LAW BOARD NO. 7721**

| | | |
|---|---|---|
| **PARTIES** | ) | **BROTHERHOOD OF LOCOMOTIVE ENGINEERS & TRAINMEN** |
| **TO** | ) | |
| **DISPUTE** | ) | **UNION PACIFIC RAILROAD COMPANY** |

**STATEMENT OF CLAIM**

Herein is an appeal on behalf of Engineer R. M. Mazzara, EID No. XXXXXXX, for compensation for all time lost, including time lost while attending the investigation in Long Beach, California, in connection with Claimant's assessment of a Maps Dismissal per the Managing Agreement Professional for Success (MAPS) Discipline Policy, letter dated May 21, 2021. Further, Claimant's annual vacation rights should be restored, and she should be compensated accordingly. In addition, Claimant's personal record should be completely expunged of any notation or record pertaining to this case.

Carrier File No. 1759052
Organization File No. E-33707

**OPINION OF BOARD**

After investigation held May 12, 2021 and by letter dated May 21, 2021, Claimant – an employee in the Carrier's service since 1989 – was dismissed for quarrelsome conduct on April 15, 2021.

On April 15, 2021, Claimant was called for the LOG-44 at Mead Yard to work along with a Conductor and a Brakeman. At the end of their assignment, the crew rode in a Carrier vehicle back to the depot. Claimant – who was sitting in the back seat – requested that the front windows of the vehicle be rolled up. That request was denied either due to COVID concerns or because Claimant was coughing.

Claimant testified that she told the Brakeman "you know, if I was a dude, you wouldn't have a face." Tr. 165-166.

According to the Brakeman, the windows had been rolled down "about three inches" and because of COVID and further because Claimant was coughing (which she denies) the windows remained cracked for ventilation purposes for the approximate 30 second drive back to the office. Tr. 168, 176-177. According to the Brakeman, after Claimant got out of the car, Claimant stated "... if I was a man, I'd punch you in the face [so], then she gets in my face like and takes a fighting stance ... [a]nd then ... she pushes me, so I- I throw my hands up like, man, I want no part of this." Tr. 169. The Brakeman further testified that Claimant began blocking his movement as he tried to get away. Tr. 170-171. Further, according to the Brakeman, Claimant followed him and was yelling at him. Tr. 173-174, 177. The Brakeman contends that he stayed quiet and did not raise his voice towards Claimant or push her. Tr. 175. According to the Brakeman "I was just trying to leave." Tr. 180. The Brakeman concluded that Claimant said "[t]hat she was gonna punch me in the face ... after that she pushed me." Tr. 180.

The Conductor witnessed the interaction between Claimant and the Brakeman and corroborated the Brakeman's version. Tr. 101-107.

Substantial evidence supports the Carrier's position that Claimant engaged in misconduct as charged. Claimant threatened the Brakeman and pushed him. That is very serious misconduct.

Nevertheless, we find that dismissal was excessive for this long-term employee. Taking Claimant's length of service into account along with her prior record, in ordinary circumstances we would formulate a remedy that Claimant would be entitled to reinstatement to her former position without loss of seniority with placement at a MAPS 2 Training level. And under ordinary circumstances, due to the serious

nature of the demonstrated misconduct, the remedy we would formulate would include that Claimant would not be entitled to compensation for time lost.

However, this Board is advised that shortly after the incident in this case, Claimant retired with a full annuity. Putting aside whether Claimant could even "unretire" to be reinstated to her former position, Claimant would face the difficulty of whether she would be obligated to repay her retirement benefits received thus far and if she chose to repay those benefits, Claimant would end up being reinstated to her former position without compensation for the period that she has already received retirement benefits and had to repay.

Given the circumstances and in the exercise of our discretion to formulate remedies, in this case we shall not require Claimant's reinstatement making that aspect of this case moot. We shall only require that Claimant's record be corrected to show that she received a MAPS Training 2 for the demonstrated misconduct.

**AWARD**

Claim sustained in accord with the Opinion.

Edwin H. Benn
Neutral Member

Carrier Member

Organization Member

Dated: May 16, 2022

# EXHIBIT J

**Brotherhood of Locomotive Engineers & Trainmen**
Union Pacific Western Lines & Pacific Harbor Line, Inc.
1902 Orange Tree Lane, Suite 110
Redlands, CA 92374
(909) 792-1200
(909) 792-1211 FAX

B.P. Carr
General Chairman

May 16, 2022

Mr. L. Simmons, Local Chairman
BLET- Division 660
5728 Alviso Ave.
Windsor Hills, CA. 90043

Org. File No E-33707

Dear Sir and Brother:

Please refer to the appeal in our office for the claim of L.A. Hub Engineer R.M. Mazzara (0229159) who was assessment of a MAPS Dismissal, per the Pacific Railroads Discipline Policy.

Enclosed, please find a copy of PLB 7721 Case 121, dated May 16, 2022. The claim has been sustained in accord with the Opinion. Given the circumstances and in the exercise of our discretion to formulate remedies, in this case we shall not require Claimant's reinstatement making that aspect of this case moot. We shall require that Claimant's record be corrected to show that she received a MAPS Training 2 for the demonstrated misconduct.

Under the Railway Labor Act, based on the foregoing, we are without prejudice to our position, closing the file.

Fraternally,

B.P. Carr

B.P. Carr

cc: Executive Committee (Email)
A. Villalobos Secretary/Treasurer Division 660

AWARD NO. 121
CASE NO. 121

PUBLIC LAW BOARD NO. 7721

| | |
|---|---|
| PARTIES ) | BROTHERHOOD OF LOCOMOTIVE ENGINEERS & TRAINMEN |
| TO ) | |
| DISPUTE ) | UNION PACIFIC RAILROAD COMPANY |

**STATEMENT OF CLAIM**

Herein is an appeal on behalf of Engineer R. M. Mazzara, EID No. XXXXXXX, for compensation for all time lost, including time lost while attending the investigation in Long Beach, California, in connection with Claimant's assessment of a Maps Dismissal per the Managing Agreement Professional for Success (MAPS) Discipline Policy, letter dated May 21, 2021. Further, Claimant's annual vacation rights should be restored, and she should be compensated accordingly. In addition, Claimant's personal record should be completely expunged of any notation or record pertaining to this case.

Carrier File No. 1759052
Organization File No. E-33707

**OPINION OF BOARD**

After investigation held May 12, 2021 and by letter dated May 21, 2021, Claimant – an employee in the Carrier's service since 1989 – was dismissed for quarrelsome conduct on April 15, 2021.

On April 15, 2021, Claimant was called for the LOG-44 at Mead Yard to work along with a Conductor and a Brakeman. At the end of their assignment, the crew rode in a Carrier vehicle back to the depot. Claimant – who was sitting in the back seat – requested that the front windows of the vehicle be rolled up. That request was denied either due to COVID concerns or because Claimant was coughing.

Claimant testified that she told the Brakeman "you know, if I was a dude, you wouldn't have a face." Tr. 165-166.

According to the Brakeman, the windows had been rolled down "about three inches" and because of COVID and further because Claimant was coughing (which she denies) the windows remained cracked for ventilation purposes for the approximate 30 second drive back to the office. Tr. 168, 176-177. According to the Brakeman, after Claimant got out of the car, Claimant stated "... if I was a man, I'd punch you in the face [so], then she gets in my face like and takes a fighting stance ... [a]nd then ... she pushes me, so I- I throw my hands up like, man, I want no part of this." Tr. 169. The Brakeman further testified that Claimant began blocking his movement as he tried to get away. Tr. 170-171. Further, according to the Brakeman, Claimant followed him and was yelling at him. Tr. 173-174, 177. The Brakeman contends that he stayed quiet and did not raise his voice towards Claimant or push her. Tr. 175. According to the Brakeman "I was just trying to leave." Tr. 180. The Brakeman concluded that Claimant said "[t]hat she was gonna punch me in the face ... after that she pushed me." Tr. 180.

The Conductor witnessed the interaction between Claimant and the Brakeman and corroborated the Brakeman's version. Tr. 101-107.

Substantial evidence supports the Carrier's position that Claimant engaged in misconduct as charged. Claimant threatened the Brakeman and pushed him. That is very serious misconduct.

Nevertheless, we find that dismissal was excessive for this long-term employee. Taking Claimant's length of service into account along with her prior record, in ordinary circumstances we would formulate a remedy that Claimant would be entitled to reinstatement to her former position without loss of seniority with placement at a MAPS 2 Training level. And under ordinary circumstances, due to the serious

nature of the demonstrated misconduct, the remedy we would formulate would include that Claimant would not be entitled to compensation for time lost.

However, this Board is advised that shortly after the incident in this case, Claimant retired with a full annuity. Putting aside whether Claimant could even "unretire" to be reinstated to her former position, Claimant would face the difficulty of whether she would be obligated to repay her retirement benefits received thus far and if she chose to repay those benefits, Claimant would end up being reinstated to her former position without compensation for the period that she has already received retirement benefits and had to repay.

Given the circumstances and in the exercise of our discretion to formulate remedies, in this case we shall not require Claimant's reinstatement making that aspect of this case moot. We shall only require that Claimant's record be corrected to show that she received a MAPS Training 2 for the demonstrated misconduct.

**AWARD**

Claim sustained in accord with the Opinion.

Edwin H. Benn
Neutral Member

Carrier Member

Organization Member

Dated: May 16, 2022

# EXHIBIT K

Gmail

Randi Mazzara <rmazzara55@gmail.com>

# MAPS

3 messages

**djc@bletupwl.org** <djc@bletupwl.org>
To: Randi Mazzara <rmazzara55@gmail.com>

Wed, May 18, 2022 at 10:30 AM

Please find attached the UP MAPS policy.

Doreen Coffman

Administrative Assistant

General Chairman Brian Carr

BLET UPWL & PHL, Inc.

1902 Orange Tree Lane, Suite 110

Redlands, CA. 92374

(909) 792-1200

**MAPS Policy 9.15.15.pdf**
18817K

**Randi Mazzara** <rmazzara55@gmail.com>
To: djc@bletupwl.org

Wed, May 18, 2022 at 10:35 PM

Hi Doreen
Can you please have GC Carr
call me and explain the MAPS2.
I've gone through the MAPS policy you sent... I need clarification on what this means and how this is applied to my case etc.
Best
Randi Mazzara
714-774-8794
[Quoted text hidden]

* **djc@bletupwl.org** <djc@bletupwl.org>
To: Randi Mazzara <rmazzara55@gmail.com>

Thu, May 19, 2022 at 9:14 AM

Good morning Randi,

*JUDICIAL REVIEW; RAILWAY LABOR ACT
NOT ADVISED

I spoke with Mr. Carr, the MAPS policy, is a Company policy. The Arbitrator removed the permanent dismissal (1.6) and reduced the discipline to a MAPS2, to show on your record. Under the Railway Labor Act we have exhausted all remedies.

Have a good day.

[Quoted text hidden]

# EXHIBIT L

Gmail

Randi Mazzara <rmazzara55@gmail.com>

## Mazzara PLB #7721

**Randi Mazzara** <rmazzara55@gmail.com>
To: "Wallace, Mark" <wallace@ble-t.org>

Wed, Jun 29, 2022 at 9:29 AM

Hi Mark,
I would like clarification on this
decision. I am still LF which I thought would be changed with the Arbitrator's decision also I am requesting to be reinstated.
Please if you would call me at your earliest convenience. This will not be a lengthy conversation. The clarification is needed to send the proper
request by certified mail.
Best
Randi Mazzara
714-774-8794 hm
714-325-4280 cl

**4 attachments**



**Screenshot_20220531-122017_Drive.jpg**
511K



**Screenshot_20220531-122012_Drive.jpg**
403K



**Screenshot_20220531-122024_Drive.jpg**
621K



**Screenshot_20220531-122030_Drive.jpg**
387K



**Screenshot_20220531-122030_Drive.jpg**
387K

---

**Wallace, Mark** <wallace@ble-t.org> Fri, Jul 1, 2022 at 2:44 PM
To: Randi Mazzara <rmazzara55@gmail.com>

Randi,

I have been on vacation this week. I will contact you next week to discuss your Award. It will most likely be mid-week as I am playing catch-up and have some scheduled meetings at the beginning of the week.

Mark

Mark L. Wallace
National Vice President
Brotherhood of Locomotive Engineers & Trainmen
828-216-8043
wallace@blet.org

---

**From:** Randi Mazzara <rmazzara55@gmail.com>
**Sent:** Wednesday, June 29, 2022 12:29 PM
**To:** Wallace, Mark <wallace@ble-t.org>
**Subject:** Mazzara PLB #7721

[Quoted text hidden]

Gmail Randi Mazzara <rmazzara55@gmail.com>

**Mazzara PLB 7721**
3 messages

**Randi Mazzara** <rmazzara55@gmail.com> Thu, Aug 4, 2022 at 11:11 AM
To: "Wallace, Mark" <wallace@ble-t.org>

Hi Mark
I know you are busy but as you know GC Carrr
has been incommunicado since the very beginning.
Since our last phone conversation on or about 7/14/2022
we discussed that you would contact Labor Relations about my reinstatement or
changing my status from LF (laid off fired) to retired.
Please let me know if there is a resolution.
Thank you,
Randi Mazzara

---

**Wallace, Mark** <wallace@ble-t.org> Thu, Aug 4, 2022 at 1:41 PM
To: Randi Mazzara <rmazzara55@gmail.com>

Randi,

I was notified by email from Labor Relations on August 1, 2022, that your status was updated from laid off fired to retired.

Mark

---

**From:** Randi Mazzara <rmazzara55@gmail.com>
**Sent:** Thursday, August 4, 2022 2:11 PM
**To:** Wallace, Mark <wallace@ble-t.org>
**Subject:** Mazzara PLB 7721

[Quoted text hidden]

---

**Randi Mazzara** <rmazzara55@gmail.com> Thu, Aug 4, 2022 at 4:28 PM
To: "Wallace, Mark" <wallace@ble-t.org>

Thank you,
Is it possible to have a copy of the email from Labor Relations?

[Quoted text hidden]

# EXHIBIT M

UNION PACIFIC BUILDING AMERICA®

August 4, 2021

Mr. B. P. Carr
General Chairman – BLE&T
1902 Orange Tree Lane, Suite 110
Redlands, CA 92374

RE: UP File: 1759052
BLET File: E-33707

Dear Sir,

I am writing in response to your appeal on behalf of Engineer R. Mazzara, EID 0229159 "for compensation for all time lost, including time lost while attending the investigation in Long Beach, California, in connection with Claimant's assessment of a Maps Dismissal per the Managing Agreement Professional for Success (MAPS) Discipline Policy, letter dated May 21, 2021. Further, Claimant's annual vacation rights should be restored, and she should be compensated accordingly. In addition, Claimant's personal record should be completely expunged of any notation or record pertaining to this case."

Claimant was dismissed from service for conduct when she threatened and made unwanted physical contact with a co-worker. Claimant admitted she threatened her co-worker and pushed him. The transcript and exhibits prove Claimant was physically and verbally abusive, threatening, confrontational, quarrelsome, and provocative. Her behavior would not be accepted in any environment, anywhere, in any industry. This was an entirely one-sided event as the brakeman did not react in kind to Claimant's attempts to provoke him.

UNION PACIFIC RAILROAD
1400 Douglas Street, 7th Floor
Omaha, Nebraska 68179

James T. Boyle
Manager
Labor Relations

P 402-544-6607
F 402-271-3926
E jboyle@up.com

The Carrier takes efforts to protect its employees from the type of behavior Claimant exhibited. Employees should feel safe from physical and verbal assaults in the workplace. The Carrier's actions dismissing Claimant from service were consistent with that goal. Claimant was dismissed on the following charge:

> On 04/15/2021, at the location of 2400 E. Anaheim Ave, Wilmington, CA, 90477, at approximately 05:00 hours, while employed as a ENGINEER, you allegedly acted with hostility toward another employee. This is a possible violation of the following rule(s) and/or policy:
>
> 1 6: Conduct – Quarrelsome

Claimant was hired June 19, 1989.

The facts are not in dispute. Claimant was called for the LOG-44 at Mead Yard with two (2) other employees: Conductor J. D. Noble (employee I. D. 0298164) and Brakeman R. Cuevas (EID 0040057). The crew had completed the work associated with their assignment. Conductor Noble was driving a Jeep to drive Claimant and Brakeman Cuevas to the depot to tie up for the day. Claimant took exception to the position of the front windows and allegedly asked the other employees to roll up them up since she was in the back seat.

The co-workers declined to roll up the windows either due to COVID, to keep the air moving, or because Claimant was coughing. The reason for keeping the windows down is immaterial. Claimant reacted in a hostile, aggressive, manner by threatening Brakeman Cuevas. Claimant acknowledged on the record and in her written statement[1]

---

[1] Exhibit 6

that she threatened bodily harm to Brakeman Cuevas for refusing to roll up his window. She wrote "…so I said "Ya know if I was a dude you wouldn't have a face"" Claimant reiterated this fact during her testimony. It is a matter of fact Claimant threatened Brakeman Cuevas.

Claimant continued her assault of Brakeman Cuevas by pushing him with both hands in the chest. She continued her harassment by walking in Brakeman Cuevas' way, preventing him from entering the depot. Brakeman Cuevas eventually got to the yard office. When he went back outside Claimant went after him again. Claimant was relentless in her hostile pursuit of Brakeman Cuevas.

Brakeman Cuevas provided a written statement[2] providing he asked if Claimant had threatened him and informed her not to speak to him any further. Claimant did not let it go and continued to threaten and harass Brakeman Cuevas apparently trying to provoke him to react to her antagonistic behavior.

> The engineer Randy Mazzara demanded I close my window. Because Randy has been coughing and also due to COVID. I left my window down. Randy then said "if I was a man, you'd have no face" I said are you threatening? I then advised her not to speak to me. It was a 30 sec drive back to the office. As we parked, Randy gets out of the vehicle all aggressive and gets in my face. She said a second time "If I was a man I'd punch you in the face" She gets in my face into like a fighting stance and pushes me. I try to walk away but she won't let me pass into the office. She's in my face, blocking me from going up the Mead Yard stairs. I eventually step around her and go into the office where I was trying to go. I went back outside into a company vehicle so I could call a manager. She follows me back outside and tries to

[2] Exhibit 7

> open the vehicle door and argue so more. I exit the vehicle
> and walk away again."

The only way the incident stopped from escalating was Brakeman Cuevas' effort to remove himself from the hostile environment. Based on his written statement, she threatened him once, then a second time, prevented him from entering the yard office, then followed him out to continue her harassment of Brakeman Cuevas.

The Organization alleged her actions were not continuous. This is in reference to the definition of quarrelsome[3]. Claimant's harassment and threats were continuous throughout the episode. She could have stopped while in the Jeep but she chose to continue to threaten and harass Brakeman Cuevas. Her anger manifested itself into verbal threats, unwanted physical contact, and continued to direct her hostility at Brakeman Cuevas.

Conductor Noble witnesses most of the events. He testified that Claimant threatened Brakeman Cuevas and, upon being physically assaulted, Brakeman Cuevas simply raised his hands in the air hoping Claimant would cease. Only Brakeman Cuevas' action prevented this incident from getting completely out of hand.

Brakeman Cuevas testified after he had been threatened that he only tried to get away from Claimant.

> Q So, as I was opening the door to get into the office, do
> you recall where you were standing?

[3] Exhibit 10 P. 10 - QUARRELSOME: When an employee's continued behavior is inclined or disposed toward an angry verbal confrontation with others in the workplace.

A I was trying to get away from you.

Q You were standing right- how many times did I- it take for me to open the door and I held it for you, Ray? How many- how many times did it take me for- you were standing right there watching my fingers shake. How many?

A Uh-

Q Trying to see if my fingers were shaking, let me clarify that. I wasn't shaking.

A Randi, I was trying to get away from you the whole time. (Tr. 194 at 19-34)

Brakeman Cuevas' actions did not warrant the type of reaction he received from Claimant. Claimant's admitted actions were unwarranted and unacceptable.

The Carrier proved by the standard of substantial evidence that Claimant was quarrelsome and discourteous. There was no justification for Claimant's outburst. The Carrier had just cause to dismiss Claimant from service. The assessment was consistent with the MAPS Policy.

As consequence for behaving in a quarrelsome and discourteous manner when she threatened Brakeman Cuevas then continued her harassing, threatening, and hostile behavior, Claimant was dismissed for violating Rule 1.6. Claimant initiated a verbal assault on her co-worker who did nothing more refuse to roll up his window. The conditions did not justify any type of reaction as Claimant demonstrated. It is an undisputed matter of fact Claimant's behavior exceeded any acceptable level of work-

related behavior in violation of Rule 1.6. The record provides just cause for the decision to dismiss.

Rule 1.6 requires employees to behave in a manner to create a safe and respectful workplace. The purpose of the rule is to establish expectations to protect employees from verbal and physical assaults. When employees find themselves victimized by such behavior, they can know that there are avenues to address such unwanted behavior.

Although Claimant received all due process consideration, the Organization alleged the hearing officer prevented Claimant from explaining other issues tangential to the incident under charge. It also implied the Carrier deliberately did not present video evidence of the verbal and physical abuse as evidence.

A review of the record reveals Claimant discussed issues involving an EEO charge and other concerns. The hearing was called to develop the facts whether Claimant acted with hostility toward another employee. The other issues may by themselves be relevant but not to the incident under charge. The hearing officer has a responsibility to hold a fair and impartial investigation and, through the course of the investigation, to develop the fact of the incident under charge. The hearing officer was fulfilling his duties to keep the investigation focused on the charge while allowing Claimant some range to testify in her own words. The hearing was not held regarding EEOC charges; it was held regarding her improper behavior of April 15, 2021. An EEOC charge and safety hotline complaint were unrelated to Claimant threatening and being

openly hostile to Brakeman Cuevas. The allegation the hearing officer prevented Claimant from offering relevant testimony is not supported by the record.

The charging manager testified that he attempted to retrieve video of the incident yet was unable to download it as he did not have access. This did not prevent each witness from offering first person testimony of the events as they occurred. Just as relevant is the Organization did not request a recess to secure the video. Video evidence may have ben relevant but, based on the record, would not have altered the facts as presented. Claimant's rights were not prejudiced in the absence of video footage of the incident.

Claimant received all due process consideration and received a fair and impartial hearing. Claimant was fully apprised of the nature of the charges made. The investigation was held in a timely manner. During the investigation, Claimant and his representative could examine and cross-examine any of the witnesses present at the hearing. The finding of guilt was based solely upon information brought forth during the investigation. Viewing the record, Claimant was afforded substantial procedural due process. There exists no basis to conclude otherwise. Accordingly, your appeal must remain denied.

Sincerely,

James T. Boyle
Manager – Labor Relations
Union Pacific Railroad

Attached:
Claimant's Discipline History

# EXHIBIT N

SHEET METAL | AIR | RAIL | TRANSPORTATION

SMART®

**TRANSPORTATION DIVISION GO887**

UNION PACIFIC WEST • CENTRAL CALIFORNIA TRACTION • STOCKTON TERMINAL & EASTERN • SAN JOAQUIN VALLEY • CALIFORNIA NORTHERN • TRONA

**500 MENLO DRIVE, SUITE 130 • ROCKLIN, CA 95765 • E-MAIL – go887smart-td@utugc887.com**
**775-313-7298 (TODD) 530-515-3376 (KURT) 909-532-2385 (KEVIN)**

**Kurt C. Berg**
**1st Vice General Chairperson**

**W. Todd Campbell**
**General Chairperson**

**Kevin Smith**
**General Secretary**

**Ruben Lomas**
**Vice General Chairperson**

January 30, 2024

SMART-TD File No. 22017 LA
NRAB-00001-220367
AWARD NO. 31560
CA Washington

Mr. Anthony Ray, Local Chairperson
SMART-TD Local 1422

Dear Mr. Ray:

Please refer to the claim of MS Redmon for removal of Permanent Dismissal status from Union Pacific, resulting from an investigation held on March 9, 2022.

The claim was heard before the NRAB – First Division on November 30, 2023. The Board rendered its decision and sustained the claim in part. A copy of the Award is enclosed for your records. Please provide Claimant with a copy of this letter and attached Award.

Yours truly,

*W. Todd Campbell*

W. Todd Campbell
General Chairperson

Form 1 **NATIONAL RAILROAD ADJUSTMENT BOARD**
**FIRST DIVISION**

**Award No. 31560**
**Docket No. 51449**
**24-1-NRAB-00001-220367**

**The First Division consisted of the regular members and in addition Referee Jacquelin F. Drucker, Esq. when award was rendered.**

**PARTIES TO DISPUTE:** (SMART Transportation Division
(
(Union Pacific Railroad Company

**STATEMENT OF CLAIM:**

> **"Request of BRAKEMAN (ONE) M Redmon (Claimant) EID XXXXXX, Los Angeles Service Unit, for removal of Permanent Dismissal status, reinstatement to service with seniority unimpaired, compensation for all time lost and restoration of vacation/retirement credits. Claim includes payment for all wage equivalence to which Claimant is entitled, such as medical/dental benefits and for any monetary loss for such coverage while dismissed from service."**

**FINDINGS:**

**The First Division of the Adjustment Board, upon the whole record and all the evidence, finds that:**

**The carrier and the employee involved in this dispute are respectively carrier and employee within the meaning of the Railway Labor Act, as approved June 21, 1934.**

**This Division of the Adjustment Board has jurisdiction over the dispute involved herein.**

**Parties to said dispute were given due notice of hearing thereon.**

**The Board, having reviewed the record in its entirety and having considered the parties' respective positions, concludes that the Carrier has established by substantial evidence that the incident at issue did occur. The record, however, does not support a**

finding that dismissal of the Claimant, who established seniority with the Carrier in 1990, is warranted.

Claim sustained in part, in accordance with the Findings. Claimant is to be reinstated to work on a last-chance basis, with the understanding that if Claimant again engages in conduct or behavior that is the same as or similar to the incidents of February 10, 2022, Permanent Dismissal will result. No back pay is awarded.

## AWARD

Claim sustained in accordance with the Findings.

## ORDER

This Board, after consideration of the dispute identified above, hereby orders that an award favorable to the Claimant be made. The Carrier is ordered to make the Award effective on or before 30 days following the postmark date the Award is transmitted to the parties.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 24th day of January 2024.

# EXHIBIT O

UNITED STATES OF AMERICA
**RAILROAD RETIREMENT BOARD**
FIELD SERVICE
844 NORTH RUSH STREET
CHICAGO, IL 60611-1275
WWW.RRB.GOV

OFFICE HOURS: 9:00 AM TO 3:00 PM
MONDAY THROUGH FRIDAY EXCEPT FEDERAL HOLIDAYS

TOLL-FREE NUMBER: 1-877-772-5772

February 22, 2024

RANDI M MAZZARA
2221 E SOUTH
REDWOOD DR
ANAHEIM CA 92806

In reply refer to
Employee Name: Randi M Mazzara

RRB-IPS-AJ3797F

Dear Ms. Mazzara:

This is in response to your inquiry regarding returning to railroad service.

The Railroad Retirement Board regulations do not prevent you from returning to railroad employment after starting your Railroad Retirement annuity and relinquishing your seniority rights. However, as stated in Form G-77a, How Work Affects Your Railroad Retirement Benefits, "A railroad retirement annuity is not payable for any month in which you work for a railroad or railroad labor organization."

Our regulations state the annuity must be suspended effective the first of the month in which the annuitant returns to railroad service. A signed statement from the annuitant is required providing the name of the railroad employer and the date of return to work, as well as an agreement to pay back any benefits paid after the return to work. Upon ceasing work from the railroad employer again, a Form G-88, Certification of Termination of Service and Relinquishment of Rights, must be completed by the annuitant and submitted to the Railroad Retirement Board to reinstate the annuity.

Therefore, you may return to work for Union Pacific Railroad. However, you must submit a statement with the required information immediately upon your return to work. Your annuity will be suspended during the time you are working at the railroad. It will be reinstated upon your ceasing railroad employment and submission of the Form G-88.

I have enclosed Form G-77a explaining the effect of work for a railroad as well as Form G-88 for you to submit when you again cease work.

If you have any questions, please contact us at 1-877-772-5772.

Sincerely,

for Susan McGranahan
Operations Support Specialist

CUSTOM (01-13)

# EXHIBIT P

| | |
|---|---|
| From: | Safety Hotline Reporting System |
| Subject: | Safety Hotline Issue Requires Attention for Issue # 141833 - Other |
| Priority: | Medium |
| Sent: | 04/05 16:21 |
| Expires: | 05/05 11:21 |

**A Safety Hotline issue created by you, has been updated.**

## Safety Hotline

**Issue ID:141833** **Other**

### Description

Alameda Corridor MP0.0 AC000 - MP10.6 AC106Conductor refuses to acknowledge Health & Safety of crew to close his cab window while train is moving through or sitting in the Alameda Corridor tunnel. Trapped diesel exhaust particles & fumes from passing trains, standing trains with refrigeration units running, consume cab. Noise is intolerable from wheels cutting the rail even with earplugs.There was a pallet fire at approx MP. 8.5 where smoke and ash lingered for 2 days. I had asked the conductor if he would close his window and I would run the A/C...no. Please address this issue if he would close his window where applicable not only in tunnel. Passing trains poise a great health risk not only in the tunnel.If you are interested in viewing outward camera LOG44-01 UP7029..at approx 23:35 going west through the Corridor.Window wide open with 2 westbound trains BNSF7539 and UP7663 Manifest. MP8.5 smoke residual from Pallet Company fire that occurred above corridor in Compton.Window is always wide open.Thank you.

### Resolution

*** Eduwiges Samaniego *** : Thank you for reporting. *** Comment Added at 04/05/21 02:17 PM *** *** Comment Added at 04/05/21 02:21 PM ***

### Issue Details

| | |
|---|---|
| **Issue ID** | 141833 |
| **Status** | Open |
| **Stage** | In Progress |
| **Category** | Other |
| **Initiated By** | Randi M Mazzara |
| **Initiated By Employee Id** | 0229159 |
| **Primary Owner** | Joseph G Martell III |
| **Secondary Owner** | Trevor M Wiley |
| **Location** | AC000, EAST REDONDO, CA |
| **Region** | Southern |
| **Service Unit** | Los Angeles |
| **Subdivision** | Alameda Corridor |

This was not entered as an exhibit although the request was made
It was ignored by the Conducting Manager J.M. Feetham

# EXHIBIT Q

**Congressman J. Luis Correa**
**2323 N. Broadway Ste. 319**
**Santa Ana, CA 92706**
**(714) 559-6190**

## *Honorable Congressman J. Luis Correa*
## *46th Congressional District*
# CASE AUTHORIZATION FORM

*In compliance with the Privacy Act of 1974, it is necessary for us to have your authorization with a completed form and your handwritten signature. Form must be completed in English, otherwise full translation of non-English text and translator's certification of competence must be provided.*

*Mr./Ms/Mrs.* Randi (*First Name*) Mae (*Middle Name*) Mazzara (*Last Name*)

Date of Birth: 10/27/55 Place of Birth: Los Angeles, Ca

Social Security #: 563 / 27 /6967 Service Number: ________ *(If Applicable)*

Address: 2221 E. South Redwood Dr. (*Street Number/Name*) ________ (*Apt. Number*) Anaheim (*City*) 92806 (*Zip Code*)

Email: Rmazzara55@gmail.com Home/ Cell Phone: 714-325-4280 cl
714-774-8794 hm

**Brief description of the issue:**

I seek Rep. Correa's assistance in routing a letter to a National Mediation Board Arbitrator Edwin Benn On the advice of my former union BLET, I have drafted a letter to the arbitrator who ruled on my claim. At isssue is reinstatement to my former position on the Union Pacific Railroad with, or without, my 32 years of seniority. I am happy to meet with your staff to discuss this further. Thank you.

Issue with what (check all that apply):

- ☐ Department of Veterans Affairs ☐ Department of Defense ☐ National Archive (Personnel Records Admin.)
- ☐ IRS ☐ Social Security Administration ☐ HUD ☑ Other: National Mediation Board

***I, (print your name)*** Randi M. Mazzara ***, hereby authorize the Honorable Congressman J. Luis Correa and his staff to work on my behalf with any federal agency relevant to the matter described below, to receive and review any information contained in my file and, if necessary, to forward any pertinent correspondence sent by me regarding this matter.***

Signature: [signature] Date: 2/29/2024

** Please attach any other relevant documents to be considered for this case.*
*** Please allow **at least 45 days** for our office to provide you a response regarding your concern.*

February 27, 2024

Attn: NMB Board Members
Re: Arbitrator Edwin Benn
1301 K Street NW #250 East
Washington, DC 20005

RE: Clarification of Arbitration Ruling; PLB 7721 award # 121 case #121

Dear Mr. Benn,

I am writing regarding your decision associated with my Public Law Board No.7721 Award #121, Case #121 dated May 16, 2022. On the advice of BLET General Chairman Brian Carr (via Administrative Assistant Doreen Coffman), I was advised to write you directly for clarification of this award.

I am a 32-year employee of the Union Pacific Railroad Company who was fired for a rule violation (1.6-Quarrelsome) in 2021. As you may recall, by the time my case progressed through the appeal process and finally found its way to you, I had retired. Regardless, my ultimate desire was always reinstatement with my 32 years of seniority preserved. While your decision does seem to recognize my years of seniority and discipline-free service (save the one exception), you also acknowledged rule violation and stipulated "no back pay".
However, the issue of reinstatement was left unresolved due, in part, to my retirement status. Therefore, I respectfully request clarification on this point.

After reading your decision, you may not have been aware that returning to work from retirement is a relatively straightforward process. Railroad Retirement Board (RRB) is notified, pension compensation ceases, and the employee is returned to the carrier's payroll system. There is no money owed or repaid to the RRB.
Just recently, I received a copy of an Arbitration Award from a fellow co-worker, M.S. Redmon who coincidentally, was fired for the same rule infraction that I was 1.6 Quarrelsome. He too had "retired" and was collecting his RRB pension. Being of similar age and years of seniority as myself, you can see in his award he was reinstated with all seniority rights preserved but with no back pay (see attached).
Not to criticize my co-worker's employment record, but he had many disciplinary events over the course of his career. I had only one.
I have contacted the UPRR Labor Relations Department and spoke with Ms. Wilderman, Director of Labor Relations. I did request reinstatement.
In response, Ms. Wilderman indicated I could return to work, but only as a "new hire" Switchman/Brakeman or as a company official, i.e., manager.
Essentially, my 32 years of nearly blemish-free service was being erased by the UPRR.

In closing, my request is for clarification of our decision in my case. While it is

# EXHIBIT R

# NATIONAL MEDIATION BOARD
WASHINGTON, D.C. 20572

[redacted]

March 27, 2024

SENT VIA EMAIL

Office of Rep. J. Louis Correa
2323 N. Broadway Suite 319
Santa Ana, CA 92706

Dear Representative Correa:

Thank you for your inquiry regarding an arbitration award related to Randi M. Mazzara and her request for clarification.

As background, the Railway Labor Act (RLA) established a specific procedure for handling minor disputes, which are grievances growing out of the interpretation and/or application of collective bargaining agreements. The National Railroad Adjustment Board (NRAB) was created to administer this arbitration process. In 1966, Section 3 of the Act was amended to create public law boards on individual rail carriers to dispose of grievances, such as the discipline appeal at issue here. The National Mediation Board funds and administers these public law boards but has no jurisdiction to enforce or vacate an arbitration award issued by one of these boards and is not a party to any action to enforce or vacate an arbitration award.

Award No. 121, issued by Public Law Board No. 7721 addressed Ms. Mazzara's dismissal from Union Pacific. The award, attached here, explicitly states that "we shall not require Claimant's reinstatement." The NMB does not have the authority to overrule the determination of a public law board. Boards are created by agreement between carriers and unions and any process for seeking clarification from the arbitrator would be part of the agreement establishing Public Law Board No. 7721.

As noted above, the NMB does not have jurisdiction to enforce or vacate arbitration awards. Section 3 of the Railway Labor Act provides procedures for enforcing or vacating awards of public law boards. A union or individual may petition for enforcement in federal district court. Such action must generally be filed within two years.

Please do not hesitate to contact me if you have additional questions.

Maria-Kate Dowling

[redacted]
General Counsel

MARIA KATE DOWLING
CHIEF LEGAL OFFICER
GENERAL COUNSEL

# PROOF OF SERVICE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 19200 Von Karman Avenue, Suite 600, Irvine, CA 92612

On March 13, 2026**,** I served the foregoing document described as

**AMENDED PETITION FOR JUDICIAL REVIEW OF ARBITRATION AWARD UNDER THE RAILWAY LABOR ACT 45 U.S.C. §153**

on the interested parties in this action by placing a true copy thereof in a sealed envelope addressed as set forth:

[ X ] (**BY U.S. MAIL**) I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **BY ELECTRONIC SERVICE:** I caused a copy of such document(s) to be delivered via electronic service pursuant to C.C.P. § 1010.6 and Cal. Rules of Court, rule 2.256. My electronic service address is: shannon@sclesq.com

Union Pacific Railroad

Jim Vena - President
1400 Douglas St
Omaha, NE 68179

BLET
Mark Wallace - President
7061 E Pleasant Valley Rd
Independence, OH 44131

Executed on **March 13, 2026**, at Santa Ana, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Shannon C. Lamb